**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE LISA W. WANG, JUDGE**

LEXJET, LLC, ABAQA, LLC, and BRAND MANAGEMENT GROUP, LLC,

Plaintiffs,

v.

UNITED STATES,

Defendant.

Court No. 26-3150

**DEFENDANT'S MOTION TO DISMISS OR FOR JUDGMENT ON THE PLEADINGS**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

AN HOANG
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
(202) 616-3226
An.Hoang@usdoj.gov

*Attorneys for Defendant*

OF COUNSEL:

HEATHER HOLMAN
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230

October 9, 2026

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LISA W. WANG, JUDGE

| | |
|---|---|
| LEXJET, LLC, ABAQA, LLC, and BRAND MANAGEMENT GROUP, LLC, | |
| Plaintiffs, | |
| v. | Court No. 26-3150 |
| UNITED STATES, | |
| Defendant. | |

**ORDER**

Upon consideration of Defendant's Motion to Dismiss or for Judgment on the Pleadings, and other papers and proceedings herein, it is hereby

**ORDERED** that the Defendant's motion is granted; and it is further

**ORDERED** that the Complaint is dismissed for lack of jurisdiction.

Dated: _______________
New York, New York

_________________________________
Judge

# TABLE OF CONTENTS

# TABLES OF AUTHORITIES

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE LISA W. WANG, JUDGE**

| | |
|---|---|
| LEXJET, LLC, ABAQA, LLC, and BRAND MANAGEMENT GROUP, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | Court No. 26-3150 |

**DEFENDANT'S MOTION TO DISMISS OR FOR JUDGMENT ON THE PLEADINGS**

Pursuant to Rule 12(b)(1) and (c) of the Rules of the United States Court of International Trade (USCIT R.), defendant, the United States, respectfully requests that the Court dismiss the complaint filed by Lexjet LLC, Abaqa, LLC, and Brand Management Group, LLC (collectively, plaintiffs), or enter judgment in favor of the United States, because the complaint fails to state any claim within the Court's jurisdiction.

Plaintiffs fail to meet their burden of demonstrating the Court's jurisdiction under either 28 U.S.C. § 1581(c) or (i). The Department of Commerce's (Commerce) decision to not initiate a changed circumstance review (CCR) and revoke an antidumping duty order is not reviewable under section 1581(c) because the decision was not published in the *Federal Register*. Plaintiffs cannot instead invoke the Court's residual jurisdiction under section 1581(i) because plaintiffs can seek revocation by raising the same allegations regarding a lack of U.S. industry before the United States International Trade Commission, or by participating in Commerce's next annual review of the antidumping duty order. The Court should therefore dismiss the complaint for lack of jurisdiction.

In the alternative, even if the Court were to determine that jurisdiction exists, plaintiffs cannot demonstrate that Commerce's determination is irrational when it is undisputed that the domestic industry continues to express interest in maintaining the antidumping duty order. And, plaintiffs cannot demonstrate a due process violation when Commerce considered plaintiffs' CCR request on the merits, nor can they demonstrate an equal protection violation when the Government clearly has substantial interests in preventing dumping and in enforcing trade laws. Accordingly, the Court should grant judgment on the pleadings in favor of the United States if the case is not dismissed for lack of jurisdiction.

## BACKGROUND

Plaintiffs challenge Commerce's June 8, 2026 determination to not initiate a changed circumstances review to partially revoke the antidumping duty order on artist canvases from the People's Republic of China (China). Compl. ¶ 1, Dkt. No. 2; *see* Ex. A.[1]

### I. Statutory and Regulatory Background

Commerce's authority to revoke an antidumping duty order is grounded in 19 U.S.C. § 1675. By its terms, Commerce "may revoke, in whole or in part, . . . an antidumping duty order" upon completion of a changed circumstances review. 19 U.S.C. § 1675(d)(1). If Commerce "decides that changed circumstances sufficient to warrant a review exist, {it} will conduct a changed circumstances review in accordance with {19 C.F.R.} § 351.221." 19 C.F.R. § 351.216(d); *see* 19 U.S.C § 1675(b)(1). Specifically, Commerce may revoke an antidumping duty order if:

> (i) Producers accounting for substantially all of the production of the domestic like product to which the order (or the part of the order to

---

[1] Exhibit A is a copy of Commerce's June 8, 2026 determination not to initiate a changed circumstances review in response to plaintiffs' request.

> be revoked) . . . pertains have expressed a lack of interest in the order . . .; or
>
> (ii) Other changed circumstances sufficient to warrant revocation or termination exist.

19 C.F.R. § 351.222(g); *see also* 19 U.S.C. § 1677m(h)(2). "{T}he party seeking revocation of an order . . . shall have the burden of persuasion with respect to whether there are changed circumstances sufficient to warrant such revocation." 19 U.S.C § 1675(b)(3).

## II. Scope of "Artist Canvas"

In March 2006, Commerce published a final determination on antidumping duties for artist canvases from China. *Final Determination of Sales at Less Than Fair Value: Certain Artist Canvas from the People's Republic of China*, 71 Fed. Reg. 16116 (Dep't of Commerce Mar. 30, 2006). The resulting antidumping duty order included specific scope language, exclusions, and subheadings of the Harmonized Tariff Schedule of the United States (HTSUS) and stated that "{Commerce's} written description of the scope of this proceeding is dispositive." *Notice of Antidumping Duty Order: Certain Artist Canvas from the People's Republic of China*, 71 Fed. Reg. 31154 (Dep't of Commerce Jun. 1, 2006) (AD Order); *see also* Compl. ¶¶ 9–10.

In July 2015, after receiving a scope ruling request from Tara Materials, Inc. (Tara), a domestic producer of artist canvases, Commerce issued a scope ruling determination that print canvases were within the scope of the AD Order. Ex. B; Ex. C; *see* Compl. ¶ 17.[2, 3] In reaching that determination, Commerce found that "print canvas is manufactured in the same manner as other subject artist canvas using the same materials" and that "'printable canvases' are

[2] Exhibit B is a copy of Commerce's July 13, 2025 final scope ruling on "print canvas."

[3] Exhibit C is a copy of Tara's scope inquiry as to whether "a form of Artist Canvas called 'Print Canvas' is within the scope of the {AD Order}."

specifically cited in the scope language of the {AD Order} as an example of subject merchandise." Ex. B at 4; Ex. C; *see* Compl. ¶ 10.

**III. Related Litigation**

In April 2023, United States Customs and Border Protection (CBP) issued penalty notices to Lexjet, LLC, Abaqa, LLC, Brand Management Group, LLC, S-One, Nevada, LLC, and S-One Holdings Corporation (Subject Companies), and sought a monetary penalty of $11,057,866.28 for the Subject Companies' failure to take reasonable measures to correctly classify 167 entries of artist canvases manufactured in China. *See* Complaint ¶¶ 9–21, *United States v. Lexjet*, No. 23-105 (Ct. Int'l Trade May 15, 2023), Dkt. No. 2. In May 2023, the United States filed suit to recover the lawful duties, taxes, fees and penalties resulting from the Subject Companies' violations of 19 U.S.C. § 1592(a). *See id*. at ¶¶ 22–27. This litigation remains ongoing. *See* Order, *United States v. Lexjet*, No. 23-105 (Ct. Int'l Trade June 18, 2026), Dkt. No. 47 (granting amended discovery schedule).

Separately, in August 2023, Printing Textiles, LLC (Printing Textiles), received a final scope ruling from Commerce that "canvas banner matisse" was within the scope of the AD Order. *Printing Textiles, LLC v. United States*, 731 F. Supp. 3d 1366, 1368–70 (Ct. Int'l Trade 2024). In September 2023, Printing Textiles challenged Commerce's scope ruling by filing a complaint pursuant to 28 U.S.C. § 1581(c). *Id*. at 1369. Printing Textiles alleged, among other things, that the AD Order was unconstitutionally vague and failed to provide "adequate notice" and "due process." *Id*. In October 2024, this Court rejected Printing Textiles' arguments and sustained Commerce's scope ruling. *Id*. at 1377. At the time represented by the same counsel as plaintiffs in the present case, Printing Textiles subsequently appealed this Court's decision while maintaining that the AD Order is "void-for-vagueness and unconstitutional." *See* Corrected Brief of Appellant 2, *Printing Textiles, LLC v. United States*, No. 25-1213 (Fed. Cir. July 30, 2025),

Dkt. No. 43.[4] On appeal, the Federal Circuit rejected all of Printing Textile's arguments and found that Commerce' scope ruling "was supported by substantial evidence, . . . did not unlawfully expand the scope of the {AD Order}, and was not otherwise arbitrary or capricious as to its scope determination{.}" *Printing Textiles, LLC, DBA Berger Textiles v. United States*, No. 2025-1213, 2026 WL 2509568, at *5 (Fed. Cir. Aug. 26, 2026).

**IV. Changed Circumstances Review**

In April 2026, plaintiffs requested that Commerce "conduct a changed circumstance review to partially revoke the {AD Order} on certain artist canvas from {China}" and exclude their "100% polyester print canvas" from the scope of the order. Ex. D at 1.[5, 6] Plaintiffs acknowledged that Ecker Textiles, LLC (Ecker), which had purchased Tara, "accounts for mostly all of print canvas domestic production." Ex. D at 2. But based on assertions that "it is unclear whether Tara/Ecker has ever made a 100% polyester print canvas," plaintiffs argued that Ecker and Tara "have had and have a lack of interest in producing 100% polyester print canvas." Ex. D at 2, 12; *see also* Ex. D at 21 (asserting that "neither Ecker, nor {Tara}, have produced 100% polyester print canvas since . . . 2006"). Plaintiffs further represented that the domestic industry's position was "that duties should not apply to 100% polyester print canvas." Ex. D at 3. Plaintiffs therefore claimed sufficient changed circumstances "to warrant a review" and

---

[4] Printing Textiles does business as "Berger Textiles." *Printing Textiles, LLC, DBA Berger Textiles v. United States*, No. 2025-1213, 2026 WL 2509568, at *1 (Fed. Cir. Aug. 26, 2026). The Government was joined by Ecker Textiles, LLC as defendant-appellees in the appeal. *Id*.

[5] Exhibit D is a copy of plaintiffs' April 23, 2026 CCR request, without exhibits.

[6] Plaintiffs had filed a substantially similar CCR request in January 2026, but Commerce rejected the request without considering its rebuttal because "it was submitted the day of Commerce's . . . decision." Ex. G at 1–2. Plaintiffs therefore resubmitted their CCR request in April 2026. Ex. D at 21.

requested that the AD Order's scope be amended to exclude "100% polyester printable canvases" and "reflect Tara's and Ecker's lack of interest." Ex. D at 2, 4; *see also* Ex. D at 21.

Later in April 2026, Ecker submitted its letter in opposition to plaintiffs' CCR request. Ex. E.[7] In its letter, Ecker contradicted plaintiffs' assertions and stated that it produces 100 percent polyester canvas and that it has a "continued interest in coverage of that product." Ex. E at 2; *see also* Ex. F at 3–4 (providing a product description of Ecker's "100 percent polyester print canvas").[8] Because plaintiffs request was "based . . . on an inference stemming from a factually inaccurate claim regarding the domestic industry's production capabilities" instead of an "affirmative statement" of the domestic industry's lack of interest, Ecker argued that the request was deficient in view of Commerce's regulations and should be rejected. Ex. E at 2 (quoting 19 C.F.R. § 351.222(g)(1)(i)).

In June 2026, plaintiffs filed a letter in response to Ecker's opposition. Ex. H.[9] Notwithstanding Ecker's opposition, plaintiffs realleged that they had produced "facts as substantial evidence . . . that show a lack of interest by Tara and Ecker." Ex. H at 3. Plaintiffs further argued that "{i}nterest of the domestic industry is not the only factor in CCRs" and that they had shown "other changed circumstances sufficient to warrant a partial revocation" based on alleged "misstatements and omissions" made during the antidumping investigation. Ex. H at 5–7; *see* Ex. D at 21–22.

---

[7] Exhibit E is a copy of Ecker's April 29, 2026 letter opposing plaintiff's CCR request.

[8] Exhibit F is a copy of Ecker's February 20, 2026 letter opposing plaintiff's prior CCR request.

[9] Exhibit H is a copy of plaintiffs' June 2, 2026 letter response to Ecker's opposition.

On June 8, 2026, Commerce determined not to initiate a CCR of the AD Order. Ex. A. Commerce stated that, "{p}ursuant to 19 C.F.R. § 351.222(g)(1)(i), {its} practice is to initiate a CCR to revoke an order . . . when the request is accompanied by a statement of no interest from the domestic industry." Ex. A at 2. Here, however, plaintiff's "CCR Request contains no statements from the domestic industry expressing a lack of interest in the requested merchandise's coverage by the {AD Order}" and "the only statement from the domestic industry . . . expresses continued interest." Ex. A at 2. Accordingly, Commerce found that "initiating a CCR based on {plaintiffs'} request would be inappropriate." Ex. A at 2. Addressing plaintiffs' arguments, Commerce found the fact of whether Ecker actually produced 100% polyester printable canvas immaterial to whether it should initiate a CCR based on lack of interest by the domestic industry. Ex. A at 3. Similarly, plaintiffs' allegations regarding Ecker's "fraudulent omissions and misstatements" regarding its production did not warrant a CCR because domestic production was not relevant to Commerce's investigation of foreign companies. Ex. A at 3–4. Accordingly, Commerce found that plaintiffs did not identify any "other changed circumstances sufficient to warrant revocation" and rejected plaintiffs' CCR request. Ex. A at 3–4.

**V. Present Case**

On June 27, 2026, plaintiffs filed their complaint to "contest the June 8, 2026, Determination Not to Initiate a Changed Circumstances Review." Compl. ¶ 1. Plaintiffs request that this Court direct "Commerce to initiate a CCR as requested," "declare the {AD Order} unconstitutional, null and void," and "{o}rder CBP to refund Plaintiffs the difference between any tariffs collected by CBP on their imports of 100% polyester print canvas products . . . and the ad valorem tariff that would otherwise apply on these imports." Compl. at 15.

## ARGUMENT

### I. Legal Standards

#### A. Rule 12(b)(1) Motion to Dismiss

The Court's determination of its subject matter jurisdiction is a threshold inquiry. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94–95 (1998). Federal courts are "presumed to be 'without jurisdiction' unless 'the contrary appears affirmatively from the record.'" *DaimlerChrysler Corp. v. United States*, 442 F.3d 1313, 1318 (Fed. Cir. 2006) (citations omitted). "{W}hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). A party seeking to invoke the Court's jurisdiction has the burden of establishing that jurisdiction exists. *Norsk Hydro Can., Inc. v. United States*, 472 F.3d 1347, 1355 (Fed. Cir. 2006).

Whether to grant a motion to dismiss for lack of jurisdiction is a question of law. *JCM, Ltd. v. United States*, 210 F.3d 1357, 1359 (Fed. Cir. 2000). When a "motion challenges a complaint's allegations of jurisdiction, the factual allegations in the complaint are not controlling and only uncontroverted factual allegations are accepted as true." *Shoshone Indian Tribe of Wind River Reservation, Wyo. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012). To "resolv{e} these disputed predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings." *Id.* (internal quotation marks and citation omitted).

#### B. Rule 12(c) Motion for Judgment on the Pleadings

Pursuant to USCIT R. 12(c), "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." "The court may grant judgment on the pleadings if there are no material facts in dispute and the moving party is entitled to

judgment as a matter of law." *Keirton USA, Inc. v. United States*, 600 F. Supp. 3d 1270, 1272 (Ct. Int'l Trade 2022) (citing *N.Z. Lamb Co. v. United States*, 40 F.3d 377, 380 (Fed. Cir. 1994)). A motion for judgment on the pleadings is reviewed under the same standard as a motion to dismiss for failure to state a claim. *See Forest Labs., Inc. v. United States*, 403 F. Supp.2d 1348, 1349 (Ct. Int'l Trade 2005), *aff'd*, 476 F.3d 877 (Fed. Cir. 2007). To survive a motion under Rule 12(c), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim of relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court should grant a motion for judgment on the pleadings if the complaint fails to present a "legally cognizable right of action," *Twombly*, 550 U.S. at 555, or does not, through factual allegations, "elevate a claim for relief to the realm of plausibility," *Laguna Hermosa Corp. v. United States*, 671 F.3d 1284, 1288 (Fed. Cir. 2012).

## II. Plaintiffs' Complaint Fails to State a Claim Within This Court's Jurisdiction

Plaintiffs claim that their "facts and assertions, substantial evidence, clearly show Ecker's and Tara's lack of interest in producing 100% polyester print canvas" and that they have "clearly met the burden of persuasion with respect to whether there are changed circumstances sufficient to warrant revocation" of the AD Order. Compl. ¶ 27. But plaintiffs fail to meet their burden of demonstrating this Court's jurisdiction. The Court does not possess jurisdiction pursuant to 28 U.S.C. § 1581(c) to review Commerce's decision not to initiate a CCR in this case because the decision was not published in the *Federal Register*. Nor does the Court have jurisdiction under 28 U.S.C. § 1581(i) when plaintiffs could request the same relief — revocation of the AD order — by either: (1) challenging the existence of a U.S. industry with the International Trade Commission (ITC); or (2) raising the issue of Ecker and Tara's domestic production of 100%

polyester print canvas in the next annual review. Accordingly, the Court should dismiss the complaint for lack of jurisdiction.

And even if the Court determines that jurisdiction exists, plaintiffs do not state a plausible claim of relief to disturb Commerce's determination to not initiate a CCR when the domestic industry expresses continued interest in maintaining the AD Order on 100% polyester print canvas. In the alternative to dismissing plaintiffs' complaint, the Court should therefore enter judgment on the pleadings in favor of the United States.

**A. The Court Lacks Jurisdiction to Entertain Plaintiffs' Claims**

The Court's jurisdiction is governed by 28 U.S.C. § 1581, and the "'particular laws over which the Court {} may assert jurisdiction' are further specified in each subsection of § 1581." *Rimco Inc. v. United States*, 98 F.4th 1046, 1051 (Fed. Cir. 2024) (quoting *Nat'l Corn Growers Ass'n v. Baker*, 840 F.2d 1547, 1555 (Fed. Cir. 1988)).

Section 1581(c) provides jurisdiction for the Court's review of civil actions brought under section 516A of the Tariff Act of 1930. 19 U.S.C. § 1516a. Pursuant to 19 U.S.C. § 1516a(a), the Court reviews Commerce's determinations made pursuant to 19 U.S.C. § 1675 in antidumping and countervailing duty proceedings. *See* 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and (B)(iii). "Interested parties are directed to raise challenges to Commerce's {antidumping duty and countervailing duty} determinations via administrative review proceedings" and "{s}ubsequent judicial review of such proceedings is available under the {Court of International Trade}'s § 1581(c) exclusive jurisdiction." *Rimco*, 98 F.4th at 1054.

In contrast, section 1581(i) provides a "residual" grant of jurisdiction "that allows the {C}ourt to take jurisdiction over designated causes of action founded on other provisions of law." *J.D. Irving, Ltd. v. United States*, 119 F.4th 48, 51 (Fed. Cir. 2024). Whether a party may properly invoke § 1581(i) is a two-step inquiry: (1) the Court determines "whether jurisdiction

under a different subsection of § 1581 could have been available"; and if so, (2) the Court determines "whether the provided remedy would have been manifestly inadequate." *Id.* at 53 (quoting *Rimco*, 98 F.4th at 1053); *see also JSC Acron v. United States*, 893 F. Supp.2d 1337, 1343 (Ct. Int'l Trade 2013). "The party asserting § 1581(i) jurisdiction has the burden to show that such alternative remedy would be manifestly inadequate." *Rimco*, 98 F.4th at 1052 (citing *Sunpreme Inc. v. United States*, 892 F.3d 1186, 1191 (Fed. Cir. 2018)). Plaintiffs are "prohibited from using creative pleading to expand {the Court}'s statutory jurisdiction." *Id*. (quoting *Norsk Hydro Can.*, 472 F.3d at 1355). "Thus, when asserting § 1581 jurisdiction, mere recitation of a basis for jurisdiction, by either a party or a court, cannot be controlling." *Id*. (quotation omitted).

Here, plaintiffs assert that the Court possesses jurisdiction pursuant to section 1581(i), but confusingly suggest that, in the alternative, section 1581(c) confers jurisdiction. Compl. ¶¶ 2–3.

Plaintiffs are clearly wrong as to the applicability of section 1581(c). As recognized by the plaintiffs themselves, section 1581(c) does not provide review of Commerce's decision not to initiate a CCR when its decision is not published in the *Federal Register*. Compl. ¶ 2; *see Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States*, 593 F.3d 1346, 1353 (Fed. Cir. 2010) (*NART II*) ("Section 1516a, in turn, provides for review of decisions not to initiate changed circumstances reviews only when those decisions are published in the Federal Register"); *see also Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States*, 30 CIT 1537, 1544 n.10 (2006) (*NART*), *aff'd in part, vacated in part, rev'd in part*, 593 F.3d 1346 (Fed. Cir. 2010). Commerce's determination to not initiate a CCR was *not* published in the *Federal Register*. Compl. ¶ 30. Therefore, the Court plainly lacks jurisdiction under section 1581(c) to entertain plaintiffs' challenge Commerce's determination. *NART II*, 593 F.3d at 1353.

Moreover, the Court also lacks jurisdiction under section 1581(i) because plaintiffs have adequate alternative remedies by which to seek revocation of the AD Order. In a similar case, the Court dismissed an action seeking review of a Commerce decision not to conduct a CCR of an antidumping duty order for lack of jurisdiction. *AOC Int'l v. United States*, 17 CIT 1412 (1993). In *AOC*, the basis of the plaintiffs' changed circumstances claim was "the lack of a domestic . . . producing industry" where plaintiffs asserted that the domestic company did not engage in any domestic production at all and "therefore the antidumping duty order should be revoked." *Id*. at 1412. The Court, however, noted that revocation of an antidumping duty order can occur through "either an injury reconsideration by ITC or a changed circumstances review by Commerce." *Id*. at 1415. Additionally, "a changed circumstances review may take place within {an} annual review" of the antidumping duty order. *Id*. Accordingly, the plaintiffs in *AOC* had "the right to address the underlying issue of {a specific company's} U.S. production in the next annual review, or they {could} ask ITC to take up the issue immediately in the context of a challenge to the existence of the entire U.S. industry." *Id*. at 1416. Because either proceeding could result in revocation of the antidumping order, and the resulting decisions would be judicially reviewable under section 1581(c), "jurisdiction {did} not lie . . . under 28 U.S.C. § 1581(i)." *Id*.

Under similar facts, the Court should likewise find that plaintiffs have failed to invoke the Court's residual jurisdiction under section 1581(i). Plaintiffs' changed circumstances claim rests on allegations of a lack of any domestic industry for 100% polyester print canvas. *See* Compl. ¶¶ 11–24 (generally restating arguments made to the ITC), 25 (alleging that Ecker "is not engaged in sufficient production-related activity to constitute domestic producer"), 28 (alleging that "Ecker provided no evidence that Tara or it actually made or makes 100% polyester print

canvas."), 29 (alleging that "Ecker has produced no facts, no proof of production"). Accordingly, as in *AOC*, plaintiffs have an alternative remedy to seek a changed circumstances review at the ITC on the basis that no domestic industry for 100% polyester print canvas exists. *AOC*, 17 CIT at 1412 ("if plaintiffs seek revocation of the {AD Order} on the basis that no domestic industry exists, they may raise that issue at any time with the {ITC}."); 19 U.S.C. § 1675(b); *cf. NART*, 30 CIT at 1542 n.8 (explaining that "{l}ike Commerce, the ITC has the authority to reconsider its antidumping determinations based on changed circumstances" but "Congress expressly made the ITC's decision not to initiate a changed circumstances review subject to judicial review" under 19 U.S.C. § 1516a(a)(1)(B)). Or, to the extent that plaintiffs wish to dispute Ecker's production of 100% polyester print canvas, plaintiffs have an alternative remedy to make that challenge before Commerce in an annual review. *AOC*, 17 CIT at 1415. ("changed circumstances relating to one company are normally addressable in a Commerce annual review, which is subject to judicial scrutiny."). The availability of these avenues by which to seek revocation of the AD Order — both of which lead to reviewable determinations under section 1581(c)[10] — precludes section 1581(i) jurisdiction. *Cf. NART II*, 593 F.3d at 1353 (finding jurisdiction under section 1581(i) because the lack of annual administrative reviews meant plaintiff "has no current or future opportunities to get judicial review of Commerce's decision").

Moreover, plaintiffs cannot demonstrate that either avenue would be a "manifestly inadequate" remedy. *JSC Acron*, 893 F. Supp.2d at 1344; *Rimco*, 98 F.4th at 1054. Plaintiffs

---

[10] The ITC's decisions not to initiate a changed circumstances review are published in the *Federal Register*. 19 C.F.R. § 207.45(c). Those decisions are expressly made subject to judicial review by this Court. 19 U.S.C. § 1516a(a)(1)(B). Similarly, Commerce's final results of its administrative reviews are published in the *Federal Register* and therefore reviewable by this Court. 19 C.F.R. § 351.221(b)(5); 19 U.S.C. § 1516a(a)(2)(B)(iii).

were not precluded from seeking revocation of the AD Order, either by requesting a changed circumstances review from the ITC or by participating in an annual review. *See* 19 U.S.C. § 1675(b) (providing for ITC review based on changed circumstances); *Opportunity To Request Administrative Review*, 91 Fed. Reg. 32937 (Dep't of Commerce June 2, 2026) (providing notice to interested parties of the opportunity to request administrative review of certain orders, including the AD Order on "Artist Canvas A-570-899"). If they had, plaintiffs would have been able to raise the issue of Ecker's U.S. production of 100% polyester print canvas as a basis to request revocation of the AD Order. *See AOC*, 17 CIT at 1416. Thus, "adequate remedies exist that will result in determinations which are judicially reviewable under 19 U.S.C. § 1516a." *Id.* at 1413. Because those remedies were available at the time plaintiffs filed their summons and complaint, they may not invoke section 1581(i) jurisdiction. *JSC Acron*, 893 F. Supp.2d at 1347. Accordingly, the Court should dismiss the complaint for lack of jurisdiction.

**B. Plaintiffs Fail to Establish Entitlement to Any Relief**

Leaving jurisdictional issues aside, the Court should still dismiss the complaint because plaintiffs fail to provide any plausible basis to find Commerce's determination irrational. Compl. ¶ 35. It is undisputed that plaintiff's CCR request "contains no statements from the domestic industry expressing a lack of interest" in the AD Order and the complaint asserts none. Ex. A at 2; *see* Ex. D; Compl. ¶¶ 27–29 (only inferring a lack of interest based on domestic production). And it is undisputed that "the only statement from the domestic industry . . . expresses continued interest." Ex. A at 2; Compl. ¶¶ 27 ("Ecker accounts for mostly all of print canvas domestic production"), 28 (acknowledging that Ecker has stated "it was interested in keeping {100% polyester print canvas} covered by the {AD Order}").

Accordingly, plaintiffs assert no plausible basis to overturn Commerce's determination to not initiate a CCR. Commerce's practice is to initiate a CCR "when the request is accompanied

by a statement of no interest from the domestic industry that establishes that '{p}roducers accounting for substantially all of the production of the domestic like product' are no longer interested in maintaining an order covering the merchandise described in the request and, further, will not oppose the partial (or total) revocation of the order with respect to that merchandise." Ex. A (quoting 19 C.F.R § 351.222(g)(1)(i)); *see Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States*, 31 CIT 2040, 2044 (2007) ("In past agency decisions, Commerce has initiated changed circumstances reviews upon the domestic industry's expression of no interest"). Therefore, the decision to not initiate a CCR when plaintiffs cannot provide a statement of no interest from the domestic industry is in accordance with Commerce's practice. *See, e.g., Common Alloy Aluminum Sheet From Germany: Preliminary Results of Changed Circumstances Review, and Intent To Revoke the Antidumping Duty Order, in Part*, 89 Fed. Reg. 7686 (Dep't of Commerce Feb. 5, 2024) ("Thus, both the Act and Commerce's regulations require that 'substantially all' domestic producers express a lack of interest in the order for Commerce to revoke the order, in whole or in part."). Moreover, Commerce's decision is in accordance with prior decisions. *Oy v. United States*, 61 F.3d 866, 875 (Fed. Cir. 1995) ("Revocation must be predicated on a lack of domestic industry interest"); *NART*, 30 CIT at 1542 n.8 (2006) ("Commerce may reconsider one of its own antidumping determinations *if there are no longer any interested parties*" (emphasis added)).

Much of plaintiffs' complaint rests on conclusory allegations that are not entitled to any weight and do not elevate their claims to "the realm of possibility." *Laguna Hermosa Corp. v. United States*, 671 F.3d 1284, 1288 (Fed. Cir. 2012); *see* Compl. ¶¶ 27–29. In particular, plaintiffs allege, without any citation, that "Commerce was legally required to have initiated the CCR in order to evaluate the substantial evidence." Compl. ¶ 33. But plaintiffs overlook that

Commerce may initiate a CCR only when it finds that "changed circumstances sufficient to warrant a review exist" — *e.g.*, when "{p]roducers accounting for substantially all of the production of the domestic like product . . . have expressed a lack of interest in the order." 19 C.F.R. § 351.216(d); 19 C.F.R. § 351.222(g); *see* 19 U.S.C § 1675(b)(1). Commerce therefore is not required to initiate a CCR for every request, nor was it required to accept plaintiffs' assertion that they "provided information 'which shows changed circumstances sufficient to warrant a review.'" Compl. ¶ 32.

At best, plaintiffs' factual allegations can be summarized as contending that Ecker and Tara are not domestic producers of 100% polyester print canvas, and that Ecker and Tara made "misstatements, omissions, and false statements" during administrative proceedings. *See* Compl. ¶ 29. But even accepted as true, plaintiffs' assertions fail to establish that they have a plausible claim for relief because they are ultimately irrelevant to Commerce's determination to not initiate a CCR. Ex. A at 3. Specifically, plaintiffs do not point to any authority that requires Ecker and Tara to produce 100% polyester print canvas before stating an interest in maintaining the scope of the AD Order. *See* Ex. A at 3 ("there is no requirement that specific products be excluded from the scope simply because such products are not available from domestic producers"). Nor do plaintiffs explain why Commerce is required to consider the domestic industry's production or conduct in ITC proceedings. *See* Ex. A at 3 ("Lexjet does not explain how any statements or omissions on the types of products available from domestic production would affect Commerce's determination that was based on the investigation of foreign companies."). In the end, plaintiffs' factual assertions in the complaint are untethered to any basis upon which to challenge Commerce's decision not to initiate a CCR.

### C. Plaintiffs Fail to State Any Cognizable Constitutional Claim

Plaintiffs also assert violations "of due process requirements" and "equal protection of the law of the United States" in counts II and III of the complaint. Compl. ¶¶ 41, 45. At best, however, these claims are derivative of plaintiffs' request for a CCR by Commerce and have no independent merit. In particular, plaintiffs allege a "due process right to 'notice and a meaningful opportunity to be heard'" that was violated "[w]hen Commerce perfunctorily took Ecker's false assertions at face value and without considering the numerous facts presented." Compl. ¶¶ 40–41 (count II). And plaintiffs premise their "equal protection" challenge on the allegation that there is "no material injury to domestic producers that do not exist." Compl. ¶ 46 (count III). But these arguments only restate the basis of plaintiffs' request for a CCR and the basis for their appeal to this Court, *i.e.*, that "Commerce improperly declined to engage with the substance of Plaintiffs' CCR." Compl. ¶ 33 (count I). To the extent that plaintiffs have simply put a "due process" or "equal protection" label on their contention that Commerce should have initiated a CCR, their claims are constitutional in name only. Thus, when plaintiffs claim that they "have been deprived of their property without due process of law" or that the AD Order itself is "unconstitutional," they are only arguing the merits of their challenge to Commerce's decision, not raising a separate constitutional contention. Plaintiffs' recharacterization of their principal claim as constitutional in nature does not create a separate "legally cognizable right of action" or "elevate [their] claim for relief to the realm of plausibility." *Twombly*, 550 U.S. at 555; *Laguna Hermosa*, 671 F.3d at 1288. Accordingly, the Court should enter judgment in favor of the United States on counts II and III.

To the extent plaintiffs raise constitutional claims separate from their contention that Commerce's determination not to initiate a CCR was irrational, those claims still fail as a matter of law. "[T]he Constitution does not provide a right to import merchandise under a particular

classification or rate of duty, or even afford a protectable interest to engage in international trade." *Int'l Custom Prods., Inc. v. United States*, 791 F.3d 1329, 1337 (Fed. Cir. 2015). Accordingly, the Due Process Clause generally guarantees only those procedures "set forth in the antidumping statute or in the agency regulations implementing that statute." *Gulf States Tube Div. of Quanex Corp. v. United States*, 981 F. Supp. 630, 652 (Ct. Int'l Trade 1997). But plaintiffs fail to articulate how they were deprived of any notice or process when requesting a CCR. Plaintiffs were able to file a CCR request (twice) and had the opportunity to make their arguments to Commerce. Compl. ¶ 27; *see* Ex. D. Plaintiffs also had the opportunity to respond to Ecker's opposition to their CCR request. Compl. ¶ 27; *see* Ex. H. Commerce considered the merits of plaintiffs' request and issued a determination explaining why it denied the request. Compl. ¶ 30; *see* Ex. A. Plaintiffs were therefore afforded "notice and a meaningful opportunity to be heard." *PSC VSMP-Avisma Corp. v. United States*, 688 F.3d 751, 761–62 (Fed. Cir. 2012) (quotation omitted). Because the Constitution does not require more, plaintiffs' claim fails and the Court should enter judgment in favor of the United States. *See Transcom, Inc. v. United States*, 294 F.3d 1371, 1380 (Fed. Cir. 2002) ("{N}otice is constitutionally sufficient if it is reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." (quotation omitted)); *see also* 19 U.S.C. § 1675(b); 19 C.F.R. § 351.216.

Plaintiffs allege that the AD Order, on its face, violates equal protection under the Fifth Amendment as "impermissibly discriminating" against "importers who import 100% polyester print canvas from China." Compl. ¶ 44. But plaintiffs fail to explain how their equal protection challenge is within the scope of Commerce's determination on review — *i.e.*, Commerce's decision not to initiate a CCR. Moreover, the AD Order, as with any antidumping duty order,

reflects a "legitimate governmental purpose" of enforcing trade laws and protecting domestic industry. *See SKF USA, Inc. v. U.S. Customs & Border Protection*, 556 F.3d 1337, 1355–60 (Fed. Cir. 2009) (referring to substantial government interests in "preventing dumping" and "enforcing the trade laws"); Compl. ¶ 46. In this case, the ITC determined that "an industry in the United States is materially injured by reason of imports from China of artists' canvas" which Commerce found "to be sold in the United States at less than fair value." *Artists' Canvas From China,* 71 Fed. Reg. 28706 (USITC May 17, 2006). The AD Order therefore is rationally related to the Government's legitimate purposes of preventing dumping to protect U.S. industry and enforcing trade laws. Because plaintiffs' equal protection challenge to the AD Order is neither within the scope of their challenge to Commerce's decision not to initiate a CCR, nor alleges any violation of equal protection under the rational basis standard, the Court should enter judgment in favor of the United States.

**CONCLUSION**

For the foregoing reasons, we respectfully request that the Court dismiss this action for lack of jurisdiction or, in the alternative, enter judgment on the pleadings in favor of the United States.

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

/s/ An Hoang
AN HOANG
Trial Attorney
Commercial Litigation Branch
Civil Division

OF COUNSEL:

HEATHER HOLMAN
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
Enforcement and Compliance
1401 Constitution Avenue, NW

Washington, D.C. 20230

U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
(202) 616-3226
An.Hoang@usdoj.gov

October 9, 2026

*Attorneys for Defendant*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this response complies with the word limitation in Court of International Trade Standard Chambers Procedures § 2(B)(1), and contains approximately 5370 words, excluding the parts of the brief exempted from the word limitation. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

/s/ An Hoang

# EXHIBIT A

Barcode:4927061-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-899
CCR: Lexjet II
**Public Document**
E&C/OIII : DS

June 8, 2026

**MEMORANDUM TO:** Erin Begnal
Director, Office III
Antidumping and Countervailing Duty Operations

**FROM:** Daniel Saba
International Trade Compliance Analyst, Office III
Antidumping and Countervailing Duty Operations

**RE:** Antidumping Duty Order on Certain Artist Canvas from the People's Republic of China

**SUBJECT:** Whether to Initiate a Changed Circumstances Review

---

## I. Summary

For the reasons detailed below, we recommend not initiating a changed circumstances review (CCR) to partially revoke the antidumping duty order on certain artist canvas (artist canvas) from the People's Republic of China (China)[1] in response to the request of Lexjet, LLC, Abaqa, LLC, and Brand Management Group, LLC (collectively, Lexjet).[2]

## II. Background

On April 23, 2026, Lexjet requested that the U.S. Department of Commerce (Commerce) conduct a CCR to partially revoke the *Order*.[3] Specifically, Lexjet asked that Commerce find, on an expedited basis, that changed circumstances warrant the partial revocation of the *Order* with respect to 100 percent polyester print canvas (requested merchandise).[4] Lexjet also requested that the scope of the *Order* be amended to exclude the requested merchandise and that the partial revocation of the order be made retroactive to the date of the *Order*.[5] On April 29, 2026, Ecker Textiles, the domestic producer, filed comments opposing this request.[6] On June 3, 2026, Lexjet filed rebuttal comments regarding Ecker's Comments.[7]

---

[1] *See Notice of Antidumping Duty Order: Certain Artist Canvas from the People's Republic of China*, 71 FR 31154 (June 1, 2006) (*Order*).
[2] *See* Lexjet's Letter, "Request for Changed Circumstances Review," dated April 23, 2026 (CCR Request).
[3] *Id.*
[4] *Id.*
[5] *Id.* at 2-3.
[6] *See* Ecker's Letter, "Lexjet, LLC et al. Second Request for Initiation of a Changed Circumstances Review," dated April 29, 2026 (Ecker's Comments).
[7] *See* Lexjet's Letter, "Response to Opposition to Request for Changed Circumstances Review," dated June 2, 2026

Filed By: Charles Doss, Filed Date: 6/9/26 12:52 PM, Submission Status: Approved
INTERNATIONAL TRADE ADMINISTRATION

## III. Analysis

Under section 751(b)(1) of the Tariff Act of 1930, as amended (the Act), Commerce shall initiate a CCR if it receives a request that shows changed circumstances sufficient to warrant a review. Pursuant to 19 CFR 351.222(g)(1)(i), Commerce's practice is to initiate a CCR to revoke an order in whole or in part when the request is accompanied by a statement of no interest from the domestic industry that establishes that "{p}roducers accounting for substantially all of the production of the domestic like product" are no longer interested in maintaining an order covering the merchandise described in the request and, further, will not oppose the partial (or total) revocation of the order with respect to that merchandise. Once Commerce receives the letter(s) of no interest from the domestic industry, we must determine that the letter indeed came from producers accounting for substantially all of the production of the domestic like product. Commerce has interpreted "substantially all" production normally to mean at least 85 percent of domestic production of the like product.[8]

Lexjet notes that "Ecker now accounts for mostly all of print canvas domestic production" and asserts that "{Ecker has had and has} a lack of interest in producing 100% polyester print canvas."[9] Ecker states that it maintains an interest in the requested merchandise and that it opposes the CCR Request.[10]

We find that the CCR Request is inadequate and does not show changed circumstances sufficient to warrant a CCR pursuant to section 751(b)(1) of the Act and determine not to initiate in accordance with 19 CFR 351.216(b). Specifically, the CCR Request contains no statements from the domestic industry expressing a lack of interest in the requested merchandise's coverage by the *Order*. Furthermore, the only statement from the domestic industry supplied to the record, Ecker's Comments, expresses continued interest in the requested merchandise.[11] Thus, we cannot conclude that "producers accounting for substantially all of the production of the domestic like product {…} have expressed a lack of interest{…}" in order to consider revocation of the *Order*, in part, pursuant to 19 CFR 351.222(g)(1)(i). Accordingly, we find that initiating a CCR based on Lexjet's request would be inappropriate.

---

(filed on June 3, 2026).

[8] *See*, *e.g.*, *Certain Nails from the People's Republic of China: Initiation and Preliminary Results of Antidumping Duty Changed Circumstances Review*, 76 FR 22369 (April 21, 2011), unchanged in *Certain Steel Nails from the People's Republic of China: Final Results of Antidumping Duty Changed Circumstances Review*, 76 FR 30101 (May 24, 2011); *Wooden Bedroom Furniture from the People's Republic of China: Notice of Initiation and Preliminary Results of Changed Circumstances Review, and Intent to Revoke Order in Part*, 74 FR 886 (January 9, 2009), unchanged in *Wooden Bedroom Furniture from the People's Republic of China: Notice of Final Results of Changed Circumstances Review, and Determination to Revoke Order in Part*, 74 FR 8505 (February 25, 2009); and *Certain Orange Juice from Brazil: Preliminary Results of Antidumping Duty Changed Circumstances Review and Intent Not to Revoke, in Part*, 73 FR 60241, 60242 (October 10, 2008), unchanged in *Certain Orange Juice from Brazil: Preliminary Results of Antidumping Duty Changed Circumstances Review*, 74 FR 4733 (January 27, 2009).

[9] *See* CCR Request at 2.

[10] *See* Ecker's Comments at 2-4.

[11] *Id*., generally, and at 1-4.

While Lexjet disagrees with Ecker Textiles on whether Ecker Textiles actually produces the requested merchandise,[12] this disagreement is not material to our analysis. All parties agree that Ecker Textiles accounts for substantially all of the domestic production of subject merchandise *i.e.,* artist canvases.[13] It is not necessary for the domestic industry to produce all types of products within a class or kind of merchandise in order to seek a remedy under an antidumping or countervailing duty order on that entire class or kind of merchandise.[14] Commerce has previously stated that there is no requirement that specific products be excluded from the scope simply because such products are not available from domestic producers.[15] Accordingly, Lexjet's contested assertion that Ecker Textiles does not produce the requested merchandise does not demonstrate that Commerce should initiate a CCR. Rather, Lexjet must demonstrate that "{p}roducers accounting for substantially all of the production of the domestic like product" are no longer interested in maintaining an order covering the merchandise described in the request. Lexjet's CCR has not demonstrated that substantially all the domestic industry is no longer interested in maintaining an order on the requested merchandise. Rather, the evidence on the record demonstrates that substantially all the domestic industry is interested in maintaining an order on the requested merchandise.[16]

Furthermore, Lexjet characterizes the statements of Ecker Textiles' predecessor-in-interest, the petitioner, and Ecker Textiles to Commerce and the U.S. International Trade Commission (ITC) in the investigation and in response to its CCR Request, respectively, as fraudulent omissions and misstatements for not stating that Ecker Textiles does not produce the requested merchandise.[17] Lexjet argues that these alleged omissions and misstatements are sufficient circumstances to warrant a partial revocation of the order with respect to the requested merchandise under 19 CFR 351.222(g)(1)(ii), which allows the Secretary to revoke an order in whole or in part, if "other changed circumstances sufficient to warrant revocation or termination exist." Further, Lexjet argues that Commerce may revisit determinations when found to be based on fraudulent information.[18] We disagree that Lexjet's allegations warrant a CCR to partially revoke the *Order* with respect to requested merchandise. First, Commerce determines whether dumping occurs by investigating foreign companies.[19] Lexjet does not explain how any statements or omissions on the types of products available from domestic production would

---

[12] *See* CCR Request at 22-29.
[13] *Id.*, at 2; *see also*, *generally*, Ecker's Comments.
[14] *See, e.g., Thermal Paper from Japan: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 54157 (September 30, 2021), and accompanying Memorandum, "Final Scope Decision," dated September 24, 2021, at 5.
[15] *See, e.g., Certain Cold-Rolled Steel Flat Products from the Russian Federation: Affirmative Preliminary Determination of Sales at Less Than Fair Value, Affirmative Preliminary Determination of Critical Circumstances, and Postponement of Final Determination*, 81 FR 12072 (March 8, 2016), and accompanying Memorandum, "Scope Comments Decision Memorandum for the Preliminary Determinations," dated February 29, 2016, at 9; *see also Certain Cold-Rolled Steel Flat Products from the Russian Federation: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 81 FR 49950 (July 29, 2016), and accompanying Memorandum, "Final Scope Comments Decision Memorandum," dated May 16, 2016, at 10.
[16] *See* Ecker's Comments.
[17] *See* CCR Request at 34-35.
[18] *Id*., at 29-35, (citing *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1360 (Fed.Cir. 2008)).
[19] *See* sections 733 and 735 of the Act.



Filed By: Charles Doss, Filed Date: 6/9/26 12:52 PM, Submission Status: Approved

affect Commerce's determination that was based on the investigation of foreign companies. Further, we find that the conduct of ITC proceedings is outside of Commerce's purview. As such, we find that Lexjet has not identified any "other changed circumstances sufficient to warrant revocation," within the meaning of 19 CFR 351.222(g)(1)(ii). Accordingly, we find that initiating a CCR based on Lexjet's request would be inappropriate.

## IV. Recommendation

Based on the foregoing analysis, we recommend not initiating a CCR.

☒ ☐

Agree Disagree

Erin Begnal

Erin Begnal
Director, Office III
AD/CVD Operations



Filed By: Charles Doss, Filed Date: 6/9/26 12:52 PM, Submission Status: Approved

# EXHIBIT B

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-899
Scope – Print Canvas
**Public Document**
E&C AD/CVD OIII: PS

July 13, 2015

**MEMORANDUM TO:** Christian Marsh
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**THROUGH:** Erin Begnal
Director, Office III
Antidumping and Countervailing Duty Operations

Andrew Medley AMM
Acting Program Manager, Office III
Antidumping and Countervailing Duty Operations

**FROM:** Paul Stolz
Senior International Trade Compliance Analyst, Office III
Antidumping and Countervailing Duty Operations

**RE:** Antidumping Duty Order on Certain Artist Canvas from the People's Republic of China

**SUBJECT:** Final Scope Ruling: Print Canvas

---

## Summary

On April 28, 2015, the Department of Commerce ("Department") received a scope ruling request from Tara, Inc. ("Tara") regarding artist canvases exported from the People's Republic of China ("PRC").[1] Tara requested a scope ruling determining whether or not a form of artist canvas, *i.e.*, "print canvas," is within the scope of the antidumping order[2] on certain artist canvas from the PRC. On June 1, 2015, the Department issued a supplemental questionnaire to Tara.[3] On June 9, 2015, Tara submitted its supplemental questionnaire response.[4] No other party submitted comments on this Scope-Ruling Request.

[1] *See* letter from Tara entitled "Scope Inquiry – Certain Artist Canvas from the People's Republic of China, Inv. A-570-899," dated April 28, 2015 ("Scope-Ruling Request").

[2] *See Notice of Antidumping Duty Order: Certain Artist Canvas from the People's Republic of China*, 71 FR 31154 (June 1, 2006) ("*Order*").

[3] *See* letter to Tara entitled "Antidumping Duty Orders on Certain Artist Canvas from the People's Republic of China – Scope Ruling Request Supplemental Questionnaire," dated June 1, 2015.

[4] *See* Tara's letter to the Department entitled "Scope Inquiry – Certain Artist Canvas from the People's Republic of China, Inv. A-570-899; Response to Supplemental Questionnaire," dated June 9, 2015 ("Supplemental Response").

In accordance with 19 CFR 351.225(d) and 351.225(k)(1), we recommend that the Department determine that the print canvas that is the subject of this inquiry is within the scope of the *Order* on artist canvas from the PRC.

**Scope of the Order**

The scope of the *Order* states:

> The products covered by this order are artist canvases regardless of dimension and/or size, whether assembled or unassembled, that have been primed/coated, whether or not made from cotton, whether or not archival, whether bleached or unbleached, and whether or not containing an ink receptive top coat.
>
> Priming/coating includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric. Artist canvases (*i.e.*, pre-stretched canvases, canvas panels, canvas pads, canvas rolls (including bulk rolls that have been primed), printable canvases, floor cloths, and placemats) are tightly woven prepared painting and/or printing surfaces. Artist canvas and stretcher strips (whether or not made of wood and whether or not assembled) included within a kit or set are covered by this proceeding.
>
> Artist canvases subject to the order are currently classifiable under subheadings 5901.90.20.00 and 5901.90.40.00 of the Harmonized Tariff Schedule of the United States ("HTSUS"). Specifically excluded from the scope of the order are tracing cloths, "paint-by-number" or "paint-it-yourself" artist canvases with a copyrighted preprinted outline, pattern, or design, whether or not included in a painting set or kit.[5] Also excluded are stretcher strips, whether or not made from wood, so long as they are not incorporated into artist canvases or sold as part of an artist canvas kit or set. While the HTSUS subheadings are provided for convenience and customs purposes, our written description of the scope of this proceeding is dispositive.
>
> Additionally, we have determined that canvas woven and primed in India but cut and stretched in the PRC and exported from the PRC is not subject to the order covering artist canvas from the PRC.

**Legal Framework**

When a request for a scope ruling is filed, the Department examines the scope language of the order at issue and the description of the product contained in the Scope-Ruling Request.[6] Pursuant to the Department's regulations, the Department may also examine other information, including the description of the merchandise contained in the petition, the records from the investigations, and prior scope determinations made for the same product.[7] If the Department

[5] Artist canvases with a non-copyrighted preprinted outline, pattern, or design are included in the scope, whether or not included in a painting set or kit.

[6] *Walgreen Co. v. United States*, 620 F.3d 1350, 1356-7 (Fed. Cir. 2010) ("*Walgreen*").

[7] 19 CFR 351.225(k)(1).

determines that these sources are sufficient to decide the matter, it will issue a final scope ruling as to whether the merchandise is covered by an order.

Conversely, where the descriptions of the merchandise are not dispositive, the Department will analyze the factors set forth at 19 CFR 351.225(k)(2). These factors are: (i) the physical characteristics of the merchandise; (ii) the expectations of the ultimate purchasers; (iii) the ultimate use of the product; (iv) the channels of trade in which the product is sold; and (v) the manner in which the product is advertised and displayed. The determination as to which analytical framework is most appropriate in any given scope proceeding is made on a case-by-case basis after consideration of all evidence before the Department.

**Description of the Merchandise Subject to this Scope Request**

The product subject to this scope request is print canvas, which is a physical medium on which printed images can be created using inkjet printers.[8] Specifically, Tara states that:

> Print canvas is manufactured in the same way, using the same equipment and same materials, as other forms of Artist Canvas. All Artist Canvas is produced using raw canvas, which may be composed of cotton, cotton and polyester, 100% polyester or linen. Bulk rolls of canvas are coated with a chemical compound, which serves as a paint or ink-receptive primer. This chemical coating permits the canvas to better receive and hold paint or ink and prevent those materials from bleeding through to the other side. Print canvas may be treated with an ink-receptive chemical topcoat; this process was followed in 2005, when the petition was filed but, as a result of subsequent advances in canvas production technology and printer capabilities, not all print canvas undergoes such treatment. Following production, the bulk rolls of coated canvas to be used as print canvas may be marketed as-is to finishers or cut into smaller rolls for sale to printers or distributors.[9]

Furthermore, Tara states that it believes that upon entry into the United States, print canvas is classified under the HTSUS categories 5901.90.20.00 and 5901.90.40.00, as is all other artist canvas.[10]

**Relevant Scope Determinations**

No prior scope inquiry regarding print canvas has been submitted to the Department.

**Tara's Comments**

Tara argues that the *Order* covers artist canvas in all its forms, except for certain specifically-excluded items, and that it explicitly includes "artist canvases . . . that have been primed/coated . . .whether or not containing an ink receptive top coat," and states that the reason for

---

[8] *See* Scope-Ruling Request at 2.
[9] *Id.*
[10] *See* Supplemental Response at 2.

priming/coating is "to promote the adherence of artist materials, such as paint or ink, to the fabric."[11] Furthermore, Tara argues that the scope of the order lists "printable canvases" among the examples of artist canvas specifically covered by the scope of the *Order* and notes that all the subject products "are tightly woven prepared painting and/or printing surfaces."[12] Tara argues that this language defines print canvas with exactitude, and that the Department can reach a determination on the face of the *Order* that print canvas is covered by the scope language of the *Order*.[13]

Furthermore, Tara argues that the U.S. International Trade Commission ("ITC"), in discussing the various types of artist canvas, noted that "{o}ther common finished forms include panels, archival boards, and print canvas, the last of which is treated with an additional ink receptive coating for use in digital printers."[14] In addition, Tara argues that the ITC considered "whether firms that convert canvas rolls into print canvas, for use in digital printing, should be included in the domestic industry."[15] Tara argues that the issue arose because of the ITC's obligation to define the producers of the domestic like product of the imports under investigation, and that if print canvas had not been included in the investigation, there would have been no need to determine who the relevant domestic producers were. In addition, Tara argues that the ITC included "inkjet printer canvas with top-coat for ink receptivity, polyester/cotton canvas, 36" x 40" "as one of the specific products for which it gathered import and domestic price information, and that it would not have done so had such print canvas not been included in the scope of the investigation."[16]

**<u>Department's Position</u>**

The United States Court of Appeals for the Federal Circuit has stated that "{i}t is the language of Commerce's final order that defines the scope of the order"[17] and "the language of the order itself . . . remains the 'cornerstone' in any scope determination."[18] The description of the product contained in the Scope-Ruling Request, *i.e.*, print canvas, as described by Tara, meets the specifications for subject merchandise as described in the scope language of the *Order*. Print canvas is manufactured in the same manner as other subject artist canvas, using the same materials.[19] In addition, the bulk rolls of canvas to be used as print canvas are coated, as specified in the scope language of the *Order*.[20] Moreover, "printable canvases" are specifically cited in the scope language of the *Order* as an example of subject merchandise. Although the written description of the merchandise is dispositive, print canvas that enters the United States is most likely classified under the HTSUS categories cited in the scope of the *Order*, *i.e.*, categories

[11] *See* Scope-Ruling Request at 3.
[12] *Id.*
[13] *Id.*
[14] *Id.* at 7, citing to *Artists' Canvas from China*, Investigation No. 731-TA-1091 (Final), USITC Pub. 3853 (May 2006) ("*Artists' Canvas ITC*").
[15] *Id.*
[16] *Id.* and *Artists' Canvas ITC* at V-3.
[17] *See Walgreen* at 1357.
[18] *Id.*
[19] *See* Scope-Ruling Request at 2.
[20] *Id.* at 2-3.

5901.90.20.00 and 5901.90.40.00.[21] Furthermore, print canvas is not specifically excluded from the scope of the *Order*.

In addition, under a 351.225(k)(1) analysis, the Department may also look to information outside of the language of the order, including the description of the merchandise contained in the petition, the records from the investigations, and prior scope determinations made for the same product. In considering this product, the ITC collected price data for "inkjet printer canvas"[22] and specifically stated that print canvas was a finished form of artist canvas. Furthermore, the ITC determined that artists' canvas is "a continuum of different types of a single domestic like product."[23] This "continuum" includes print canvas. The ITC stated that "{w}hile differences in finishing processes and price exist between artists' canvas in bulk rolls and the various forms of converted product, and the interchangeability of certain types of artists' canvas may be limited (digital printing, for example, may only be performed on **print canvas**)" (emphasis added).[24]

**Recommendation**

Based upon the above analysis, and pursuant to 19 CFR 351.225(d) and (k)(1), we recommend that the Department find that print canvas is subject to the scope of the *Order* on certain artist canvas from the PRC.

If you agree with this recommendation we will serve a copy of this memorandum to all interested parties on the scope service list via first class mail, as directed by 19 CFR 351.225(d).

✓

Agree ______ Disagree ______

Christian Marsh
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

7/14/15
Date

[21] *See* Supplemental Response at 2.
[22] *See Artists' Canvas ITC* at 53.
[23] *Id.* at 5.
[24] *Id.* We also note Tara's argument that, because the ITC considered whether firms that convert canvas rolls into print canvas, for use in digital printing, should be included in the domestic industry, it follows that print canvas would be subject merchandise. However, the ITC found that such converters were not part of the domestic industry; thus, this argument does not support Tara's position that print canvas are within the scope of the *Order*. *Id.* at 14.

# EXHIBIT C

**THOMPSON & ASSOCIATES, PLLC**
gwt@gwthompsonlaw.com
1250 Connecticut Avenue, NW, Suite 200
Washington, DC 20036
202.261.6585

April 28, 2015

Inv. No. A-570-899
Total pages: 22
Scope Request
E&C AD/CVD
**PUBLIC DOCUMENT**

Honorable Penny Pritzker
Secretary
United States Department of Commerce
14th Street & Constitution Avenue, NW
Washington, DC 20230

Attention: Enforcement & Compliance, APO/Dockets Unit, Room 18022

**Re: Scope Inquiry – Certain Artist Canvas from the People's Republic of China, Inv. A-570-899**

Dear Madame. Secretary:

This scope inquiry is submitted on behalf of our client, Tara Materials, Inc. (Tara Materials), pursuant to 19 C.F.R. § 351.225(c). Tara Materials is a domestic producer of Artist Canvas and filed the petition that resulted in entry of the antidumping duty order on *Certain Artist Canvas from the People's Republic of China*, Incv. No. A-570-899. Consequently, Tara Materials is an interested party within the meaning of 19 U.S.C. § 1677(9)(C) and 19 C.F.R. § 351.102(17), and is authorized to file this scope inquiry.

Tara Materials hereby requests the Commerce Department to issue a scope determination that a form of Artist Canvas called "Print Canvas" is within the scope of the antidumping duty

order on *Artist Canvas from the People's Republic of China*, published at 71 Fed. Reg. 31154 (June 1, 2006).

**A. Description of the Merchandise**

This inquiry covers Print Canvas. As the name indicates, Print Canvas is a physical medium used by inkjet printers to create printed images. Print Canvas is manufactured in the same way, using the same equipment and same materials, as other forms of Artist Canvas. All Artist Canvas is produced using raw canvas, which may be composed of cotton, cotton and polyester, 100% polyester or linen. Bulk rolls of canvas are coated with a chemical compound, which serves as a paint or ink-receptive primer. This chemical coating permits the canvas to better receive and hold paint or ink and prevent those materials from bleeding through to the other side. Print canvas may be treated with an ink-receptive chemical topcoat; this process was followed in 2005, when the petition was filed but, as a result of subsequent advances in canvas production technology and printer capabilities, not all print canvas undergoes such treatment. Following production, the bulk rolls of coated canvas to be used as print canvas may be marketed as-is to finishers or cut into smaller rolls for sale to printers or distributors.

**B. Print Canvas Is Within the Scope of the Antidumping Duty Order**

**1. Summary of Argument**

For the reasons set forth below, Tara Materials believes that the merchandise addressed in this request is within the scope of the antidumping duty order on *Artist Canvas from the People's Republic of China*.

The order covers Artist Canvas in all its forms, except for certain specifically-excluded items. Indeed, it explicitly includes "artist canvases . . . that have been primed/coated . . . whether or not containing an ink receptive top coat", states that the reason for priming/coating is "to promote the adherence of artist materials, such as paint or ink, to the fabric", identifies "printable canvases" among the examples of Artist Canvas and notes that all the subject products "are tightly woven prepared painting and/or printing surfaces." This language defines Print Canvas with exactitude, and the Department can reach a determination that Print Canvas is included based on the language in the antidumping duty order.

Moreover, application of the "Diversified" factors set forth at 19 C.F.R. § 351.225(k)(1) warrants inclusion of Print Canvas within the class or kind of subject merchandise. Print Canvas is identical in all respects to other Artist Canvas, except for the additional priming with in ink-receptive topcoat that some print canvas still undergoes, and is produced by the same process on the same machinery. Ultimate purchasers obtain Print Canvas for the same reason they do other Artist Canvas: as a medium on which to display graphic content, and this ultimate use is the same for all forms of Artist Canvas. The channels of trade for Print Canvas overlap those for other forms of Artist Canvas, in that they involve retailers and distributors/wholesalers, while Print Canvas also is sold directly to printers, including print shops and individuals. The specific outlets carrying Print Canvas, and Artist Canvas marketed to painters, may vary. Outlets that carry print supplies tend to stock Print Canvas, while those that market traditional artists' supplies tend to carry other forms of Artist Canvas.

## 2. Relevant Statutory and Administrative Authorities

The Commerce Department has statutory authority to impose antidumping duty orders against a "class or kind" of imported merchandise, and may determine whether specific imported articles are part of the class or kind of merchandise against which an order has been issued. 19 U.S.C. §§ 1673, 1673e; *Smith-Corona Corp. v. United States*, 915 F.2d 683 (Fed. Cir. 1990). The Department has adopted regulations under which it exercises its authority to determine the scope of countervailing or antidumping duty orders. A scope ruling shall be issued pursuant to 19 C.F.R. § 351.225(d) when the ruling request and the descriptions of the merchandise referenced in 19 C.F.R. § 351.225(k)(1) provide the basis for making the determination. In turn, 19 C.F.R. § 351.225(k), provides (with exceptions not relevant here) that:

> in considering whether a particular product is within the class or kind of merchandise described in an existing order, the Secretary will take into account the following:
>
> (1) The descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission.

Tara Materials submits that the requested scope determination can be made pursuant to 19 C.F.R. § 351.225(d), based solely on the terms of this request and the product descriptions referenced in 19 C.F.R. §§ 351.225(d) and (k).

## 3. The Description of the Merchandise in the Investigations and Orders Specifically Encompasses Print Canvas

The initial investigation and antidumping duty order describe the subject merchandise in pertinent part as follows (footnote omitted):

> The products covered by this order are artist canvases regardless of dimension and/or size, whether assembled or unassembled, that have been primed/coated, whether or not made from cotton, whether or not archival, whether bleached or unbleached, and whether or not containing an ink receptive top coat. Priming/coating includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric. Artist canvases (i.e., pre–stretched canvases, canvas panels, canvas pads, canvas rolls (including bulk rolls that have been primed), printable canvases, floor cloths, and placemats) are tightly woven prepared painting and/or printing surfaces. Artist canvas and stretcher strips (whether or not made of wood and whether or not assembled) included within a kit or set are covered by this proceeding.
>
> Artist canvases subject to this order are currently classifiable under subheadings 5901.90.20.00 and 5901.90.40.00 of the Harmonized Tariff Schedule of the United States ("HTSUS"). Specifically excluded from the scope of this order are tracing cloths, "paint–by-number" or "paint–it-yourself" artist canvases with a copyrighted preprinted outline, pattern, or design, whether or not included in a painting set or kit.
>
> Also excluded are stretcher strips, whether or not made from wood, so long as they are not incorporated into artist canvases or sold as part of an artist canvas kit or set. While the HTSUS subheadings are provided for convenience and customs purposes, our written description of the scope of this proceeding is dispositive. Additionally, we have determined that canvas woven and primed in India but cut and stretched in the PRC and exported from the PRC is not subject to the order covering artist canvas from the PRC.

*Final Determination of Sales at Less Than Fair Value: Certain Artist Canvas from the People's Republic of China*, 71 Fed. Reg. 16116 (March 30, 2006); *Notice of Antidumping Duty Order: Certain Artist Canvas from the People's Republic of China*, 71 Fed. Reg. 31154 (June 1, 2006). The U.S. International Trade Commission's ("Commission") final affirmative determination defined the domestic like product as coincident with the scope of the investigations. *Artists' Canvas From China*, Investigation No. 731-TA-1091 (Final), USITC Pub. 3853 (May 2006) at 8

("... we find a single domestic like product, all artists' canvas, co-extensive with the scope of the investigation.)[1]

On its face, the scope language treats Print Canvas as a form of Artist Canvas within the order's ambit. The order directs that "{t}he products covered by this order are artist canvases regardless of dimension and/or size, whether assembled or unassembled, that have been primed/coated, whether or not made from cotton, whether or not archival, whether bleached or unbleached, **and whether or not containing an ink receptive top coat**" (bold added.) It further specifies that "{p}riming/coating includes the application of a solution, designed to promote the adherence of artist materials, such as paint **or ink**, to the fabric" (bold added.) Among the different forms which artist canvas may take, the order includes "printable canvases", and it defines "artist canvas" to be "tightly woven prepared painting **and/or printing surfaces**" (bold added.) This language leaves no doubt or ambiguity about inclusion of Print Canvas, a product that has the features identified above: "an ink receptive topcoat," "a solution, designed to promote the adherence of artist materials, such as . . . ink, to the fabric" and "tightly woven prepared . . . printing surfaces."

The Commission's determinations likewise reflect the inclusion of Print Canvas within the class or kind of subject merchandise. The Commission defined the product under investigation as "a surface for the graphic presentation of painted or printed images. Made from woven fabric that is primed and coated ('gessoed') to accept paints or inks, it is sold in a variety of shapes, sizes, textures, and formats." USITC Pub. 3853, *supra*, at 3. In discussing the various

---

[1] Cited pages from the Commission's report are attached as Exhibit A to this letter.

types of Artist Canvas, the Commission noted that "{o}ther common finished forms include panels, archival boards, and print canvas, the last of which is treated with an additional ink receptive coating for use in digital printers." *Id*. at 5 (footnotes deleted.) The agency further considered "whether firms that convert canvas rolls into print canvas, for use in digital printing, should be included in the domestic industry." *Id*. at 9. The issue arose because of the Commission's obligation to define the producers of the domestic product like the imports under investigation; if Print Canvas had not been included in the investigation, there would have been no need to determine who the relevant domestic producers were. The Commission included "inkjet printer canvas with top-coat for ink receptivity, polyester/cotton canvas, 36" x 40" " as one of the specific products for which it gathered import and domestic price information. It would not have done so had such Print Canvas not been included in the scope of the investigation. The Commission's affirmative determination was premised on inclusion of Print Canvas within the domestic like product and the class or kind of imports under investigation.

In sum, all previous determinations addressing the scope of the investigation and order have identified Print Canvas as subject merchandise. Because the Department can resolve the scope issue by reference to the language of the order and such previous determinations, it can readily determine that Print Canvas is included pursuant to 19 C.F.R. § 351.225(k)(1).

**4. Application of the *Diversified Products* Factors Warrants a Determination that Print Canvas Is Included in the Order**

In *Diversified Products v. United States*, 572 F. Supp. 883 (Ct. Int'l Trade 1983), the Court of International Trade identified factors that are relevant to determining whether a particular products is within a defined "class or kind" of merchandise. The Department has

adopted these factors in its regulations regarding evaluation of the scope of antidumping and countervailing duty orders. 19 C.F.R. § 351.225(k)(1). The regulations require the Department's consideration of the following factors in conducting scope inquiries:

(i) The physical characteristics of the product;

(ii) The expectations of the ultimate purchasers;

(iii) The ultimate use of the product;

(iv) The channels of trade in which the product is sold; and

(v) The manner in which the product is advertised and displayed.

Tara Materials submits that each of these factors weighs in favor of a determination that Print Canvas is within the order.

**a. Print Canvas Has the Same Physical Characteristics as Other Artist Canvas**

Print Canvas has the same physical characteristics as all other Artist Canvas. All Artist Canvas is composed of fabric with a chemical coating. Print Canvas may have an additional topcoat, to permit reception of ink, but otherwise is identical to other forms of Artist Canvas. All Artist Canvas is manufactured in the same facilities and on the same equipment, using the same materials.

There are a number of converters that purchase bulk rolls of chemically-coated canvas from domestic producers and undertake the final step of applying the ink-receptive topcoat themselves to produce Print Canvas. Such converters engage in the same activity as integrated producers to complete the Print Canvas process. There is no difference in the characteristics of the final product or in the conversion process or materials used.

**b. Ultimate Purchasers of Print Canvas Have the Same Expectations as Purchasers of Other Artist Canvas**

Purchasers of Artist Canvas expect to obtain a medium on which to place images. Most Print Canvas (*i.e.*, without an additional topcoat) can be used as a painting medium, interchangeably with other forms of Artist Canvas. Even though certain forms of Artist Canvas, for example, stretcher strips, cannot be used with printers, there no requirement that items be interchangeable in physical characteristics and use to fall within the same class or kind of merchandise. The Commission considered this issue in evaluating the applicable domestic like product, and found that all Artist Canvas is fundamentally similar despite some variations among the different products under investigation.

> Limits on interchangeability, for example, are not reserved to comparing bulk rolls and finished product. As the Commission noted in its preliminary determination, canvas presented on a stretcher strip (assembled canvas) may not be used for printing; the costs for certain materials may also limit their use for particular applications. . . .Instead of showing a clear dividing line between bulk rolls and finished product, the record continues to demonstrate a continuum of artists' canvas products sold in numerous grades, textures, shapes, sizes, formats, and packages, sharing varying degrees of similarity in terms of physical characteristics and uses, interchangeability, customer and producer perceptions, channels of distribution, and manufacturing facilities, processes, and employees.

USITC Pub. 3853, *supra*, at 8. Thus, any variations in use between Print Canvas and other subject merchandise are no more pronounced than other differences among forms of Artist Canvas used for painting. The ultimate purchasers' expectations for all such goods are the same: to obtain a medium on which to place graphic expression.

**c. The Ultimate Use of Print Canvas Is the Same as for Other Artist Canvas**

The ultimate use of Print Canvas is the same as for all other Artist Canvas, as a medium for placing graphic expression. In this regard, it reflects the expectations of ultimate purchasers. The Commission found that all Artist Canvas, including Print Canvas, "share significant similarities, particularly in terms of physical characteristics and uses . . ." along with other factors. *Id*.

**d. Print Canvas Is Sold in the Same Channels of Trade as Other Artist Canvas**

The Commission determined that "Practically all sales of assembled canvas go to retailers and distributors/wholesalers." USITC Pub. 3853 at II-1. This remains the case for Print Canvas and other forms of Artist Canvas. Print Canvas tends to be sold to distributors of printable media products, retailers and printers, including print shops and individuals. Other forms of Artist Canvas typically are sold to distributors and retailers. The specific outlets carrying one or the other form may vary, depending on whether they carry other print-related items or other artists' materials.

**e. Print Canvas Is Advertised and Displayed the Same as Other Artist Canvas**

Because Print Canvas is used in printing, typically of artwork reproductions, it is advertised to the individuals and companies that are engaged in such printing activities. Other forms of Artist Canvas are marketed to painters. In both cases, the advertising is directed toward persons who will use the canvas as a medium for a particular graphic material.

**C. Conclusion**

For the foregoing reasons, we request the Department to conclude that Print Canvas is within the scope of the antidumping duty order on *Certain Artist Canvas from the People's Republic of China*.

Please contact the undersigned if you have any questions about this submission.

Respectfully submitted,

/s/ George W. Thompson

## COMPANY CERTIFICATION

I, Mike Ecker, currently employed by Tara Materials, Inc. ("Tara Materials") as General Manager, certify that I prepared or otherwise supervised the preparation of the attached Letter submitted on behalf of Tara Materials in regard to the antidumping duty order on *Certain Artist Canvas from the People's Republic of China*, Inv. No. A-570-899. I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

**Signature:** [signature]

**Date:** April 27, 2015

**REPRESENTATIVE CERTIFICATION**

I, George W. Thompson, with Thompson & Associates, PLLC, counsel or representative to Tara Materials, Inc., certify that I have read the attached submission of the Letter submitted on behalf of Gartner Studios in regard to the antidumping and countervailing duty investigations on *Certain Artist Canvas From The People's Republic Of China.* In my capacity as an adviser, counsel, preparer or reviewer of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

Signature: ----------------------------------------------------------------

Date: April 28, 2015

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Letter (Public Document) was served upon the following parties via method indicated below at the following addresses on this 28th day of April, 2015:

**VIA FIRST CLASS UNITED STATES MAIL, POSTAGE PREPAID:**

R. Kevin Williams, Esq.
Rodriguez O'Donnel Ross Fuerst Gonzalez Williams & England, P.C
8430 West Bryn Mawr Ave.
Suite 525
Chicago, IL 60631

Rosa S. Jeong, Esq.
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006

Ronald M. Wisla, Esq.
Kutak Rock LLP
1101 Connecticut Avenue, NW
Suite 1000
Washington, DC 20036

Philip S. Gallas, Esq.
Sonnenschein Nath & Rosenthal LLP
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005

/s/ George W. Thompson
George W. Thompson

# Artists' Canvas From China

Investigation No. 731-TA-1091 (Final)

Publication 3853 May 2006

**U.S. International Trade Commission**



Washington, DC 20436

# VIEWS OF THE COMMISSION

Based on the record in this investigation, we determine that an industry in the United States is materially injured by reason of imports of artists' canvas from China that are sold in the United States at less than fair value (LTFV).[1] [2] Artists' canvas is a surface for the graphic presentation of painted or printed images. Made from woven fabric that is primed and coated ("gessoed") to accept paints or inks, it is sold in a variety of shapes, sizes, textures, and formats.[3]

The petition was filed with the Commission on April 1, 2005, by the largest domestic producer of artists' canvas, Tara Materials, Inc. (Tara or Petitioner). Ten importers and two foreign producers/exporters have participated as respondent interested parties (collectively, Respondents): Importers Michaels Stores, Inc. (Michaels), Aaron Brothers, Inc. (Aaron Bros.), MacPherson's (also Art Supply Enterprises) (MacPherson's), ColArt Americas, Inc. (ColArt), Dick Blick Art Materials (Dick Blick), Sbars, Inc. (Sbars), Hobby Lobby Stores, Inc. (Hobby Lobby), A.C. Moore, Jerry's Artarama (Artarama), Jo-Ann's Stores, Inc. (Jo-Ann's); and Chinese producers/exporters Wuxi Phoenix Artist Materials Co., Ltd. (Phoenix Artist) and Ningbo Conda Import & Export Co., Ltd. (Conda).

## I. DOMESTIC LIKE PRODUCT

### A. In General

In determining whether an industry in the United States is materially injured or threatened with material injury by reason of imports of the subject merchandise, the Commission first defines the "domestic like product" and the "industry."[4] Section 771(4)(A) of the Tariff Act of 1930, as amended (the Act), defines the relevant domestic industry as the "producers as a [w]hole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."[5] In turn, the Act defines "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation . . . ."[6]

The decision regarding the appropriate domestic like product(s) in an investigation is a factual determination, and the Commission has applied the statutory standard of "like" or "most similar in characteristics and uses" on a case-by-case basis.[7] No single factor is dispositive, and the Commission

---

[1] Commissioner Pearson dissenting. See Additional and Dissenting Views of Commissioner Daniel R. Pearson.

[2] This investigation does not raise the issues of whether the establishment of an industry is materially retarded, or the existence of critical circumstances under 19 U.S.C. § 1673d(b)(4)(A)(i).

[3] Confidential Staff Report, INV-DD-047 (Apr. 13, 2006) (CR) at I-6, Public Staff Report (PR) at I-4-I-5.

[4] 19 U.S.C. § 1677(4)(A).

[5] 19 U.S.C. § 1677(4)(A).

[6] 19 U.S.C. § 1677(10).

[7] See, e.g., NEC Corp. v. Department of Commerce, 36 F. Supp.2d 380, 383 (Ct. Int'l Trade 1998); Nippon Steel Corp. v. United States, 19 CIT 450, 455 (1995); Torrington Co. v. United States, 747 F. Supp. 744, 749 n.3 (Ct. Int'l Trade 1990), aff'd, 938 F.2d 1278 (Fed. Cir. 1991) ("every like product determination 'must be made on the particular record at issue' and the 'unique facts of each case'"). The Commission generally considers a number of factors including: (1) physical characteristics and uses; (2) interchangeability; (3) channels of distribution; (4) customer and producer perceptions of the products; (5) common manufacturing facilities, production processes and production employees; and, when appropriate, (6) price. See Nippon, 19 CIT at 455 n.4; Timken Co. v. United States, 913 F. Supp. 580, 584 (Ct. Int'l Trade 1996).

a slat in the frame).[14] Other common finished forms include panels,[15] archival boards,[16] and print canvas, the last of which is treated with an additional ink receptive coating for use in digital printers.[17]

In the preliminary phase of this investigation, the Commission applied the traditional six factor test and determined that artists' canvas is a continuum of different types of a single domestic like product. The Commission found that the various types of artists' canvas share significant similarities, particularly in terms of physical characteristics and uses, the perceptions of producers and importers, channels of distribution, and manufacturing facilities, processes, and employees. While differences in finishing processes and price exist between artists' canvas in bulk rolls and the various forms of converted product, and the interchangeability of certain types of artists' canvas may be limited (digital printing, for example, may only be performed on print canvas), the Commission concluded that these distinctions do not establish clear dividing lines between artists' canvas products that would justify finding two or more domestic like products.[18] The Commission thus found a single domestic like product, co-extensive with the scope, but noted that it would further examine the like product definition in any final phase, particularly with respect to the treatment of artists' canvas kits and the treatment of bulk rolls as compared to finished product.[19]

### C. Parties' Arguments and Analysis

The definition of the domestic like product is not in dispute. Petitioner and Respondents concur with the Commission's treatment of the issue in its preliminary determination. Petitioner also contends that application of a semi-finished products analysis, which it claims is not required because bulk canvas is not necessarily a "semi-finished" product, leads to the same finding of a single domestic like product.[20] We conclude that the record in the final phase of this investigation has not changed so as to warrant a departure from the definition adopted by the Commission in the preliminary phase, that is, a single domestic like product corresponding to the scope.[21]

---

[14] Bulk rolls may also be characterized as "finished" product for certain consumers (typically professional artists) who purchase it in this form so that they may perform their own customized stretching. There are also end uses for bulk products independent of finished canvas, such as floor cloths. See CR at I-6, I-12 & II-1, PR at I-4-I-5, I-9, & II-1; see also Artists' Canvas from China, Inv. No. 731-TA-1091 (Prelim.), USITC Pub. 3777 (May 2005) (Preliminary Determination) at 6 n.27. (Where we need to refer to the confidential version of the preliminary phase opinion, we cite to "Confidential Views.")

[15] Coated canvas that is adhered to a chipboard or a cardboard core. Preliminary Determination at 5.

[16] Coated canvas of high professional grade that is adhered to hardboard. Id.

[17] CR at I-6, PR at I-5. Less common forms of finished product include floor cloths and place mats. CR at I-6, PR at I-5.

[18] Preliminary Determination at 5-7.

[19] Preliminary Determination at 7 & n.35.

[20] E.g., Petitioner's Prehearing Brief at 3-18; Respondents' Prehearing Brief at 2-3.

[21] In the preliminary determination, the Commission noted that it would further examine the treatment of artists' canvas kits in a final phase investigation. While ***, kits were included in the scope based on concerns of the Petitioner of possible circumvention of any resulting order. Preliminary Determination at 5 n.19. Information collected during the final phase indicates that kits are fabricated domestically, albeit in limited quantities. CR at I-8 n.22, PR at I-7 n.22 (***). Thus, we need not turn to the "next most similar" product analysis addressed in the preliminary phase. The factual record is otherwise unchanged regarding kits, and the parties raise no issue regarding their inclusion as defined in the scope. Accordingly, we do not find that artists' canvas kits constitute a separate domestic like product.

produced in the same facilities and the workers performing the converting may also be employed in the production of the bulk canvas, although the machines used are different.[40]

The converting processes consist of additional steps in the manufacture of artists' canvas,[41] and these additional steps increase the price of the product. In 2005, for example, the average unit value of U.S. producers' commercial shipments of bulk rolls was $*** per square meter, compared to $*** per square meter for finished canvas.[42] The Commission noted in the preliminary phase that the existence of pricing differences was consistent with an expected price continuum of different types of the same product.[43]

The other differences evidenced in this final phase, particularly with respect to the finishing processes and interchangeability, are also consistent with the continuum of artists' canvas found in the preliminary phase. Any dividing lines among artists' canvas products, including between bulk rolls and finished product, are not clear on this record. Limits on interchangeability, for example, are not reserved to comparing bulk rolls and finished product. As the Commission noted in its preliminary determination, canvas presented on a stretcher strip (assembled canvas) may not be used for printing; the costs for certain materials may also limit their use for particular applications.[44] Moreover, the processes that take place after gessoing the bulk canvas, the facilities in which they are performed, and the employees who perform them vary depending on the particular type of finished product.

Instead of showing a clear dividing line between bulk rolls and finished product, the record continues to demonstrate a continuum of artists' canvas products sold in numerous grades, textures, shapes, sizes, formats, and packages, sharing varying degrees of similarity in terms of physical characteristics and uses, interchangeability, customer and producer perceptions, channels of distribution, and manufacturing facilities, processes, and employees. The parties are in agreement that no one artists' canvas product or type of product constitutes a separate domestic like product. Based on the record in this final phase investigation, whether we apply the traditional six factor test or a semi-finished products analysis, we find a single domestic like product, all artists' canvas, co-extensive with the scope of the investigation.

## II. DOMESTIC INDUSTRY[45]

### A. In General

The domestic industry is defined as "producers as a [w]hole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."[46] In assessing the domestic production activity associated with a

---

[40] CR at I-9-I-10, PR at I-7; Tr. at 127-128 (Mr. Freeman) (noting that the same employees make bulk and finished canvas).

[41] See, e.g., CR at I-7-I-8, I-13; PR at I-6, I-9-I-10.

[42] CR, PR at Tables III-5-III-6.

[43] Preliminary Determination at 7.

[44] Preliminary Determination at 6.

[45] Commissioner Pearson, reaching a negative final determination, does not join in the remainder of these Views. See Additional and Dissenting Views of Commissioner Daniel R. Pearson. Chairman Koplan and Commissioner Aranoff concur in the affirmative material injury determination, but do not join in the rest of the opinion. See Views of Chairman Stephen Koplan and Commissioner Shara L. Aranoff.

[46] 19 U.S.C. § 1677(4)(A). In defining the domestic industry, the Commission's general practice has been to include in the industry all domestic production of the domestic like product, whether toll-produced, captively consumed, or sold in the domestic merchant market. See United States Steel Group v. United States, 873 F. Supp.
(continued...)

particular operation and whether it constitutes sufficient activity to bring that operation within the meaning of domestic industry for purposes of the Act, the Commission generally considers six factors: (1) source and extent of the firm's capital investment; (2) technical expertise involved in U.S. production activities; (3) value added to the product in the United States; (4) employment levels; (5) quantity and type of parts sourced in the United States; and (6) any other costs and activities in the United States directly leading to production of the like product.[47] No single factor is determinative, and the Commission may consider any other factors it deems relevant in light of the specific facts of any investigation.[48]

In the preliminary phase of this investigation, the Commission addressed whether firms that engage in the production of pre-stretched canvas but do not produce the bulks rolls (so-called converters) are part of the domestic industry producing artists' canvas. In addition to these firms, there was evidence of a toll-processing arrangement whereby ***. Based on the available information in the preliminary phase, *** appeared to be an "important but minor" additional processing step in the fabrication of certain finished product.[49] However, the record was unclear as to whether there were other such toll processors and the Commission had no trade, production, or financial data from firms engaged in this sort of converting operation. Therefore, the Commission did not address their inclusion in the domestic industry.[50] In contrast, the available information indicated that firms converting bulk rolls into pre-stretched canvas were engaged in sufficient production-related activity to constitute members of the domestic industry. Accordingly, the Commission defined the industry to include these converters, but noted it would explore the issue further in any final phase investigation.[51]

### B. Parties' Arguments

The parties are in agreement with respect to the inclusion in the domestic industry of firms that convert bulk rolls into pre-stretched or assembled canvas.[52] Whether such firms engage in sufficient production-related activity is not disputed in the final phase of this investigation. The significant issue, they contend, is whether firms that convert canvas rolls into print canvas, for use in digital printing, should be included in the domestic industry.

Petitioner argues that print converting operations are not sufficient to qualify as artists' canvas production under the Commission's traditional production-related activity test and, thus, print converters do not qualify as domestic producers.[53] Respondents argue that the Commission need not engage in the six-factor sufficient production-related activity test because there appear to exist only non-integrated

---

[46] (...continued)
673, 681-84 (Ct. Int'l Trade 1994), aff'd, 96 F.3d 1352 (Fed. Cir. 1996). Thus, toll producers that engage in sufficient production-related activity are typically included in the industry.

[47] See, e.g., Prestressed Concrete Steel Wire Strand from Brazil, India, Korea, Mexico, and Thailand, Inv. Nos. 701-TA-432 (Final) and 731-TA-1024-1028 (Final), USITC Pub. 3663 (Jan. 2004) at 10-11.

[48] See, e.g., Aramid Fiber Formed of Poly Para-Phenylene Terephthalamide from the Netherlands, Inv. No. 731-TA-652 (Final), USITC Pub. 2783 (June 1994) (Aramid Fiber) at I-8-I-9 & n.34 ("no single factor – including value added – is determinative and ... value added information becomes more meaningful when other production activity indicia are taken into account"), aff'd, Aramide Maatschappij V.O.F. v. United States, 19 CIT 884 (1995).

[49] Confidential Views at 11 n.40.

[50] Preliminary Determination at 8 n.40.

[51] Preliminary Determination at 7-8.

[52] See, e.g., Petitioner's Prehearing Brief at 18-20; Respondents' Prehearing Brief at 3-6.

[53] See, e.g., Petitioner's Responses to Commissioner Questions at 5-9.

# PART II: CONDITIONS OF COMPETITION IN THE U.S. MARKET

## U.S. MARKET SEGMENTS/CHANNELS OF DISTRIBUTION

Artists' canvas is sold in four different forms: assembled canvas (pre-stretched and stapled either on the side or on the back), canvas panels, canvas pads, and bulk canvas rolls. The product is used for graphic presentation of painted or printed images. The majority of digital print canvas is used for art reproductions.[1] The demand for assembled artists' canvas tends to be seasonal, peaking in the spring and summer months as retailers stock up for back-to-school promotions.

Practically all sales of assembled canvas go to retailers and distributors/wholesalers. Among the varieties of assembled canvas, side-stapled artists' canvas and canvas panels are considered the entry-level products and reportedly accounted for 21 percent of total artists' canvas sales in 2005.[2] Most sales of bulk canvas go to converters that produce assembled artists' canvas using bulk canvas or that specialize in coating.[3] Some sales of bulk canvas go to retailers and distributors.

When purchasers were asked about the interchangeability between assembled canvas and bulk canvas rolls, five of 15 purchasers reported that they are interchangeable because both forms are used as a painted surface. Ten purchasers reported that the interchangeability is limited because, in order for bulk canvas rolls to be transformed into a finished product, the consumer must possess the skills, tools, and time to cut stretcher bars and stretch and fit the canvas to the frame. Many purchasers reported that only professional or experienced artists buy bulk canvas and stretch it themselves, often in order to achieve non-traditional sizes or shapes. Assembled canvas, on the other hand, reportedly appeals more to students and hobbyists because it is ready-to-use.

When firms were asked to list market areas in the United States where they sell artists' canvas, the responses showed that the market areas tended to be nationwide. Among the six responding U.S. producers, five reported that they sell nationally while the other reported that it sells specifically in the northeast. Among importers of artists' canvas from China, all but one reported that they sold nationally. One reported that it sold specifically in the Midwest and on the east coast.

U.S. inland shipping distances for U.S.-produced artists' canvas were compared with those for imports from China. For U.S. producers, *** percent of their U.S. sales occur within 100 miles of their storage or production facility, *** percent were within distances of 101 to 1,000 miles, and *** percent were at distances of over 1,000 miles from their facilities. For imports from the subject country, *** percent of sales occurred within 100 miles of importers' storage facilities, *** percent were within 101 to 1,000 miles, and *** percent were over 1,000 miles.

Lead times for delivery of artists' canvas ranged widely for both producers and importers. For producers they ranged from two days to as much as four weeks. For importers they ranged from one day to as much as 17 weeks.

---

[1] Less than five percent of digital print canvas is used for photography. Petitioner's posthearing brief, responses to questions, p. 10.

[2] Petitioner's posthearing brief, responses to questions, p. 1.

[3] U.S. producers of assembled canvas (***) coat their own canvas, *** coats bulk canvas rolls, and *** are coaters/converters of inkjet printable canvas. U.S. producer *** produces digital print canvas under a tolling agreement with ***.

canvas in stores and still make a profit due to the low price of the imports.[9] This U.S. producer also reported that domestic artists' canvas is typically not discounted at retail more than 20 to 25 percent.[10] One importer also reported that large discounts on artists' canvas at the retail level serve to promote the product and increase consumer demand.[11]

## PRICE DATA

The Commission requested U.S. producers and importers of artists' canvas to provide quarterly data for the total quantity and value of selected products that were shipped to unrelated customers in the U.S. market.[12] Data were requested for the period January 2002-December 2005 on the following products:

***Product 1.*–8x10 stretched canvas, medium-weight, 100% unbleached cotton duck, double-primed acrylic, standard stretcher strips (1-5/8" x 11/16"), side-stapled.**

***Product 2.*–16x20 stretched canvas, medium-weight, 100% unbleached cotton duck, double-primed acrylic, standard stretcher strips (1-5/8" x 11/16"), side-stapled.**

***Product 3.*–16x20 stretched canvas, medium-weight, 100% unbleached cotton duck, double-primed acrylic, standard stretcher strips (1-5/8" x 11/16"), stapled on back.**

***Product 4.*–16x20 stretched canvas, medium-weight, 100% unbleached cotton duck, double-primed acrylic, standard stretcher strips (1-5/8" x 11/16"), with spline.**

***Product 5.*–12x12 stretched canvas, gallery (or deep) stretcher bars (1-7/16" x 1-7/16" or 1-1/2" x 1-1/2 "), 100% unbleached cotton duck, double-primed acrylic, stapled on back.**

***Product 6.*–8x10 canvas panel (non-archival) with chipboard core, polyester/cotton canvas.**

***Product 7.*–Double-primed, medium-weight, 100% unbleached cotton duck, 73" x 6 yd. roll.**

***Product 8.*–Inkjet printer canvas with top-coat for ink receptivity, polyester/cotton canvas, 36" x 40' roll.**

Five U.S. producers and six importers provided usable pricing data for sales of the requested products, although not all firms reported pricing for all products for all quarters. Pricing data reported by these firms accounted for approximately *** percent of the value of U.S. producers' commercial shipments of artists' canvas during January 2002-December 2005 and *** percent of the value of U.S. imports from China over the same period.

---

[9] The U.S. producer also stated that discounts can vary widely by retailer. Hearing transcript, pp. 26-27 (Straquadine).

[10] Hearing transcript, pp. 123-4 (Delin).

[11] Hearing transcript, p. 212 (Stapleton).

[12] These sales prices are broken out by channel of distribution (i.e., converter, distributor, or retailer) in app. F. Purchase prices of direct imports from China and of domestic products are presented in app. G.

# EXHIBIT D

Barcode: 4915737-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II

**PUBLIC DOCUMENT**

April 23, 2026

DOC Case No. A-570-899
Total Pages: 324
Changed Circumstances Review AD/CVD Operations, E&C Office III

Howard Lutnick, Secretary of Commerce
International Trade Administration
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
1401 Constitution Avenue, NW
Washington, DC 20230

**Re: Certain Artist Canvas From the People's Republic of China: Request for Changed Circumstances Review**

Dear Secretary Lutnick,

On behalf of Lexjet, LLC, Abaqa, LLC, and Brand Management Group, LLC (together "Lexjet"), and pursuant to 19 U.S.C. § 1675(b), 19 C.F.R. § 351.216, and 19 C.F.R. § 351.221(c)(3)(ii), we respectfully requests that the U.S. Department of Commerce ("Commerce") conduct a changed circumstances review to partially revoke the antidumping duty order on certain artist canvas from the people's Republic of China.[1] Lexjet also requests that the agency conduct this review on an expedited basis, consistently with 19 C.F.R. §§ 351.216(e) and 351.221(c)(3)(ii). More specifically, Lexjet requests that Commerce conduct an expedited changed circumstances review to clearly establish that its 100 % polyester print canvas, as described herein, are excluded from the *Order*. As an importer of print canvas, Lexjet is an interested party entitled to make this request pursuant to 19 C.F.R. § 351.216(b).

---

[1] *See Notice of Antidumping Duty Order: Certain Artist Canvas from the People's Republic of China*, 71 FR 31154 (June 1, 2006) ("*Order*").

Filed By: kyl@kirbyfedlaw.com, Filed Date: 4/23/26 3:47 PM, Submission Status: Approved

As outlined below, the petitioner Tara Materials Inc ("Tara"), and its subsequent purchaser, Ecker Textiles LLC ("Ecker"), have had and have a lack of interest in producing 100% polyester print canvas. We also note that Ecker now accounts for mostly all of print canvas domestic production. Tara and Ecker have been the only parties to participate in the US International Trade Commission ("ITC") §751(c) sunset reviews since 2016.[2] Thus, "The Secretary may revoke an order, in whole or in part, or terminate a suspended investigation if the Secretary concludes that: (i) Producers accounting for substantially all of the production of the domestic like product to which the order (or the part of the order to be revoked) or suspended investigation pertains have expressed a lack of interest in the order, in whole or in part, or suspended investigation (see section 782(h) of the Act)". 19 C.F.R. § 351.222(g)(1)(i). The new language would remove 100% polyester canvas. The new language would be as follows:

> "Specifically excluded from the scope of this investigation are 100% polyester printable canvases, tracing cloths, "paint-by-number" or "paint-it-yourself" artist canvases with a copyrighted preprinted outline, pattern, or design, whether or not included in a painting set or kit."

Lexjet requests this clarification of the scope, and the resulting partial revocation of the *Order*, to effectuate the domestic industry's intent that 100% polyester printable canvases be excluded from the *Order*. Confirming that intent, and providing good cause for this review, as further described below, Ecker accounts for virtually all of the domestic manufacturing regarding

---

[2] *See* "Of these four companies, only Tara Materials is a producer of canvas for painting, for which it performs the entire coating process of priming uncoated canvas with paint-receptive gesso. Tara Materials also primes print canvas, again using raw canvas. The other three companies filing these comments produce print canvas by placing an ink-receptive topcoat on canvas that already was primed with gesso by another entity. The Commission has referred to such parties as 'print converters', and concluded that they do not undertake insufficient production-related activity to qualify as 'producers' within the meaning of 19 U.S.C. § 1677(4)(A)." *Inv. No. 731-TA-1091, Section 751(c) Five-Year Sunset Review of the Antidumping Duty Order Against Artists' Canvas from the People's Republic of China; Domestic Producers' Comments on Adequacy of Responses to Notice of Institution* (December 15, 2016), excerpts attached at Exhibit 1.

this changed circumstances review request. Consistent with the/ domestic industry's position that duties should not apply to 100% polyester print canvas, and as further explained below, Lexjet requests that Commerce not only amend the scope language, but clarify that the change is retroactive to the date that the antidumping duty *Order* was published, i.e., June 1, 2006. Lexjet further requests that Commerce expedite this changed circumstances review in accordance with 19 C.F.R. §§ 351.216 and 351.221(c)(3)(ii), combining the notice of initiation and preliminary results in a single notice, and issuing a final determination within 45 days of initiation. Indeed, given the request considers the overwhelming domestic industry and the critical nature of the issues, Commerce should proceed to issue its final results as expeditiously as possible - within 45 days or less of receiving this request.

Below, Lexjet provides the current scope of the *Order*. Next, Lexjet explains that the prerequisites for a changed circumstances review, including good cause, are met in this case. Finally, Lexjet explains why Commerce should not only make an affirmative determination in this review on an expedited basis, but should make the partial revocation of the *Order* retroactive to the date of the *Order*, i.e., June 1, 2006.

## I. THE SCOPE OF THE *ORDER*

Currently, the scope of the *Order* is as follows:

> The products covered by this investigation are artist canvases regardless of dimension and/or size, whether assembled or unassembled, that have been primed/coated, whether or not made from cotton, whether or not archival, whether bleached or unbleached, and whether or not containing an ink receptive top coat. Priming/coating includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric. Artist canvases ( *i.e.*, pre-stretched canvases, canvas panels, canvas pads, canvas rolls (including bulk rolls that have been primed), printable canvases, floor cloths, and placemats) are tightly woven prepared painting and/or printing surfaces. Artist canvas and stretcher strips (whether or not made of wood and whether or not assembled) included within a kit or set are covered by this proceeding.

> Artist canvases subject to this investigation are currently classifiable under subheadings 5901.90.20.00 and 5901.90.40.00 of the Harmonized Tariff Schedule of the United States ("HTSUS"). Specifically excluded from the scope of this investigation are tracing cloths, "paint-by-number" or "paint-it-yourself" artist canvases with a copyrighted preprinted outline, pattern, or design, whether or not included in a painting set or kit.[1] Also excluded are stretcher strips, whether or not made from wood, so long as they are not incorporated into artist canvases or sold as part of an artist canvas kit or set. While the HTSUS subheadings are provided for convenience and customs purposes, our written description of the scope of this proceeding is dispositive.
>
> Additionally, we have determined that canvas woven and primed in India but cut and stretched in the PRC and exported from the PRC is not subject to the investigation covering artist canvas from the PRC.[3]

## II. THE PREREQUISITES FOR CONDUCTING A CHANGED CIRCUMSTANCES REVIEW HAVE BEEN MET

Pursuant to 19 U.S.C. §§ 1675(b)(1) & (4) and 19 C.F.R. § 351.216, Commerce will conduct a changed circumstances review within 24 months of the publication of a final less-than-fair value or subsidy investigation determination where (1) it receives a request for such a review from an interested party that shows changed circumstances sufficient to warrant a review and (2) good cause is provided for conducting the review.[4] Lexjet makes this request as an importer of print canvas goods, and thus qualifies as an interested party.[5]

Changed circumstances exist that are sufficient to warrant a review. In particular, despite the parties lack of interest in 100% polyester print canvas, the original scope language, i.e., whether or not made from cotton, subject Lexjet's products to duties. The amended scope language that Lexjet proposes would reflect Tara's and Ecker's lack of interest in the 100% polyester print canvas products. Lexjet notes that the new scope exclusion would be based on physical characteristics.

---

[3] *Order* at 31155.
[4] The final less-than-fair-value determination was published on Marrch 30, 2006. See *id*. at 31154.
[5] 19 U.S.C. § 1677(9).

Good cause also exists for the agency to conduct this review. In assessing good cause, the agency has previously looked to whether companies accounting for 85% or more of domestic manufacturing of the like product support the changed circumstances review request.[6] Here, because Ecker does not have an interest in 100% polyester print canvas, companies accounting for virtually 100% of print canvas are reflected in this request. Accordingly, the agency should initiate a changed circumstances review.

Tara's lack of interest was clear from the beginning of the case. In its petition to the ITC and Commerce, when speaking to common manufacturing facilities, production processes, and production employees, Tara stated, "Therefore, regardless of the form, all artist canvas is identifiable as treated canvas for graphic display. While there may be minor variations in size, material composition (all cotton or cotton/polyester blend fabric) and format (Such as pre-stretched or in panel form), these do not provide clear dividing lines among articles."[7] Tara made no reference regarding 100% polyester print canvas.

Interestingly, in its petition, Tara made a mention to 100% polyester when it stated, "Artist canvas is produced as follows. Raw woven materials ('canvas') are purchased. The canvas may be woven in various widths and densities, ranging Erom 36" to 150" in width, 100 to 2000 yards in length, and 4 to 12 ounces per square yard in density. This material could consist of 100% cotton, a cotton and polyester mix, 100% polyester, 100% linen, or other variations of

[6] *See* Letter from Erin Begnal, Director, AD/CVD Operations, Off. III, to Whirlpool Corporation c/o Thomas M. Beline, Cassidy Levy Kent (USA) LLP, re: *Request for a Changed Circumstances Review of the Antidumping and Countervailing Duty Orders on Certain Metal Lockers and Parts There of from the People's Republic of China: Determination Not to Initiate a Changed Circumstances Review* (Jan. 23, 2023), attached at Exhibit 2.

[7] Petition filed with Commerce and the ITC by Tara Materials, Inc. (April 1, 2005) ("Petition"), excerpts attached at Exhibit 3.

woven substrates."[8] Tara made no such product in 2005. Indeed, in its petition Tara presented marketing materials stating, "Fredrix Inkjet Canvas - A fine quality Polyflax/cotton canvas for printing on large-format and desktop inkjet printers. Ink receptive clear coat delivers enhanced color quality, and a fine art appearance that can only be archived on canvas."[9]

On April 22, 2005, in the following exchange between the ITC and Tara, the ITC inquired about 100% polyester in the Preliminary Conference:

> "MS. FREUND: Okay. And the artists' canvas that are competing from China; what kind of raw materials are they? Are they using cotton or polyester?
>
> MR. BENATOR: Primarily, 100-percent cotton bleached or unbleached, primarily. That's the biggest volume, but there are other products that they use.
>
> MS. FREUND: Okay. And would you be able to give some estimate of how much your production is in that later?
>
> MR. BENATOR: Yes, we would later.
>
> MS. FREUND: Okay. Thanks."[10]

However, Tara never responded to the question in its follow-on brief.[11]

In the Preliminary Conference, when likely referring to 100% polyester print canvas, Tara stated, "At the moment, and that's yesterday, we don't have people coming into our making demands for a cheap Chinese product in canvas. It just doesn't exist."[12]

Also in the preliminary conference Tara stated, "We can supply a price list that shows the difference between the ultra-smooth polyester blend, the linen, and the cotton."[13] No reference

[8] Petition, excerpts attached at Exhibit 4.
[9] Petition, attached at Exhibit 5.
[10] Preliminary Conference of Artists' Canvas from China (April 22, 2005) ("Preliminary Conference"), excerpts attached at 6.
[11] Post Conference Brief of Tara Materials, Inc. (April 28, 2005) ("Post Conference Brief"), attached at 7.
[12] Preliminary Conference, excerpts attached at 8.
[13] *Id*., excerpts attached at 9.

was made regarding 100% polyester coated fabrics. Moreover, on April 28, 2005, Tara provided follow-up pricing from the ITC Preliminary Conference as below:[14]

| item | description | MSRP/sq. meter |
|---|---|---|
| | **100% Cotton Fabric** | [ |
| 1096 | 63"x6yd Dallas medium wt cotton duck | |
| 1016 | 54"x6yd Dixie heavy wt cotton duck | |
| | **100% Polyester Fabric** | |
| 1097 | 59"x6yd Cherokee medium wt polyester | |
| 1098 | 57"x6yd Ultrasmooth medium wt polyester | |
| | **Cotton/Polyester Blended Fabric** | |
| 1075 | 57"x6yd Scholastic medium wt cotton/poly blend | |
| 1094 | 75"x6yd Mural Portrait medium wt cotton/poly | |
| | **100% Belgian Linen Acrylic Primed** | |
| 1055 | 52"x6yd Antwerp DP medium wt Belgian linen | |
| 1079 | 54"x6yd Sarasota fine weave Belgian linen | |
| | **100% Belgian Linen Oil Primed** | |
| 1040 | 54"x6yd Carleton DP Handprimed/Oil primed heavy weight Belgian linen | |
| 1092 | 84"x6yd Flemish DP Handprimed/Oil primed fine weave, medium wt Belgian linen | ] |

Importantly and oddly enough, items 1097 and 1098 above were noted in Tara marketing materials as Polyflax, both polyester/cotton.[15] See the below. Moreover, in materials presented to the ITC by Tara and other parties, there was no mention of any print canvas products of 100% polyester. Instead, products were made up of 100% cotton, Polyflax/cotton, and 100% Polyflax.

[14] Post Conference Brief at 44.
[15] Petition, excerpts attached at Exhibit 5.

# Fredrix® Print Canvas™

**What is Fredrix Print Canvas?** Fredrix Print Canvas is similar to other Fredrix archival canvas used for fine arts, but it receives a specially formulated top coat for ink receptivity. The raw canvas has a finer, more consistent texture to deliver enhanced fine arts reproductions. Our line consists of canvas specifically made for lithographic printing, giclée, wide-format inkjet and desktop inkjet, serigraphic and electrostatic/dye sublimation.

For more information, call our **Fredrix Print Canvas technical line at 1-800-241-8129 Ext. 123.**

**Fredrix Litho Canvas** — A fine, archival quality Polyflax/cotton canvas, face-coated for lithographic printing inks, and back-coated to reduce lint buildup on blankets and to provide better yield. 17mil / 320 GSM (grams per square meter) weight.

| Item No. | Dimension | Description |
|---|---|---|
| 10975BC | 28" x 40" | Cut sheets |
| 10976BC | 23" x 27" | Cut sheets |
| 10977BC | 21" x 27" | Cut sheets |

**Fredrix Inkjet Canvas** — A fine quality Polyflax/cotton canvas for printing on large-format and desktop inkjet printers. Ink receptive clear coat delivers enhanced color quality, and a fine art appearance that can only be achieved on canvas. 18mil / 411GSM. Cut sheets also available from 8½"x11" to 17"x22" and A4 to A2 metric sizes. Please inquire.

| Item No. | Dimension | Description |
|---|---|---|
| 11042 | 24" x 40' | Rolls — for wide-format printing |
| 11001 | 36" x 25' | Rolls — for wide-format printing |
| 11002 | 36" x 40' | Rolls — for wide-format printing |
| 11052 | 50" x 40' | Rolls — for wide-format printing |
| 11062 | 60" x 40' | Rolls — for wide-format printing |

**Fredrix Giclée (Iris®) Canvas** — A fine quality 100% cotton canvas specially coated to compliment the new Iris technology to deliver a high resolution, color brilliant reproduction. 17mil / 373 GSM weight.

| Item No. | Dimension | Description |
|---|---|---|
| 11704 | 24½" x 24½" | Cut sheets |
| 11705 | 35" x 47" | Cut sheets |

**Fredrix Mural Artist Canvas** — A fine, archival quality canvas especially made for super wide-format color printers. 21-28mil thickness / 454 GSM weight. Available in Polyflax or 100% cotton rolls from 75" to 144" wide. Used for printing large murals and billboards. Other sizes quoted upon request.

Polyflax®/cotton | 100% Polyflax® | 12oz. cotton

| Item No. | Dimension | Description |
|---|---|---|
| 10942 | 75" x 30yd. | Polyflax®/cotton |
| 100867 | 98"(249cm) x 7yd.(6.4m) | 100% Polyflax® |
| 10086 | 98"(249cm) x 25yd.(22m) | 100% Polyflax® |
| 1028 | 120"(305cm) x 18yd.(16m) | Heavy 12oz. cotton |
| 10087 | 127"(322cm) x 7yd.(6.4m) | 100% Polyflax® |
| 10085 | 127"(322cm) x 25yd.(22m | 100% Polyflax® |
| 1031 | 144"(365cm) x 18yd.(16m) | Heavy 12oz. cotton |

**Fredrix Serigraphic Canvas** — A fine, archival quality canvas for serigraphic printing. Made of Fredrix Ultrasmooth Polyflax/cotton. Excellent lay flat and stable for multiple impressions. 16mil / 388GSM. Available in 6yd., 30yd. and 100yd. rolls, 58"- 59" wide (including selvage). A lead time of up to 30 days for slitting is requested. Other sizes quoted upon request.

medium texture | ultra-smooth texture

**Medium texture Polyflax®/cotton**

| Item No. | Dimension |
|---|---|
| 1097 | 59" x 6yd. |
| 10972 | 59" x 30yd. |
| 10973 | 59" x 100yd. |

**Ultra-smooth Polyflax®/cotton**

| Item No. | Dimension |
|---|---|
| 1098 | 57" x 6yd. |
| 10982 | 57" x 30yd. |
| 10983 | 57" x 100yd. |

## Fredrix® Artist Canvas Rolls - Polyflax®-Acrylic Primed

**Polyflax®-Acrylic Primed** — Pg 13

| Each | Stock | Style | Width | Price | Ctn. | lbs. |
|---|---|---|---|---|---|---|
| | 1058 | 500 Poly/cotton | 60 | 42.40 ⇑ | 6 | 7 |
| | 10582 | 500 " 30 yd. | 60 | 201.40 ⇑ | 1 | 30.8 |
| | 10583 | 500 " 100 yd. | 60 | 636.00 ⇑ | 1 | 103 |
| | 10087 | Mural Poly 7yd. | 126 | 258.00 ⇑ | 1 | 29 |
| | 10085 | Mural Poly 25 yd. | 126 | 970.00 ⇑ | 1 | 90 |
| | 100867 | Mural Poly 7yd. | 98 | 218.00 ⇑ | 1 | 34.5 |
| | 10086 | Mural Poly 25 yd. | 98 | 820.00 ⇑ | 1 | 78 |
| | 1059 | 520 Polyflax | 59 | 74.25 ⇑ | 6 | 7.4 |
| | 10592 | 520 30 yd. | 59 | 352.70 ⇑ | 1 | 37.7 |
| | 10593 | 520 100 yd. | 59 | 1113.75 ⇑ | 1 | 100 |

**Polyflax®-Acrylic Primed - continued** — Pg 13

| Each | Stock | Style | Width | Price | Ctn. | lbs. |
|---|---|---|---|---|---|---|
| | 1075 | 575 Poly/cotton | 57 | 46.15 ⇑ | 6 | 7.2 |
| | 10752 | 575 30 yd. | 57 | 219.20 ⇑ | 1 | 19 |
| | 10753 | 575 100 yd. | 57 | 692.25 ⇑ | 1 | 65 |
| | 1083 | 900 Portrait | 59 | 63.60 ⇑ | 6 | 7 |
| | 1097 | 901 Poly/cotton | 59 | 64.85 ⇑ | 6 | 7.3 |
| | 10972 | 901 30 yd. | 59 | 308.00 ⇑ | 1 | 41 |
| | 10973 | 901 100 yd. | 59 | 972.75 ⇑ | 1 | 110 |
| | 1094 | Mural Portrait | 73 | 95.35 ⇑ | 6 | 10.4 |
| | 10942 | Mural Port.30yd. | 73 | 452.90 ⇑ | 1 | 47.4 |
| | 10943 | Mural Port.100yd. | 73 | 1430.25 ⇑ | 1 | 171 |

**Polyflax®-Acrylic Primed - continued** — Pg 13

| Each | Stock | Style | Width | Price | Ctn. | lbs. |
|---|---|---|---|---|---|---|
| | 1095 | 900 Poly/cotton | 75 | 80.50 ⇑ | 6 | 8 |
| | 1098 | Ultrasmooth | 57 | 75.65 ⇑ | 6 | 7 |
| | 10982 | Ultrasmooth30yd. | 57 | 359.34 ⇑ | 1 | 36.7 |
| | 10983 | Ultrasmooth100yd. | 57 | 1134.75 ⇑ | 1 | 131 |

*Most acrylic primed canvases are available in 3, 6, 30 and 100 yd. rolls that may not be listed. Please inquire.*

16

## Fredrix® Artist Canvas Rolls - Polyflax®-Acrylic Primed

**Polyflax®-Acrylic Primed** — Pg 13

| Each | Stock | Style | Width | Price | Ctn. | lbs. |
|---|---|---|---|---|---|---|
| | 1058 | 500 Poly/cotton | 60 | 44.50 ⇑ | 6 | 7 |
| | 10582 | 500 " 30 yd. | 60 | 211.40 ⇑ | 1 | 30.8 |
| | 10583 | 500 " 100 yd. | 60 | 667.50 ⇑ | 1 | 103 |
| | 10087 | Mural Poly 7yd. | 126 | 215.00 ⇑ | 1 | 29 |
| | 100810 | Mural Poly 10 yd. | 126 | 330.00 ⇑ | 1 | 90 |
| | 100815 | Mural Poly 15 yd. | 126 | 525.00 ⇑ | 1 | 90 |
| | 10085 | Mural Poly 25 yd. | 126 | 1015.00 ⇑ | 1 | 90 |
| | 100867 | Mural Poly 7yd. | 98 | 199.00 ⇑ | 1 | 34.5 |
| | 10086 | Mural Poly 25 yd. | 98 | 900.00 ⇑ | 1 | 78 |
| | 1059 | 520 Polyflax | 59 | 77.95 ⇑ | 6 | 7.4 |
| | 10592 | 520 30 yd. | 59 | 370.25 ⇑ | 1 | 37.7 |
| | 10593 | 520 100 yd. | 59 | 1169.25 ⇑ | 1 | 100 |

**Polyflax®-Acrylic Primed - continued** — Pg 13

| Each | Stock | Style | Width | Price | Ctn. | lbs. |
|---|---|---|---|---|---|---|
| | 1075 | 575 Poly/cotton | 57 | 47.50 ⇑ | 6 | 7.2 |
| | 10752 | 575 30 yd. | 57 | 225.60 ⇑ | 1 | 19 |
| | 10753 | 575 100 yd. | 57 | 712.50 ⇑ | 1 | 65 |
| | 1083 | 900 Portrait | 59 | 66.75 ⇑ | 6 | 7 |
| | 1097 | 901 Poly/cotton | 59 | 67.95 ⇑ | 6 | 7.3 |
| | 10972 | 901 30 yd. | 59 | 322.75 ⇑ | 1 | 41 |
| | 10973 | 901 100 yd. | 59 | 1019.25 ⇑ | 1 | 110 |
| | 1094 | Mural Portrait | 73 | 99.95 ⇑ | 6 | 10.4 |
| | 10942 | Mural Port.30yd. | 73 | 474.75 ⇑ | 1 | 47.4 |
| | 10943 | Mural Port.100yd | 73 | 1499.25 ⇑ | 1 | 171 |

**Polyflax®-Acrylic Primed - continued** — Pg 13

| Each | Stock | Style | Width | Price | Ctn. | lbs. |
|---|---|---|---|---|---|---|
| | 1098 | Ultrasmooth | 57 | 79.45 ⇑ | 6 | 7 |
| | 10982 | Ultrasmooth30yd. | 57 | 377.35 ⇑ | 1 | 36.7 |
| | 10983 | Ultrasmooth100yd. | 57 | 1191.75 ⇑ | 1 | 131 |

*Most acrylic primed canvases are available in 3, 6, 30 and 100 yd. rolls that may not be listed. Please inquire.*

17

Page 6

## Fredrix® Artist Canvas Rolls - Polyflax®-Acrylic Primed

**Polyflax®-Acrylic Primed** — Pg 13

| Each | Stock | Style | Width | Price | Ctn. | lbs. |
|---|---|---|---|---|---|---|
| | 1058 | 500 Poly/cotton | 60 | 48.00 ⇑ | 6 | 7.1 |
| | 10582 | 500 " 30 yd. | 60 | 228.00 ⇑ | 1 | 30.8 |
| | 10583 | 500 " 100 yd. | 60 | 720.00 ⇑ | 1 | 102.7 |
| | 10087 | Poly Mural 7yd. | 126 | 215.00 | 1 | 29 |
| | 100810 | Poly Mural 10 yd. | 126 | 330.00 | 1 | 51 |
| | 100815 | Poly Mural 15 yd. | 126 | 525.00 | 1 | 65 |
| | 100820 | Poly Mural 20 yd. | 126 | 735.00 | 1 | – |
| | 10085 | Poly Mural 25 yd. | 126 | 1015.00 | 1 | 120 |
| | 100867 | Poly Mural 7yd. | 98 | 199.00 | 1 | 34.5 |
| | 10086 | Poly Mural 25 yd. | 98 | 900.00 | 1 | 78 |
| | 100886 | Poly Mural 25 yd. | 80 | 820.00 ⇓ | 1 | – |
| | 100887 | Poly Mural 7 yd. | 80 | 175.00 ⇓ | 1 | – |

**Polyflax®-Acrylic Primed - continued** — Pg 13

| Each | Stock | Style | Width | Price | Ctn. | lbs. |
|---|---|---|---|---|---|---|
| | 1059 | 520 Polyflax | 59 | 84.00 ⇑ | 6 | 7.42 |
| | 10592 | 520 30 yd. | 59 | 399.00 ⇑ | 1 | 37.7 |
| | 10593 | 520 100 yd. | 59 | 1260.00 ⇑ | 1 | 100 |
| | 1075 | 575 Poly/cotton | 57 | 51.00 ⇑ | 6 | 7.2 |
| | 10752 | 575 30 yd. | 57 | 242.00 ⇑ | 1 | 19 |
| | 10753 | 575 100 yd. | 57 | 765.00 ⇑ | 1 | 65 |
| | 1097 | 901 Poly/cotton | 59 | 74.00 ⇑ | 6 | 7.3 |
| | 10972 | 901 30 yd. | 59 | 350.00 ⇑ | 1 | 41 |
| | 10973 | 901 100 yd. | 59 | 1110.00 ⇑ | 1 | 110 |

**Polyflax®-Acrylic Primed - continued**

| Each | Stock | Style | Width | Price | Ct |
|---|---|---|---|---|---|
| | 1094 | Mural Portrait | 73 | 108.00 ⇑ | |
| | 10942 | Mural Port.30yd. | 73 | 513.00 ⇑ | |
| | 10943 | Mural Port.100yd | 73 | 1620.00 ⇑ | |
| | 1098 | Ultrasmooth | 57 | 86.00 ⇑ | |
| | 10982 | Ultrasmooth30yd. | 57 | 408.00 ⇑ | |
| | 10983 | Ultrasmooth100yd. | 57 | 1290.00 ⇑ | |

*Most acrylic primed canvases are available in 3, 6, 30 and 100 yd. rolls that may not be listed. Please inquire.*

18

---

16 Public Hearing Materials (March 29,2006), excerpts attached at Exhibit 10.
17 *Id*., excerpts attached at Exhibit 11.
18 *Id*., excerpts attached at Exhibit 12.

On December 1, 2005, in its injury pricing requests, Tara never suggested to have 100% polyester print canvas as part of the questionnaires.[19]

On December 2, 2005, in its injury pricing requests, Tara never suggested to have 100% polyester print canvas as part of the questionnaires.[20]

On December 16, 2005, in its published questionnaires, the ITC did not include a 100% polyester print canvas product.[21] See the below.

***Product 1*.–8x10 stretched canvas, medium-weight, 100% unbleached cotton duck, double-primed acrylic, standard stretcher strips (1-5/8" x 11/16"), side-stapled.**

***Product 2*.–16x20 stretched canvas, medium-weight, 100% unbleached cotton duck, double-primed acrylic, standard stretcher strips (1-5/8" x 11/16"), side-stapled.**

***Product 3*.–16x20 stretched canvas, medium-weight, 100% unbleached cotton duck, double-primed acrylic, standard stretcher strips (1-5/8" x 11/16"), stapled on back.**

***Product 4*.–16x20 stretched canvas, medium-weight, 100% unbleached cotton duck, double-primed acrylic, standard stretcher strips (1-5/8" x 11/16"), with spline.**

***Product 5*.–12x12 stretched canvas, gallery (or deep) stretcher bars (1-7/16" x 1-7/16" or 1-1/2" x 1-1/2 "), 100% unbleached cotton duck, double-primed acrylic, stapled on back.**

***Product 6*.–8x10 canvas panel (non-archival) with chipboard core, polyester/cotton canvas.**

***Product 7*.–Double-primed, medium-weight, 100% unbleached cotton duck, 73" x 6 yards roll.**

***Product 8*.–Inkjet printer canvas with top-coat for ink receptivity, polyester/cotton canvas, 36" x 40' roll.**

On March 28, 2006, during its Public Hearing with the ITC, Tara stated, “Fredrix was the first canvas manufacturer to combine polyester and cotton fibers in our poly-flax artists'

[19] Tara Materials, Inc.’s Comments on Draft Questionnaires, excerpts attached at Exhibit 13.
[20] Clarifications to Tara Materials, Inc.'s Comments on Draft Questionnaires, attached at Exhibit 14.
[21] *See* Exhibit 15.

canvas."[22] Some 20 years later Ecker (now through Blick Art Materials, LLC) markets its Polyflax as poly/cotton. [23] Thus, it seems the data provided to the ITC was incorrect.

In 2011, when making comments to the ITC regarding the Five-Year Sunset Review of the *Order*, Tara did not inform the ITC that it was not producing 100% polyester canvas. Tara stated, "The domestic like product in this review should be defined as was in the original investigation: a single domestic like product, all artists' canvas, co-extensive with the scope of the investigation. No information has been submitted or developed warranting a change in this definition."[24] [25]

On April 28, 2015, in its scope ruling request concerning print canvas, Tara stated, "Print Canvas is manufactured in the same way, using the same equipment and same materials, as other forms of Artist Canvas. All Artist Canvas is produced using raw canvas, which may be composed of cotton, cotton and polyester, 100% polyester or linen."[26] However, Tara made no 100% polyester print canvas 2015.

It is well-known that "The Commission looks for clear dividing lines among possible like products and disregards minor variations."[27] However, here, the ITC would have divided a line between print canvases as part of the case and 100% polyester if it were not for the above misstatements and omissions. Simply put, there was no domestic producer of 100% polyester

[22] ITC Public Hearing (March 28, 2006), excerpts attached Exhibit 16.
[23] *See* https://www.dickblick.com/search/?q=polyflax (last visited April 23, 2026). *See also* polyflax trademark status at Exhibit 17.
[24] Domestic Producers' Response to Notice of Institution (September 2, 2011), excerpts attached at Exhibit 18.
[25] Tara made similar assertions in sunset reviews in 2016 and 2022. If Tara did not produce 100% polyester print canvas, misstatements/omissions would have occurred. See excerpts attached at Exhibit 19 and Exhibit 20.
[26] Tara Scope Inquiry Request (April 28, 2015), excerpts attached at Exhibit 21.
[27] Publication 3853 (Final) (May 2006) ("Publication 3853"), excerpts attached at Exhibit 22.

Barcode: 4915737-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II

print canvas prior to 2016. Commerce should also revoke the *Order*, in part, based on "Other changed circumstances sufficient to warrant revocation or termination exist." 19 C.F.R. § 351.222(g)(1)(i). As stated below, it is unclear whether Tara/Ecker has ever made a 100% polyester print canvas.

Beginning in 2013 Tara and Lexjet entered into two consecutive memorandum of understanding agreements ("MOU") where Lexjet was to be the exclusive distributor of Tara's Fredrix print canvas line.[28] With the MOUs, Tara had an exclusive right to manufacture: Fredrix Print Canvas; Sunset brand print canvas offering of LexJet; BMG print canvas offerings for Kodak and future brands represented; White box private label program print canvas offerings of LexJet and ABAQA.[29] [30] Under the MOUs Tara also had a right of first refusal to meet competition and manufacture the products not covered in the scope of this MOUs.[31] In fact, on January 27, 2017, Tara executed a letter stating that Lexjet's 100% polyester Water Resistant Satin Cloth was out of scope of the *Order*.[32] Tara did not consider 100% polyester print canvas as artist canvases.[33] Tara Materials Inc (Tara) and Ecker never considered 100% polyester a canvas or an artist canvas. Importantly, Tara had knowledge of Lexjet's contract manufacturing from China and acquiesced as such for Lexjet's 100% polyester print canvases, including Sunset Production Matte Canvas ("SPMC"), Sunset Production Gloss Canvas ("SPGC"), Water Resistant Polyester Canvas, Water Resistant Premium Poly Canvas, and Water Resistant 100% Polyester Canvas.[34]

[28] *See* Exhibit 23.
[29] *Id*.
[30] *See also* Exhibit 24.
[31] See Exhibit 23.
[32] *See* Exhibit 25.
[33] *See* Exhibit 26 and Exhibit 60.
[34] *See* Exhibit 24. *See also* Exhibit 26.

In 2016, Lexjet and Tara launched a co-developed a coated fabric, possibly 100% polyester, called Sunset Production Satin Canvas SUV ("SPSC") under the codename Mustang.[35] In terms of likeness, SPSC was similar to no 100% polyester print canvas imported by Lexjet. *See* Exhibit 27 Tony Sary explaining that SPSC fell between SPMC and SPGC chemistry and use wise. However, the product was fraught with quality and production volume issues from the beginning:

On September 19, 2016, Lexjet made internal statements that the launch would be delayed a month from Tara base issues[36]

On October 19, 2016, Lexjet made internal statements that the first product was shipping from Tara but limited stock would continue for a few months, until mid-December[37]

On October 25, 2016, Lexjet made statements to Tara concerning quality issues: concerning wrinkled rolls; a decline in durability; and soft top coats[38]

On March 31, 2017, Tara indicated supply issues to Lexjet[39]

On August 3, 2017, Lexjet indicated quality (base) and supply issues to Tara[40]

On February 5, 2018, Lexjet made internal statements regarding quality issues (headstrikes)[41]

On October 11, 2018, Lexjet made internal statements that a customer moved away from the product because of quality and supply issues[42]

On March 29, 2019, Lexjet made internal statements concerning numerous quality issues[43]

On August 19, 2019, Lexjet sought help from third party to correct quality issues[44]

---

[35] Lexjet was not able to definitively determine that the fabric was 100% versus polyflax.
[36] *See* Exhibit 28.
[37] *See* Exhibit 29.
[38] *See* Exhibit 30.
[39] *See* Exhibit 31.
[40] *See* Exhibit 32.
[41] *See* Exhibit 33.
[42] *See* Exhibit 34.
[43] *See* Exhibit 35.
[44] *See* Exhibit 36.

Barcode: 4915737-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II

On November 8, 2019, Lexjet made internal statements regarding delays with product from Tara[45]

On November 18, 2019, Lexjet noted supply issues to Tara[46]

On June 3, 2000, Tara noted raw material delays[47]

July 21, 2020, Lexjet made internal statements regarding supply issues[48]

August 7, 2000, Tara noted supply issues[49]

August 21, 2020, Lexjet made internal statements regarding quality and supply issues[50]

August 21, 2020, Lexjet made internal statements regarding quality and supply issues[51]

August 26, 2020, Lexjet made internal statements regarding quality issues with new SPSC/Mustang[52]

On September 23, 2020, September 30, 2020, and October 6, 2020, Tara noted quality issues with new SPSC/Mustang[53]

On July 21, 2021, Lexjet noted ongoing quality issues to Tara[54]

On May 27, 2022, Lexjet made internal statements regarding quality and supply issues[55]

August 31, 2022, Lexjet made internal statements to move away from SPSC/Mustang because of quality and supply issues[56]

On November 28, 2022, Lexjet made internal statements regarding quality issues[57]

Lexjet ceased distributing SPSC/Mustang late 2022.

[45] *See* Exhibit 37.
[46] *See* Exhibit 38.
[47] *See* Exhibit 39.
[48] *See* Exhibit 40.
[49] *See* Exhibit 41.
[50] *See* Exhibit 42.
[51] *See* Exhibit 43.
[52] *See* Exhibit 44.
[53] *See* Exhibit 45, Exhibit 46, Exhibit 47, and Exhibit 48.
[54] *See* Exhibit 49.
[55] *See* Exhibit 50.
[56] *See* Exhibit 51.
[57] *See* Exhibit 52.

Filed By: kyl@kirbyfedlaw.com, Filed Date: 4/23/26 3:47 PM, Submission Status: Approved

Barcode: 4915737-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II

Even beyond SPSC/Mustang quality and supply issues with Tara are well documented. On June 3, 2016, Tara stated, "We are the manufacturer and the quality issues were real, therefor we were at fault."[58] On August 1, 2016, Tara stated, "Take a look at the attached document, these are the top canvas customers that were lost due to the consistency issues with the Tara product. A couple of them moved to Reserve so we have regained the business but for the most part they have been lost."[59] On July 20, 2020 Lexjet stated to Tara, "On a side note we may have run into an issue on the most recent lot with spotting in the IRC. I'm still gathering samples and pictures of what they're seeing on the rolls, but just an FYI in case you get other claims on this lot(s)."[60] On August 14, 2020 Lexjet stated to Tara, "Mid-September? Dudeeeeeeeeeee…we already pushed them back from early August to late August, now we're pushing them to mid-September? I get you're slammed, but he's going to go elsewhere if we do that.[61] On August 14, 2020, Lexjet stated internally regarding the same issues, "Maybe you guys have more background on what's going on? Rob and I have been running into a lot, lead times keep getting pushed and pushed without stock. I just assumed they were slow or it was virus related, but Reid's always claiming they're too slammed. In this example below we sell 64x150 rolls of SFSS for Simply Canvas (which truthfully is already on the rocks from QC issues)."[62] On November 23, 2020, "We need to begin preparing a letter to send to Tara, notifying them of breach of MOU for the ongoing quality issues. … There continues to be quality issues with product from Tara Materials which are having a negative affect with S-One customers."[63] *See also* Exhibit 26 where

---

[58] *See* Exhibit 24.
[59] *See* Exhibit 53.
[60] *See* Exhibit 54.
[61] *Id.*
[62] *Id.*
[63] *See* Exhibit 55.

Alexander Ried stated that quality and volume issues were numerous, which caused great strain on its customers. Sadly, Tara and Ecker failed to modernize their equipment.[64] Tony Sary confirmed that the Tara/Ecker equipment is very antiquated, differs from more efficient modern operations, there lacks a quality and innovation culture, and little investment has been made."[65] Without this modernization, foreign manufacturers have been able to operate more efficiently with superior quality. Tara and Ecker should not be rewarded by sitting on the sidelines while operating archaic equipment. Importantly, a single machine now performs any coating whether it be a bottom coat (referenced by Tara as so-called "gesso" or top inkjet like coat.[66] [67] On April 5, 2006, concerning the same equipment technology that exists for bottom and top coating Tara stated that "[a] coating line can be operated by between one and three employees" and that "[o]perators basically monitor an inspection station where the substrate automatically feeds through the equipment." … and that "[t]he technical expertise needed to apply the print canvas coating is minimal; merely requires one to three operators to monitor the coating process."[68] Thus, there is no differentiation between skills, costs, etc. between bottom and top coating processes. Moreover, Tara's bottom coating (bulk canvas) capital investment argument[69] is a

[64] *See* Exhibit 27.
[65] *Id*.
[66] *See* Exhibit 56 for a state-of-the-art print canvas operation (machine performs bottom and top coating) explained in a scope ruling request with Commerce.
[67] *See also* Exhibit 24 where Tony Sary assisted with the implementation of inkjet coating in Tara's factory.
[68] *See* Responses to Commission Questions by Tara Materials, Inc. (April 5, 2006) ("Responses to Commission"), excerpts at Exhibit 57.
[69] See where the ITC relied on Tara's bulk canvas producer argument in stating, "Petitioner also makes the point that the production-related activities of the coaters – the makers of the bulk canvas – are significantly greater than the production-related activities of print converters. In Tara's case, for example, the capital investment for producing bulk canvas that is used by print converters is approximately $***, including coating lines (***), $*** for inspection equipment, $*** million for chemical making equipment, and $*** for handling equipment. Bulk operations at Tara alone employ *** production workers.", excerpts at Exhibit 58.

moot point, given the same equipment is used for both, especially that Tara and Ecker have not replaced its aged equipment.[70] Thus, Ecker is nothing more than an archaic, inefficient print converter that is not engaged in sufficient production-related activity to constitute domestic producer.[71] [72] Tara and Ecker have failed to disclose this in their sunset reviews.

Since 2020, Fredrix has marketed a "100% polyester" print canvas under the name of PANORAMA 1008SJ in widths of 80", 98", and 126". See the below.[73]

[70] *See also* where "Tara was clear from the outset of this investigation that there were inkjet coaters in the United States, and that Tara did not consider the coating process to constitute production, but to instead be a mere finishing operation. Tara did not include such finishers in the petition precisely because it does not consider them to be domestic producers.", Responses to Commission, excerpts attached at Exhibit 59.

[71] Publication 3853, excerpts attached at Exhibit 58.

[72] Lexjet also proposes an alternate argument that for a partial revocation of the *Order* for all print canvas.

[73] *See* https://fredrixprintcanvas.com/2020/02/18/canvas-compatibility-chart/ (last visited April 23, 2026).




Fredrix Canvas Compatibility Chart

FEBRUARY 18, 2020 ADMIN POSTED IN: UNCATEGORIZED

However, Ecker also markets the product as a "polyester blend".[74] Additionally, an Ecker distributor markets the product as Polyflax. See the below.

---

[74] *See* https://eckertex.com/shop/panorama-1008sj/ (last visited April 23, 2026).



PANORAMA Grand Format Canvas 12.5 osy / 440 gsm, 126" x 25-50yd (3.20 x 22.85-45.70m),100% PolyFlax®, 22.5 mils / 572 microns

20,20 € VAT Excluded

✖ Läbimüüdud

Teavitage mind kui on laos tagasi

[75]

All Products / PANORAMA Grand Format Canvas 12.5 osy / 440 gsm, 98" x 25-50yd (2.49 x 22.85-45.70m),100% PolyFlax®, 22.5 mils / 572 microns



PANORAMA Grand Format Canvas 12.5 osy / 440 gsm, 98" x 25-50yd (2.49 x 22.85-45.70m),100% PolyFlax®, 22.5 mils / 572 microns

20,20 € VAT Excluded

✖ Läbimüüdud

Teavitage mind kui on laos tagasi

[76]

---

[75] *See* https://www.photoartsupplies.eu/et/shop/panorama-grand-format-canvas-12-5-osy-440-gsm-126-x-25-50yd-3-20-x-22-85-45-70m-100-polyflax-r-22-5-mils-572-microns-2409?page=11 (last visited April 23, 2026).

[76] *See* https://www.photoartsupplies.eu/et/shop/panorama-grand-format-canvas-12-5-osy-440-gsm-98-x-25-50yd-2-49-x-22-85-45-70m-100-polyflax-r-22-5-mils-572-microns-2408?page=11 (last visited April 23, 2026).



PANORAMA Grand Format Canvas 12.5 osy / 440 gsm, 80" x 25-50yd (2.03 x 22.85-45.70m),100% PolyFlax®, 22.5 mils / 572 microns

20,20 € VAT Excluded

✖ Läbimüüdud

Teavitage mind kui on laos tagasi

[77]

Crucially, Tara did not have machines wide enough to accommodate the product and Ecker does not have machines wide enough to accommodate the product.[78] Thus, Tara and Ecker have demonstrated their intent of lacking interests in 100% polyester print canvas.

## III. ECKER'S RESPONSE FAILS TO PROVIDE A LEGAL REASON FOR COMMERCE TO DENY THE CCR

On February 20, 2026, Ecker submitted a response through its counsel.[79] In its letter, Ecker opposes the requests that Commerce conduct a CCR of the ADD order. Lexjet filed a response pursuant to 19 C.F.R. § 351.301(b)(1) and §351.102(b)(21)(v) on March 11, 2026.[80] However, Commerce failed to review Lexjet's March 11th submission in stating, "On March 12, 2026, Lexjet submitted additional comments to rebut Ecker's Comments. [footnote removed]

---

[77] *See* https://www.photoartsupplies.eu/et/shop/panorama-grand-format-canvas-12-5-osy-440-gsm-80-x-25-50yd-2-03-x-22-85-45-70m-100-polyflax-r-22-5-mils-572-microns-2407?page=11 (last visited April 23, 2026).
[78] See Exhibit 26 and Exhibit 60.
[79] *See Re: Certain Artist Canvas From the People's Republic of China: Response to Opposition to Request for Changed Circumstances Review* (February 20, 2026).
[80] Filing under this section of the regulations is appropriate because the factual information herein does not satisfy the description of paragraphs §351.102(b)(21)(i)-(iv). *See Re: Certain Artist Canvas From the People's Republic of China: Response to Opposition to Request for Changed Circumstances Review* (March 11, 2026).

However, we are not addressing Lexjet's Rebuttal herein, as it was submitted the day of Commerce's imitation decision."[81] Note that Lexjet submitted its response on March 11, 2026 and Commerce's decision was not issued until March 13, 2026. As such, Lexjext is resubmitting its CCR request and reiterating its responses to Ecker's filing.

Lexjet strongly disagrees with Ecker's assertions. **First**, Lexjet's CCR meets the requirements for the initiation of a CCR because Ecker does not produce 100% polyester print canvas and, neither Ecker, nor Tara Materials Inc ("Tara"), have produced 100% polyester print canvas since before the *Order* was announced in 2006.[82] **Second**, as demonstrated in its CCR, Tara and Ecker have had a lack of interest in producing 100% polyester print canvas. **Third**, Tara and Ecker's lack of production and interest stand as a warrantless opposition to Commerce rejecting the CCR. **Fourth**, well documented quality and production issues from its archaic machinery support a lack of both production and interest in 100% polyester print canvas. In short, the requirements of 19 C.F.R. § 351.222(g)(1).

### A. Lexjet's Request Does Not Fail to Meet the Requirements for the Initiation of a CCR

Contrary to Ecker's assertion, Lexjet's request is not fatally flawed. Since there has been a lack of production and interest, there has been a change in circumstances to review. Ecker offered no evidence to counter Lexjet's documentation that it and Tara have produced 100% polyester print canvas or that either had an interest in producing 100% polyester print canvas. Moreover, as established in Lexjet's CCR, Tara's misstatements and omissions (and lack of production) during the investigation phase of the ADD case disallowed the ITC from properly investigating 100% polyester print canvas as it concerned pricing and costs to support an ADD

[81] *See SUBJECT: Whether to Initiate a Changed Circumstances Review* (March 12,2026).
[82] Lexjet has otherwise demonstrated that it meets the requirements pursuant to 19 U.S.C. §§ 1675(b)(1) & (4) and 19 C.F.R. § 351.216.

Barcode: 4915737-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II

order. Instead, the ITC was unable "to provide clear dividing lines among articles."[83] Ecker had no response regarding Tara's unlawful interference with the investigation or its lack of transparency in the sunset reviews.

Ecker falsely posits that it currently produces two 100% polyester print canvases. Regarding the Fredrix Panorama 1008SJ, first, Lexjet clearly demonstrated in its CCR that Ecker does not possess the machinery to produce any products 80 inches or wider for which Ecker provided no response regarding any machinery capable of making the product widths. Simply put, it cannot and does not produce the Fredrix Panorama 1008SJ in its advertised 80", 98", and 126" widths. Moreover, even Ecker's own website states that the product is "Polyester Blend", contrary to any 100% polyester statements. See the below.[84] Ecker is unable to explain these inconsistencies.

---

[83] Petition filed with Commerce and the ITC by Tara Materials, Inc. (April 1, 2005), excerpts attached at in CCR.
[84] *See* https://eckertex.com/shop/panorama-1008sj/ (last visited April 23, 2026).

eckertex.com/shop/panorama-1008sj/ Relaunch to update

ECKER TEXTILES HOME ABOUT PRODUCTS BLOG CONTACT

Home | Solvent/Eco-Solvent/UV/Latex | Panorama 1008SJ





Translate

# Panorama 1008SJ

**Brand:** Fredrix Print Canvas
**Applications:** Wall Décor, Display Signage, Murals
**Roll Widths:** 80"-126" (2.03m-3.2m)

This product is unavailable for online purchase. Contact us for sales information.

**SKU** N/A
**Category** Solvent/Eco-Solvent/UV/Latex

Search 59°F Sunny 3:01 PM 2/21/2026

eckertex.com/shop/panorama-1008sj/ Relaunch to update

ECKER TEXTILES HOME ABOUT PRODUCTS BLOG CONTACT

f X in

Information

**Description**

This canvas is designed for digital printing applications using solvent based ink sets. Although designed for all printers using these ink sets, actual results may vary depending on printer model, age, print design, environmental conditions, and other factors. Exposure of a print to atmospheric pollutants, or to temperature, humidity, and/or lighting extremes can result in fading, color shifting, or other visual changes. The ideal conditions of printing and storage are a temperature of 70°F +-5°F and relative humidity of 50% RH +-3% RH. The shelf life is 1 year at recommended temperature and humidity.

Translate ...tiles guarantees only the canvas itself against defects in quality or

**Specifications**

| | |
|---|---|
| Style | 1008SJ |
| Name | Panorama |
| Item Master | 1008 + Width + VL |
| Canvas Construction | 100% Polyester |
| Weave | 1x1 |
| Coatings | Acrylic/Latex Primers, One Optimized Matte Solvent Topcoat |

Search 59°F Sunny 3:01 PM 2/21/2026




Ecker goes on to state that it produces a 100% polyester print canvas called Fredrix 520 Red Lion Polyflax. Ecker's statements are again quite perplexing. In the link provided in Ecker's response, Ecker markets the product as "FREDRIX 520 RED LION POLYFLAX, Poly/Cotton, 7oz raw, 10oz primed, available in 58″ width, USA PRIMED" and "FREDRIX CREATIVE SERIES poly/cotton canvas is primed just north of Atlanta, Georgia, with an acid-free acrylic titanium gesso."[85] See the below.

[85] See https://fredrixartistcanvas.com/product/creative-series-520-red-lion-polyflax-10oz-primed-58-wide (last visited April 23, 2026).

fredrixartistcanvas.com/product/creative-series-520-red-lion-polyflax-10oz-primed-58-wide

New Chrome available

World Class Canvases Since 1868

About Us Store Locator Products Contact

Fredrix Artist Canvas

# Polyflax & Poly-Cotton Rolls - Acrylic Primed

Fredrix Artist Canvas → Products → CREATIVE SERIES 520 RED LION POLYFLAX, 10oz Primed, 58″ Wide

## CREATIVE SERIES 520 RED LION POLYFLAX, 10oz Primed,

Type here to search

10:52 PM 3/3/2026

fredrixartistcanvas.com/product/creative-series-520-red-lion-polyflax-10oz-primed-58-wide

New Chrome available



## LION POLYFLAX, 10oz Primed, 58″ Wide

FREDRIX 520 RED LION POLYFLAX, Poly/Cotton, 7oz raw, 10oz primed, available in 58″ width, USA PRIMED.

| | |
|---|---|
| SKU | 1059 |
| Category | Polyflax & Poly-Cotton Rolls - Acrylic Primed |
| Tags | Acrylic Primed Roll, Canvas Roll, Cotton Canvas, Cotton Roll, Roll, Rolled Canvas, Rolls |

Description Related Products Stock Information

Type here to search

10:52 PM 3/3/2026




Even Ecker's reseller states that the product as a "Polyflax" "65% Poly / 35% Cotton" blend. See the below.[86]




---

[86] *See* https://www.dickblick.com/products/fredrix-style-520-polyflax-red-lion-canvas-rolls/?srsltid=AfmBOorA72jctDj4_CNBH-QiWyEnNJTO_vLS3__ZSXal_U8HLmn-roV5 (last visited April 23, 2026).


dickblick.com/products/fredrix-style-520-polyflax-red-lion-canvas-rolls/?srsltid=AfmBOorA72jctDj4_CNBH-QiWyEnNJTO_vLS3__ZSXal_U8...
New Chrome available
B
Departments
(800) 828-4548
Live Chat
Search 110,000+ art supplies
Stores
Hello, Sign In
Account
Shop School or Business
Orders
Cart
No. 520
Description: Medium Texture
Format: Roll
Size: 58" x 6 yd
Size (Metric): 147.32 cm x 5.49 m
Final Weight: 10 oz
Fredrix Red Lion Canvas Roll - 59" x 6 yards, Acrylic Primed
SAVE 19% off List!
List $167.00
$133.97
PayPal Pay in 4 interest-free payments of $33.50. Learn more
Qty
1
Add To Cart
Add to list
In stock online
Check Store Availability
® Fredrix is a registered trademark.
BACK TO TOP
Type here to search
9:48 PM
3/3/2026


dickblick.com/products/fredrix-style-520-polyflax-red-lion-canvas-rolls/?srsltid=AfmBOorA72jctDj4_CNBH-QiWyEnNJTO_vLS3__ZSXal_U8...
New Chrome available
B
Departments
(800) 828-4548
Live Chat
Search 110,000+ art supplies
Stores
Hello, Sign In
Account
Shop School or Business
Orders
Cart
® Fredrix is a registered trademark.
Reviews
Q & A
Related Products
Frequently Asked Questions
Q&A
Search for answers to your question
Search for...
Showing 3 out of 3 Questions
Sort By
Newest
Q is this 100% polyester
Asked by Amanda 3 years ago
Add your answer
BACK TO TOP
Type here to search
9:49 PM
3/3/2026




Ecker absolutely provided no proof production for any 100% polyester print canvas such as the following for neither Tara nor Ecker:

Raw Materials

- Contract
- Purchase order and sales confirmation
- Bill of lading/truck waybill from source location (and freight bill if applicable)
- Goods receipt
- Invoice (commercial rated and final)
- Packing list
- Quality Inspection report
- Proof of payment (i.e., wire transfer, canceled check, etc.)
- Sufficient space to store raw materials

Manufacturing/Production

- Annual output of the items
- Confirmation of claimed capacity with actual output
- Photographs of property, plant, and equipment where items were produced
- Complete description of all production processing steps (and costs) and dates they were performed
- Bill of material showing a breakdown of components, materials, or ingredients by weight and the actual cost that are converted into finished good
- Production and shipping records for the items
- Timecards to show that employees were actually working during the time the items were produced

- Utility bills to show energy used during time the audited items were produced
- List of number and types of machinery available for the production of the items
- Proof of workstations in actual use to sustain production
- Training logs and records
- Quality Inspection reports

It seems this is yet another failed attempt to show that Ecker produces and has an interest in 100% polyester print canvas. Pursuant to 19 U.S.C. §§ 1675(b)(1) & (4) and 19 C.F.R. § 351.216, Commerce will conduct a changed circumstances review within 24 months of the publication of a final less-than-fair value or subsidy investigation determination where (1) it receives a request for such a review from an interested party that shows changed circumstances sufficient to warrant a review and (2) good cause is provided for conducting the review.[87] Here it is undeniable there is a good cause for conducting a CCR.

**B. Ecker Textiles' Opposition Does not Warrant a Rejection of the CCR**

"A changed circumstances review is a statutorily required administrative process whereby Commerce, upon request, must review a final affirmative determination resulting in an antidumping duty order if an interested party has demonstrated the existence of changed circumstances sufficient to warrant review." *Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States*, 30 CIT 1537, 1538 n.3, 464 F.Supp.2d 1350, 1352 n.3 (2006), aff'd in part, rev'd in part, 593 F.3d 1346 (Fed. Cir. 2010) ('*Trustees II*') (citing 19 U.S.C. § 1675(b)(1)).
"19 U.S.C. § 1675(b)(1)(A) requires that the Commission conduct a review of 'a final affirmative determination that resulted in" an AD or CVD order whenever the Commission 'receives information ... or a request from an interested party ... which shows changed circumstances sufficient to warrant a review.'

[87] The final less-than-fair-value determination was published on March 30, 2006. See *id*. at 31154.

Barcode: 4915737-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II

Section 1675(b)(2)(A) provides the standard that the Commission applies when conducting a CCR:

> [I]n the case of a countervailing duty order or antidumping duty order or finding, [the Commission shall] determine *whether revocation of the order or finding is likely to lead to continuation or recurrence of material injury*,

(emphasis supplied).

In addition, § 1675(b)(3)(A) places on the 'party seeking revocation of an order' pursuant to a CCR 'the burden of persuasion with respect to whether there are changed circumstances sufficient to warrant' revocation of the order." *Eregli Demir Ve Çelik Fabrikalari T.A.S. v. U.S. Int'l Trade Comm'n,* 719 F.Supp.3d 1302 (22 July 2024).

"Section 1675(b) provides for an administrative review of a countervailing duty order, after publication of a Federal Register notice, based upon a request concerning "changed circumstances". A section 1675(b) review includes, inter alia, the opportunity for the submission of written comments and a hearing, and such review can be conducted only if there are "changed circumstances" determined to be "sufficient to warrant review". *Ceramica Regiomontana, SA v. United States*, 557 F. Supp. 596, 602, 5 CIT 23 (Ct. Int'l Trade 1983).

"It may be true — and plaintiff does not argue otherwise — that the lack of interest on the part of the domestic industry constitutes 'changed circumstances' sufficient to warrant review." *Gilmore Steel Corp. Or. Steel Mills Div. v. US*, 672 F. Supp. 1459, 11 CIT 684 (Ct. Int'l Trade 1987).

"In *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1360 (Fed.Cir.2008), we held that Commerce itself has the authority to reopen a proceeding if it later discovers evidence of fraud in the original proceeding. Section 751(b) of the Tariff Act of 1930, codified at 19 U.S.C. § 1675(b), provides for what is known as a 'changed circumstances' review. Under that section, Commerce has the statutory authority to reconsider its decisions whenever the

Barcode: 4915737-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II

agency ‘receives information ... which shows changed circumstances sufficient to warrant a review.’ 19 U.S.C. § 1675(b)(1); see also 19 C.F.R. § 351.216. In *Tokyo Kikai*, 529 F.3d at 1357, Commerce itself initiated a changed circumstances review in order to reconsider the results of three yearly administrative reviews in light of new evidence brought to light during a separate district court proceeding that indicated the respondents' representatives had committed perjury during the agency proceedings. Upon review, Commerce applied adverse facts available and increased the respondents' dumping rate from zero percent to 59.67 percent. *Id*. at 1357–58. The respondents appealed, contesting Commerce's authority to reopen the proceeding and arguing that new evidence of fraud did not fall into the category of ‘changed circumstances’ for which Commerce was authorized to reopen under § 1675(b). *Id*. At 1359–60. The Trade Court sustained Commerce's authority to reopen the proceeding, and we [*1377] affirmed. *Id*. We agreed that new evidence of fraud did not fit neatly into the category of ‘changed circumstances,’ because in such cases ‘the circumstances that led to the determination have “changed” only because the true circumstances, previously concealed by fraud, have come to light.” *Id*. at 1360. Nonetheless, we held that ‘administrative agencies possess inherent authority to reconsider their decisions, subject to certain limitations, regardless of whether they possess explicit statutory authority to do so.’ *Id*. Furthermore, we noted that “[a]n agency's power to reconsider is even more fundamental when, as here, it is exercised to protect the integrity of its own proceedings from fraud.” *Id*. at 1361. [ *See also Alberta Gas Chems., Ltd. v. Celanese Corp.*, 650 F.2d 9, 13 (2d Cir.1981) (“It is hard to imagine a clearer case for exercising this inherent power [to reconsider] than when a fraud has been perpetrated on the tribunal in its initial proceeding.”); *Elkem Metals Com. v. United States*, 193 F.Supp.2d 1314, 1321 (Ct. Int'l Trade 2002) (“A finding that the ITC has the authority to reconsider a final determination is particularly appropriate where after-discovered

fraud is alleged.”).]. Thus, *Tokyo Kikai* established that Commerce has inherent authority to reopen a case to consider new evidence that its proceedings were tainted by fraud.” *Home Products Int'l Inc. v. United States*, 633 F.3d 1369, 1376 (Fed. Cir. 2011).

“Antidumping law grants Commerce the authority to revoke an antidumping order based on changed circumstances. See 19 U.S.C. § 1675(b), (d) (2000). Commerce is required to conduct a changed circumstances review whenever it receives a request by an interested party that "shows changed circumstances sufficient to warrant a review" of an antidumping duty order. § 1675(b)(1). Commerce's regulations elaborate on this requirement, stating that Commerce may revoke an order if "[p]roducers accounting for substantially all of the production of the domestic like product, to which the order (or the part of the order to be revoked) ... pertains have expressed a lack of interest in the order, in whole or in part ..." 19 C.F.R. § 351.222(g) (2006); see *Or. Steel Mills Inc. v. United States*, 862 F.2d 1541, 1545 (Fed.Cir.1988) (holding that lack of industry support alone is a ground for revocation); *Stainless Steel Plate in Coils from Italy*, 71 Fed.Reg. 15380 (Dep't Commerce Mar. 28, 2006) (final results of changed circumstances review) (revoking countervailing duty order based on lack of industry support).” *Trustees of N. Am. Rubber Thread v. U.S.*, 533 F.Supp.2d 1290, 1293 (Ct. Int'l Trade 2007).

"[A] CCR may address a broad range of matters and the only limitation in the statute is the requirement that there be changed circumstances sufficient to warrant a review." *Marsan Gida Sanayi Ve Ticaret A.S. v. United States,* 35 CIT 222, 228, 2011 WL 546815 (2011) *(" Marsan Gida"); see also Or. Steel Mills Inc. v. United States,* 862 F.2d 1541, 1543–44 (Fed. Cir. 1988).

“As Commerce noted, the statute authorizing Commerce to conduct a changed circumstances review, 19 U.S.C. § 1675(b)(1), does not explicitly define what a CCR is or what

a CCR entails. In fact, a CCR may address a broad range of matters and the only limitation in the statute is the requirement that there be "changed circumstances **sufficient** to warrant a review." *See Mittal Canada, Inc. v. United States*, 30 CIT 1565, 1572, 461 F. Supp. 2d 1325, 1332 n.7 (2006) (emphasis added). Thus, as Commerce pointed out, it has discretion to construe the breadth of CCRs because statutory silence provides "an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *See Chevron*, 467 U.S. at 843-44." *Marsan Gida Sanayi Ve Ticaret A.S. v. United States*, Court No. 09-00483, Slip Op. 11-20, *5 (Ct. Int'l Trade Feb 16, 2011).

"Commerce may initiate a changed circumstances review to examine several factors wholly unrelated to assessment rates. The scope of Commerce's authority to initiate changed circumstances reviews under 19 U.S.C. § 1675(b) is delimited only by the general requirement that there be "changed circumstances sufficient to warrant a review" of the antidumping order. *See* 19 U.S.C. § 1675(b)(1) (2000). Commerce's discretion is broad, and the range of matters subject to changed circumstances reviews is wide. *See, e.g.*, *Or. Steel Mills, Inc. v. United States*, 862 F.2d 1541, 1545 (Fed.Cir.1988) (review of amount of domestic industry support of antidumping duty order); *Jia Farn Mfg. Co., Ltd. v. United States*, 17 CIT 187, 193, 817 F.Supp. 969, 974 (1993) (review of importer's resales of other producer's merchandise); *Stainless Steel Sheet and Strip in Coils from the Republic of Korea*, 71 Fed.Reg. 37906 (Dep't Commerce July 3, 2006) (final results of changed circumstances review) (successor-in-interest review); *Carbon and Certain Alloy Steel Wire Rod from Ukraine*, 70 Fed.Reg. 21396 (Dep't Commerce Apr. 26, 2005) (notice of initiation of changed circumstances review) (reviewing non-market economy status)." *Mittal Canada, Inc. v. U.S.*, 461 F.Supp.2d 1325, 2006 WL 2724031, *12 (Ct. Int'l Trade 2006).

As outlined in the CCR and in the response, the petitioner Tara, and its subsequent purchaser, Ecker, have had and have a lack of interest in producing 100% polyester print canvas. We have also noted that Ecker now accounts for mostly all of print canvas domestic production. Tara and Ecker have been the only parties to participate in the ITC sunset reviews since 2016.[88] Because of these facts (lack of production and interest), by default, 85% or more of domestic manufacturing of the like product or companies accounting for virtually 100% of print canvas are reflected in this request and thus support the changed circumstances review request.[89] Here, because Ecker does not have an interest in 100% polyester print canvas, companies accounting for virtually 100% of print canvas are reflected in this request. Lexjet has also provide that a revocation of the order or finding is likely to not lead to continuation or recurrence of material injury. Lastly, Tara and Ecker's fraudulent omissions and misstatements throughout the investigation and the CCR are of further cause to initiate a CCR. Simply put, Lexjet with its CCR and Response, has clearly met the burden of persuasion with respect to whether there are

---

[88] *See* "Of these four companies, only Tara Materials is a producer of canvas for painting, for which it performs the entire coating process of priming uncoated canvas with paint-receptive gesso. Tara Materials also primes print canvas, again using raw canvas. The other three companies filing these comments produce print canvas by placing an ink-receptive topcoat on canvas that already was primed with gesso by another entity. The Commission has referred to such parties as 'print converters', and concluded that they do not undertake insufficient production-related activity to qualify as 'producers' within the meaning of 19 U.S.C. § 1677(4)(A)." *Inv. No. 731-TA-1091, Section 751(c) Five-Year Sunset Review of the Antidumping Duty Order Against Artists' Canvas from the People's Republic of China; Domestic Producers' Comments on Adequacy of Responses to Notice of Institution* (December 15, 2016), excerpts attached at Exhibit 1.

[89] *See* Letter from Erin Begnal, Director, AD/CVD Operations, Off. III, to Whirlpool Corporation c/o Thomas M. Beline, Cassidy Levy Kent (USA) LLP, re: *Request for a Changed Circumstances Review of the Antidumping and Countervailing Duty Orders on Certain Metal Lockers and Parts There of from the People's Republic of China: Determination Not to Initiate a Changed Circumstances Review* (Jan. 23, 2023), attached at CCR.

Barcode: 4915737-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II

changed circumstances sufficient to warrant revocation of the order. Accordingly, the agency should initiate a changed circumstances review.

### C. Lexjet's Allegations Regarding Quality Issues Are Both Relevant and Correct

As stated in the CCR, Tara's and Ecker's quality and production issues directly relate to its lack of interest, a cause of the initiation of a CCR.

## IV. ON AN EXPEDITED BASIS, COMMERCE SHOULD RETROACTIVELY AMEND THE ORDERS CONSISTENT WITH LEXJET'S PROPOSAL

For the reasons set forth above, Lexjet respectfully requests that Commerce initiate a changed circumstances review for the specified 100% polyester print canvas imported from China. Given the facts presented and the lack of interest by Tara and Ecker, Lexjet requests that Commerce expedite this review and combine its notices of initiation and its preliminary results of review, and conduct the requested review in an expedited timeframe. With respect to conducting the review on an expedited basis, Commerce's regulations explicitly provide for expedited determinations.[90] Specifically, the regulations provide for Commerce to initiate a changed circumstances review within 45 days of a request, and to combine its initiation notice and preliminary results where the agency "concludes that expedited action is warranted."[91] Here, Lexjet respectfully requests that the agency both initiate a review as soon as practicable, and that it combine its initiation notice and preliminary results in doing so.

---

[90] 19 C.F.R. §§ 351.216(e) and 351.221(c)(3)(ii).

[91] 19 C.F.R. § 351.221(c)(3)(ii). Separately, the regulations also provide that Commerce will issue a final determination within 45 days of initiation, "if all parties to the proceeding agree to the outcome of the review."
19 C.F.R. § 351.216(e). Here, while the review has not yet been initiated and so the identity of "all parties to the proceeding" is not yet completely certain, given there is only one party responding to sunset reviews and because Ecker does produce 100% polyester print canvas, it there should be no opposition.

Filed By: kyl@kirbyfedlaw.com, Filed Date: 4/23/26 3:47 PM, Submission Status: Approved

Barcode: 4915737-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II

Lexjet also requests that Commerce apply the proposed scope exclusion retroactively to June 1, 2006, the date of publication of the preliminary determination in the investigation and the date of institution of provisional measures. With respect to retroactivity, the changed circumstances review statute leaves the effective date of any affirmative changed circumstances determination up to the agency.[92] Exercising this authority, Commerce has previously chosen dates as far back as the preliminary results of an investigation as the effective date for changed circumstances reviews.[93] For example, pursuant to a changed circumstances review of the antidumping duty order on certain Chinese steel nails, the agency partially revoked the order retroactive to the preliminary determination in the underlying investigation.[94] In selecting this effective date, the agency noted that the parties agreed to the date.[95] Further, examining the record of its first administrative review (the only one that had been thus far completed), the agency noted that the sole mandatory respondent did not sell the variety of nails as to which the order was being revoked during the review period.[96] Thus, making the partial revocation retroactive to the preliminary results of the investigation posed no administrability concerns.[97] Finally, the agency noted that it had similarly made its revocation retroactive to the preliminary investigation results in other changed circumstances reviews. *Id*. at 2-4. The circumstances present here likewise support retroactivity. *See also Steel Wire Garment Hangers From the People's Republic of China: Final Results of Changed Circumstances Review, and Revocation in Part of Antidumping Duty Order*, 74 FR 50956-57 (Oct. 2, 2009) (making changed

[92] 19 U.S.C. §§ 1675(d)(1) & (3).
[93] *See Final Results of Redetermination Pursuant to Itochu Building Products v. United States*, Slip Op. 14-37 (Ct Int'l Trade Apr. 8, 2014).
[94] *See* generally *Id*.
[95] *Id*. at 3-4.
[96] *Id*. at 3.
[97] Id.

Barcode: 4915737-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II

circumstances review retroactive to date of preliminary determination). Commerce has considered "factors such as the effective date proposed by the petitioner (and/or the effective date agreed to by all parties)" among the criteria for determining the effective date of the partial revocation of an order. *See Certain Hardwood Plywood Products From the People's Republic of China: Final Results of Changed Circumstances Reviews, and Revocation of the Antidumping and Countervailing Duty Orders in Part*, 86 FR 29,562, 29,564 (June 2, 2021) ("We find, based on the facts in this case, that it is appropriate to apply these partial revocations retroactively to unliquidated entries that were entered or withdrawn from warehouse, for consumption, on or after . . . the effective dates of the preliminary determinations in the AD and CVD investigations"). And as explained below, there are no administrability concerns.

There are no current judicial injunctions against liquidation; as such, liquidation instructions making the final results of this review retroactive to the date of the *Order* would not implicate any such injunctions. Further, retroactivity will not implicate any other proceedings involving the *Order*.

Moreover, Lexjet was not named as an importer of subject goods in the petition, and the manufacturers and exporters[98] were not identified as relevant since questionnaires were not sent from the ITC.[99] As also reflected above by Tara's misstatements and omissions, the ITC's reports reflect no collection of data regarding 100% polyester print canvas from supposed producers of print canvas.[100] Importantly, products not investigated by the ITC cannot lawfully be treated as

[98] Lexjet producers and exporters of 100% polyester print canvas were: China Great Wall Industry Shanghai Co Ltd; Guangdong Glm Digital Technology Co Ltd; Weifang Jiacheng Digital Materials Co Ltd; Zhongshan Glm Digital Technology Co Ltd; and Zhongshan Rbt Digital Technology Co Ltd.
[99] See ITC's Electronic Document Information System data at https://edis.usitc.gov/external/ (last visited April 23, 2026, Exhibit 61.
[100] Exhibit 252207, 249867, and 767702.

Filed By: kyl@kirbyfedlaw.com, Filed Date: 4/23/26 3:47 PM, Submission Status: Approved

subject to antidumping or countervailing duty orders.[101] Given that the ITC did not include 100% polyester print canvas products in its injury analysis, the retroactivity requested here would serve the statutory aim of the antidumping laws.[102] As such, Commerce should not only adopt Lexjet's proposed additional exclusionary language and revoke the *Order* as to products described by that language, it should (1) conduct this review on an expedited basis and (2) make the revocation retroactive to June 1, 2006., the date of the *Order*.

**V. Conclusion**

As detailed above and in the CCR, Commerce should initiate a changed circumstances review and should amend the scope of the antidumping *Order* on artists' canvas from China to clearly exclude 100% polyester print canvas products that are not described by the current exclusionary language. Clearly Tara and Ecker's lack of interest/production, along with its fraudulent misstatements and omissions, fall under 19 C.F.R. § 351.222(g)(1)(i). This request accounts for virtually 100% of print canvas producers. Lexjet therefore respectfully requests that Commerce expeditiously render a changed circumstances determination that partially revokes the *Order*, effective as of June 1, 2006.

* * *

[101] *A.L. Patterson, Inc. v. United States*, 585 Fed. Appx. 778, 785 (Fed. Cir. 2014); *Trendium Pool Prods. v. United States*, 399 F.Supp.3d 1335, 1345 (Ct Int'l Trade 2019); see also 19 U.S.C. §§ 1671 & 1673; 19 U.S.C. §1677(4).
[102] *Trendium Pool Prods.*, 399 F.Supp.3d at 1345, quoting Wheatland Tube Co. v. United States, 161 F.3d 1365, 1371 (Fed. Cir. 1998).

Barcode: 4915737-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II

I, Kyl J. Kirby, certify that a copy of the attached submission was served this April 23, 2026, pursuant to 19 C.F.R. § 351.303(f), on the following party for Ecker Materials, LLC electronically at gwt@gwthompsonlaw.com:

George Thompson
Thompson & Associates, PLLC
1050 Connecticut Avenue, NW
Suite 500
Washington, DC 20036

Please do not hesitate to contact the undersigned with any questions regarding this submission.

Respectfully submitted,

Kyl J. Kirby

Kyl J. Kirby

Counsel to Lexjet, LLC, Abaqa, LLC, and Brand Management Group, LLC

Filed By: kyl@kirbyfedlaw.com, Filed Date: 4/23/26 3:47 PM, Submission Status: Approved

# REPRESENTATIVE CERTIFICATION

I, Kyl J. Kirby, with Kyl J. Kirby, Attorney and Counselor at Law, P.C., counsel to Lexjet, LLC, Abaqa, LLC, and Brand Management Group, LLC, certify that I have read the attached submission, *Request for Changed Circumstances Review*, filed on April 23, 2026, pursuant to the Changed Circumstances Review regarding the antidumping order on *Certain Artist Canvas from the People's Republic of China* (No. A-570-899). In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Kyl J. Kirby

Date: April 23, 2026

# COMPANY CERTIFICATION

I, Jason Metnick, President & COO, currently employed by S-One Holdings Corporation, certify that I prepared or otherwise supervised the preparation of the attached submission, *Request for Changed Circumstances Review*, filed on April 23, 2026, pursuant to the Changed Circumstances Review regarding the Antidumping Duty order on *Certain Artist Canvas from the People's Republic of China* (Case No. A-570-899). I certify that the public information and any business proprietary information of by S-One Holdings Corporation's Lexjet, LLC, Abaqa, LLC, and Brand Management Group, LLC contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ____________________

Date: April 23, 2026

# EXHIBIT E

Barcode: 4916917-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II

**THOMPSON & ASSOCIATES, PLLC**
gwt@gwthompsonlaw.com
1138 R Street, NW, Suite 312
Washington, DC 20009
202.413.1564

April 29, 2026

A-570-899
No. of Pages: 7
CCR Request
AD/CVD Operations

**PUBLIC DOCUMENT**

**BY ELECTRONIC FILING (ACCESS)**
The Honorable Howard Lutnick
Secretary of Commerce
International Trade Administration
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 18022
1401 Constitution Avenue, N.W.
Washington, D.C. 20230

**Re: Lexjet, LLC et al. Second Request for Initiation of a Changed Circumstances Review**

Dear Mr. Secretary:

This letter is submitted on behalf of Ecker Textiles, LLC ("Ecker Textiles"), a domestic producer of Artist Canvas, to opposd the second request for a changed circumstances review (CCR) filed by Lexjet, LLC, Abaqa, LLC, and Brand Management Group, LLC (collectively "Lexjet") on April 23, 2026.

Lexjet's second request is substantively identical to its first one, filed on January 26, 2026, which the Department already determined was inadequate to warrant initiation of a CCR. See *Antidumping Duty Order on Certain Artist Canvas from the People's Republic of*

Filed By: gwt@gwthompsonlaw.com, Filed Date: 4/29/26 12:48 PM, Submission Status: Approved

Barcode: 4916917-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II



*China, Memorandum from Charles Doss to Erin Begnal re Whether to Initiate a Changed Circumstances Review* (March 12, 2026). That memorandum correctly noted that

> . . . the CCR Request contains no statements from the domestic industry expressing a lack of interest in the requested merchandise's coverage by the *Order*. Furthermore, the only statement from the domestic industry supplied to the record, Ecker's Comments, expresses continued interest in the requested merchandise. Thus, we cannot conclude that "substantially all of the production of the domestic like product {...} have expressed a lack of interest{...}" in order to consider revocation of the *Order*, in part, pursuant to 19 CFR 351.222(g)(1)(i). (Footnote omitted.)

Lexjet's resubmitted CCR suffers from the same deficiency the Department previously identified. It lacks any statements from the domestic industry expressing a lack of interest in continued antidumping duty order coverage of 100 percent polyester canvas. Moreover, Ecker Textiles affirms its continued interest in coverage of that product, as it did in responding to Lexjet's initial CCR.

Lexjet's stated reason for resubmitting the previously rejected CCR is that the Department's memorandum did not address its tardily filed rebuttal comments. This latest iteration continues to falsely assert that Ecker Textiles does not produce 100 percent polyester canvas. That the company does so was definitively established in Ecker Textiles' comments dated February 20, 2026, and there is no need for it to again address Lexjet's misrepresentations of fact.

The more important point is that Lexjet has not cured the deficiencies in its first CCR. As the Department's non-initiation memorandum explained, "Commerce's practice is to initiate a CCR to revoke an order in whole or in part when the request is accompanied by a statement of no interest from the domestic industry that establishes that '{p}roducers

Barcode: 4916917-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II



accounting for substantially all of the production of the domestic like product' are no longer interested in maintaining an order covering the merchandise described in the request and, further, will not oppose the partial (or total) revocation of the order with respect to that merchandise." This practice requires an affirmative statement from domestic producers. Lexjet presented no such affirmative statement but instead based its claim on an inference stemming from a factually inaccurate claim regarding the domestic industry's production capabilities.

Moreover, in its February 20, 2026, comments, Ecker Textiles conveyed to the Department its interest in maintaining the order on 100 percent polyester canvas and its opposition to Lexjet's proposed revocation. Lexjet's continued assertion that the domestic industry does not have such an interest simply ignores Ecker Textiles' statement to the contrary. It also ignores the Department's regulation, which provides that:

> (1) The Secretary may revoke an order, in whole or in part, or terminate a suspended investigation if the Secretary concludes that:
>
> (i) Producers accounting for substantially all of the production of the domestic like product to which the order (or the part of the order to be revoked) or suspended investigation pertains have expressed a lack of interest in the order, in whole or in part, or suspended investigation (*see* section 782(h) of the Act); or . . .

19 C.F.R. § 351.222(g)(1)(i). The regulation requires that domestic producers must "have expressed a lack of interest in the order, in whole or in part," for revocation to be permitted. Lexjet's failure to provide the required expression of lack of interest, coupled with Ecker Textiles' affirmative statement of opposition, warrants non-initiation of this second CCR just as it did the first

Filed By: gwt@gwthompsonlaw.com, Filed Date: 4/29/26 12:48 PM, Submission Status: Approved

For these reasons, Ecker Textiles requests the Department to dismiss Lexjet's second request for a changed circumstances review.

Respectfully submitted,

/s/

George W. Thompson

Barcode: 4916917-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II

# COMPANY CERTIFICATION

I, Mike Ecker, currently employed by Ecker Textiles LLC as CEO, certify that I prepared or otherwise supervised the preparation of the attached Letter Opposing Lexjet, LLC's Request for a Changed Circumstances Review submitted on behalf of Ecker Textiles LLC in regard to the Antidumping Duty Order against Artist Canvas from the People's Republic of China, A-570-899. I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

**Signature:** Mike Ecker

**Date:** April 28, 2026

Filed By: gwt@gwthompsonlaw.com, Filed Date: 4/29/26 12:48 PM, Submission Status: Approved

## REPRESENTATIVE CERTIFICATION

I, George W. Thompson, with Thompson & Associates, PLLC, counsel or representative to Ecker Textiles, LLC, certify that I have read the attached Letter Opposing Lexjet, LLC's Request for a Changed Circumstances Review, submitted on behalf of Ecker Textiles, LLC in regard to the changed circumstances review request submitted by Lexjet, LLC in the antidumping duty order on *Artist Canvas from the People's Republic of China*. In my capacity as an adviser, counsel, preparer or reviewer of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

Signature: /s/ George W. Thompson

Date: April 29, 2026

**CERTIFICATE OF SERVICE**
**Artist Canvas from China, A-570-899, CCR Request**

I, George W. Thompson, hereby certify that on April 29, 2026, a copy of the attached document was submitted via ACCESS, and service of the attached document will be effectuated via ACCESS on the party listed below:

Kyl Kirby, Esq.
Counsel for Lexjet, LLC et al.
kyl@kirbyfedlaw.com

/s/ George W. Thompson

# EXHIBIT F

Barcode: 4882962-01 A-570-899 CCR - Changed Circumstances - Lexjet polyester print canvas

THOMPSON & ASSOCIATES, PLLC
gwt@gwthompsonlaw.com
1138 R Street, NW, Suite 312
Washington, DC 20009
202.413.1564

February 20, 2026

A-570-899
No. of Pages: 12
CCR Request
AD/CVD Operations

**PUBLIC DOCUMENT**

**BY ELECTRONIC FILING (ACCESS)**
The Honorable Howard Lutnick
Secretary of Commerce
International Trade Administration
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 18022
1401 Constitution Avenue, N.W.
Washington, D.C. 20230

**Re: Lexjet, LLC et al. Request for Initiation of a Changed Circumstances Review**

Dear Mr. Secretary:

This letter is submitted on behalf of Ecker Textiles, LLC ("Ecker Textiles"), a domestic producer of Artist Canvas, to express opposition the request for a changed circumstances review filed by Lexjet, LLC, Abaqa, LLC, and Brand Management Group, LLC (collectively "Lexjet".)

Filed By: gwt@gwthompsonlaw.com, Filed Date: 2/20/26 4:29 PM, Submission Status: Approved

Barcode: 4882962-01 A-570-899 CCR - Changed Circumstances Lexjet polyester print canvas



A. Lexjet's Request Fails to Meet the Requirements for Initiation of a Changed Circumstances Review

Lexjet's request is fatally flawed in two respects, each of which warrants rejection of the request for a changed circumstances review.

First, it falsely asserted that Ecker Textiles does not produce artist canvas made with 100 percent polyester fabric, nor did its predecessor in interest, Tara Materials, Inc. ("Tara Materials"). In fact, Ecker Textiles manufactures 100 percent polyester print and painting canvas, as did Tara Materials. There has been a continuity of production since before the antidumping duty investigation was initiated in 2005.

In short, there has been no changed circumstance to review.

Second, Lexjet misapplied the criteria used to determine whether the domestic industry has no interest in maintaining an antidumping duty order on specific merchandise and misrepresented Ecker Textiles' position. In accordance with the enabling statute, 19 U.S.C. § 1677m(h)(2), the Department requires documentation that "producers accounting for substantially all of the production of that domestic like product, have expressed a lack of interest in the order or suspended investigation."

Lexjet failed to provide an affirmative statement of no opposition from domestic producers; indeed, it did not consult with Ecker Textiles on the question. Instead, it inferred from its false claim regarding non-production of 100 percent polyester canvas that Ecker Textiles is not interested in the product.

Filed By: gwt@gwthompsonlaw.com, Filed Date: 2/20/26 4:29 PM, Submission Status: Approved

**THOMPSON & ASSOCIATES, PLLC**

The Honorable Howard Lutnick
February 20, 2026
Page 3

B. Ecker Textiles Is a Domestic Producer of 100 Percent Polyester Canvas

Ecker Textiles produces 100 percent polyester print canvas which it markets as Fredrix Panorama 1008SJ. The product description, available at https://eckertex.com/shop/panorama-1008sj/, states:

> Description
>
> This canvas is designed for digital printing applications using solvent based ink sets. Although designed for all printers using these ink sets, actual results may vary depending on printer model, age, print design, environmental conditions, and other factors. Exposure of a print to atmospheric pollutants, or to temperature, humidity, and/or lighting extremes can result in fading, color shifting, or other visual changes. The ideal conditions of printing and storage are a temperature of 70°F +-5°F and relative humidity of 50% RH +-3% RH. The shelf life is 1 year at recommended temperature and humidity.
>
> Ecker Textiles guarantees only the canvas itself against defects in quality or workmanship. No other warranty is expressed or implied.

Specifications

| | |
|---|---|
| Style | 1008SJ |
| Name | Panorama |
| Item Master | 1008 + Width + VL |
| Canvas Construction | 100% Polyester |
| Weave | 1x1 |
| Coatings | Acrylic/Latex Primers, One Optimized Matte Solvent Topcoat |
| Appearance | Natural White |
| Texture | Medium |
| Finish Weight | 12.5 oz. / 440 gsm |
| Thickness | 22.5 mil / 572 microns |
| Whiteness | 87 |
| Brightness | 82 |

| | |
|---|---|
| L | 93 |
| a | 0 |
| b | 0 |

Without explaining the inconsistency with its prior claim of no domestic production, Lexjet acknowledged that "Since 2020, Fredrix has marketed a '100% polyester' print canvas under the name of PANORAMA 1008SJ in widths of 80", 98", and 126"." While the 100 percent polyester Panorama line long predates 2020, this acknowledgement contradicts the underlying premise of Lexjet's changed circumstances review request. Its claim that Ecker Textiles describes the product as a polyester blend is dispelled by the website provided as a reference.

Ecker Textiles also produces 100 percent polyester canvas for painting, which it markets as FREDRIX 520 RED LION POLYFLAX. Polyflax "is a synthetic fabric developed purposely as an artist canvas. It boasts a significantly greater strength in comparison to natural fibers and has a medium texture with perfect uniformity. 58" width, 7oz raw, 10oz primed." (A polycotton blend version is also available.) The product description is available at:

https://fredrixartistcanvas.com/product/creative-series-520-red-lion-polyflax-10oz-primed-58-wide

The attached Statement of Mike Ecker, President of Ecker Textiles, confirms that Tara Materials produced artist canvas with 100 polyester fabric at the time of the original investigation and Ecker Textiles continues doing so today.

It is incontestable that Ecker Textiles produces artist canvas with 100 percent polyester fabric and has done so since its establishment, as did Tara Materials from 2005 through its asset sale to Ecker Textiles. Lexjet's claims otherwise are pure fiction.

C. Ecker Textiles' Opposition Warrants Rejection of the Review Request

The statute directs that an antidumping duty order may be revoked only "if the administering authority determines that producers accounting for substantially all of the production of that domestic like product, have expressed a lack of interest in the order . . ." This standard requires an affirmative expression by domestic producers that they are not interested in maintaining an order 's coverage of a specific product. See *Common Alloy Aluminum Sheet From Germany: Preliminary Results of Changed Circumstances Review, and Intent To Revoke the Antidumping Duty Order, in Part*, 89 Fed. Reg. 7686 (Feb. 5, 2024) ("Thus, both the Act and Commerce's regulations require that 'substantially all' domestic producers express a lack of interest in the order for Commerce to revoke the order, in whole or in part.") (Footnote omitted.)

The party requesting a changed circumstances review must provide documentation that the requisite number of domestic producers do not object to the proposed amendment for a review to be initiated. For example, in *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Notice of Initiation of Changed Circumstances Reviews, and Consideration of Revocation of the Antidumping and Countervailing Duty Orders, in Part*, 88 Fed. Reg. 44498 (July 31, 2023), the decision to

initiate was explicitly premised on inclusion of a letter of non-opposition from the petitioning domestic producer along with the absence of any opposition by any domestic producers:

> Within SOURCE Global's CCR request, SOURCE Global included a letter from the American Alliance for Solar Manufacturing (the Alliance), a U.S. producer of the domestic like product and a petitioner in the underlying investigations, in which the Alliance stated that it did not oppose the partial revocation of the *Orders* proposed by SOURCE Global. No interested parties filed comments opposing the CCR request.

(Footnote omitted.)

Likewise, in *Common Alloy Aluminum Sheet From Germany: Notice of Initiation of Changed Circumstances Review, and Consideration of Revocation, in Part, of the Antidumping Duty Order*, 88 Fed. Reg. 49486 (July 31, 2023), the Department declined to consider a changed circumstances review request until after the requester had "provided a letter from the Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its individual members (domestic producers) in which they stated that they 'do not oppose revocation of the antidumping order on CAAS from Germany with respect to the lithographic sheet for which Kodak is seeking a partial revocation in its request for a {changed circumstances review}.''' (Footnote omitted.)

The review was subsequently initiated because "Commerce determines that the information submitted by Kodak, and the domestic producers' statement of no opposition to the partial revocation of the *CAAS AD Order* on Germany with respect to the product described by Kodak, which is the changed circumstance under consideration, constitute a sufficient basis to conduct a changed circumstances review of the *CAAS AD Order* on Germany." (Footnote omitted.)

Even Lexjet acknowledged at page 4 of its request letter the requirement that "companies accounting for 85% or more of domestic manufacturing of the like product support the changed circumstances review request." Yet, inexplicably, it ignored the requirement and claimed that "Ecker does not have an interest in 100% polyester print canvas."

Lexjet has failed to meet the minimal criteria to properly request a changed circumstances review seeking amendment of the antidumping duty order. It has submitted no statement from Ecker Textiles or any other domestic producer of artist canvas that they lack interest in 100 percent polyester canvas products, support the request, or do not oppose it. No such statement will be forthcoming, of course, because Ecker Textiles opposes the request. Lexjet's deficient submission, and Ecker Textiles' opposition, warrant dismissal of the changed circumstances review request.

D. Lexjet's Allegations Regarding Quality Issues Are Both Irrelevant and Incorrect

Substantial portions of Lexjet's letter address matters which have no relevance to initiation of a changed circumstances review. Pages 4 through 12 rehash the International Trade Commission's material injury proceedings from 2005 and 2006. Lexject apparently hopes the Department will infer from its cherry-picked excerpts from those proceedings that Tara Materials either did not produce 100 polyester canvas or was uninterested in including imports of such products covered by the order.

The discussion is beside the point, since Tara Materials did produce such canvas then. Moreover, the scope of the investigation and ensuing antidumping duty order encompass all

forms of artist canvas. There is no exclusionary language for 100 percent polyester canvas, confirming Tara Materials' interest in covering that product from the outset.

Pages 12-17 and 20 relate to alleged quality issues with canvas which Tara Materials produced for Lexjet. Ecker Textiles cannot speculate on why Lexjet considered these commercial interactions to be remotely applicable to a Commerce Department changed circumstances review. It sees no reason to respond except to state that the alleged quality issues were attributable to variations in the polyester fabric received from the supplier, which Lexjet had requested it use, and not any deficiencies in Tara Materials' production processes. See Statement of Mike Ecker.

For these reasons, Ecker Textiles requests the Department to dismiss Lexjet's request for a changed circumstances review.

Respectfully submitted,

/s/

George W. Thompson

Barcode: 4882962-01 A-570-899 CCR - Changed Circumstances Lexjet polyester print canvas

Statement of Mike Ecker

1. I am the President of Ecker Textiles, LLC ("Ecker Textiles").

2. Ecker Textiles manufactures artist canvas, including print canvas, in the United States. In 2021, it purchased the US based assets of Tara Materials, Inc. ("Tara Materials"), the Petitioner in the Sales At Less Than Fair Value investigation resulting in the Antidumping Duty Order on Artist Canvas from China.

3. Before establishing Ecker Textiles, I was employed by Tara Materials as Sales Manager and advanced to Executive Vice President. My employment there began in 2002. I was involved in the antidumping investigation that resulted in the Antidumping Duty Order.

4. I have personal knowledge of the products manufactured by Ecker Textiles and, before that, Tara Materials.

5. Tara Materials, and Ecker Textiles thereafter, have continuously produced artist canvas with 100 percent polyester fabric throughout my tenure at both companies.

6. I am familiar with the alleged production quality issues which are described in Lexjet's submission. They were attributable to polyester fabric of varying quality provided to Tara Materials by a supplier which Lexjet had requested we use. They did not continue after Tara Materials obtained the fabric from a different supplier.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 20, 2026.

Mike Ecker

Mike Ecker

Filed By: gwt@gwthompsonlaw.com, Filed Date: 2/20/26 4:29 PM, Submission Status: Approved

**COMPANY CERTIFICATION**

I, Mike Ecker, currently employed by Ecker Textiles LLC as CEO, certify that I prepared or otherwise supervised the preparation of the attached Letter Opposing Lexjet, LLC's Request for a Changed Circumstances Review submitted on behalf of Ecker Textiles LLC in regard to the Antidumping Duty Order against Artist Canvas from the People's Republic of China, A-570-899. I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

**Signature:** Mike Ecker

**Date:** February 20, 2026

## REPRESENTATIVE CERTIFICATION

I, George W. Thompson, with Thompson & Associates, PLLC, counsel or representative to Ecker Textiles, LLC, certify that I have read the attached Letter Opposing Lexjet, LLC's Request for a Changed Circumstances Review, submitted on behalf of Ecker Textiles, LLC in regard to the changed circumstances review request submitted by Lexjet, LLC in the antidumping duty order on *Artist Canvas from the People's Republic of China*. In my capacity as an adviser, counsel, preparer or reviewer of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

Signature: /s/ George W. Thompson

Date: February 20, 2026

**CERTIFICATE OF SERVICE**
**Artist Canvas from China, A-570-899, CCR Request**

I, George W. Thompson, hereby certify that on February 20, 2026, a copy of the attached document was submitted via ACCESS, and service of the attached document will be effectuated via ACCESS on the party listed below:

Kyl Kirby, Esq.
Counsel for Lexjet, LLC et al.
kyl@kirbyfedlaw.com

/s/ George W. Thompson

# EXHIBIT G

Barcode: 4894421-01 A-570-899 CCR - Changed Circumstances - Lexjet polyester print canvas

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-899
CCR: Lexjet
**Public Document**
E&C/OIII: CD

March 12, 2026

**MEMORANDUM TO:** Erin Begnal
Director, Office III
Antidumping and Countervailing Duty Operations

**FROM:** Charles Doss
Senior International Trade Compliance Analyst, Office III
Antidumping and Countervailing Duty Operations

**RE:** Antidumping Duty Order on Certain Artist Canvas from the People's Republic of China

**SUBJECT:** Whether to Initiate a Changed Circumstances Review

---

## I. Summary

For the reasons detailed below, we recommend not initiating a changed circumstances review (CCR) to partially revoke the antidumping duty order on certain artist canvas (artist canvas) from the People's Republic of China (China) in response to the request of Lexjet, LLC, Abaqa, LLC, and Brand Management Group, LLC (collectively Lexjet).[1]

## II. Background

On January 26, 2026, Lexjet requested that the U.S. Department of Commerce (Commerce) conduct a CCR to partially revoke the *Order*.[2] Specifically, Lexjet asked that Commerce find, on an expedited basis, that changed circumstances warrant the partial revocation of the *Order* with respect to 100 percent polyester print canvas (requested merchandise).[3] Lexjet also requested that the scope of the *Order* be amended to exclude the requested merchandise and that the partial revocation of the order be made retroactive to the date of the *Order*.[4] On February 20, 2026, Ecker Textiles, LLC (Ecker), a domestic producer of artist canvas, submitted comments in opposition to the CCR Request.[5] On March 12, 2026, Lexjet submitted additional comments to

[1] *See* Lexjet's Letter, "Request for Changed Circumstances Review," dated January 26, 2026 (CCR Request); *see also Notice of Antidumping Duty Order: Certain Artist Canvas from the People's Republic of China*, 71 FR 31154 (June 1, 2006) (*Order*)
[2] *Id*.
[3] *See* CCR Request at 1.
[4] *Id*. at 2.
[5] *See* Ecker's Letter, "Lexjet, LLC et al. Request for Initiation of a Changed Circumstances Review," dated February 20, 2026 (Ecker's Comments).

Filed By: charles doss, Filed Date: 3/13/26 12:02 PM, Submission Status: Approved
INTERNATIONAL TRADE ADMINISTRATION

Barcode: 4894421-01 A-570-899 CCR - Changed Circumstances - Lexjet polyester print canvas

rebut Ecker's Comments.[6] However, we are not addressing Lexjet's Rebuttal herein, as it was submitted the day of Commerce's imitation decision.

## III. Analysis

Under section 751(b)(1) of the Tariff Act of 1930, as amended (the Act), Commerce shall initiate a CCR if it receives a request that shows changed circumstances sufficient to warrant a review. Pursuant to 19 CFR 351.222(g)(1)(i), Commerce's practice is to initiate a CCR to revoke an order in whole or in part when the request is accompanied by a statement of no interest from the domestic industry that establishes that "{p}roducers accounting for substantially all of the production of the domestic like product" are no longer interested in maintaining an order covering the merchandise described in the request and, further, will not oppose the partial (or total) revocation of the order with respect to that merchandise. Once Commerce receives the letter(s) of no interest from the domestic industry, we must determine that the letter indeed came from producers accounting for substantially all of the production of the domestic like product. Commerce has interpreted "substantially all" production normally to mean at least 85 percent of domestic production of the like product.[7]

Lexjet asserts that "Ecker now accounts for mostly all of print canvas domestic production" and, "{Ecker} ha{s} a lack of interest in producing {requested merchandise}."[8] Ecker states that it is a producer of requested merchandise and that it opposes the CCR Request.[9]

We find that the CCR Request is inadequate and does not show changed circumstances sufficient to warrant a CCR pursuant to section 751(b)(1) of the Act and determine not to initiate in accordance with 19 CFR 351.216(b). Specifically, the CCR Request contains no statements from the domestic industry expressing a lack of interest in the requested merchandise's coverage by the *Order*. Furthermore, the only statement from the domestic industry supplied to the record, Ecker's Comments, expresses continued interest in the requested merchandise.[10] Thus, we cannot conclude that "substantially all of the production of the domestic like product {…} have expressed a lack of interest{…}" in order to consider revocation of the *Order*, in part, pursuant to 19 CFR 351.222(g)(1)(i). Accordingly, we find that initiating a CCR based on Lexjet's request would be inappropriate.

---

[6] *See* Lexjet's Letter, "Response to Opposition to Request for Changed Circumstances Review," dated March 11, 2026 (Lexjet's Rebuttal).

[7] *See*, *e.g.*, *Certain Nails from the People's Republic of China: Initiation and Preliminary Results of Antidumping Duty Changed Circumstances Review*, 76 FR 22369 (April 21, 2011), unchanged in *Certain Steel Nails from the People's Republic of China: Final Results of Antidumping Duty Changed Circumstances Review*, 76 FR 30101 (May 24, 2011); *Wooden Bedroom Furniture from the People's Republic of China: Notice of Initiation and Preliminary Results of Changed Circumstances Review, and Intent to Revoke Order in Part*, 74 FR 886 (January 9, 2009), unchanged in *Wooden Bedroom Furniture from the People's Republic of China: Notice of Final Results of Changed Circumstances Review, and Determination to Revoke Order in Part*, 74 FR 8505 (February 25, 2009); and *Certain Orange Juice from Brazil: Preliminary Results of Antidumping Duty Changed Circumstances Review and Intent Not to Revoke, in Part*, 73 FR 60241, 60242 (October 10, 2008), unchanged in *Certain Orange Juice from Brazil: Preliminary Results of Antidumping Duty Changed Circumstances Review*, 74 FR 4733 (January 27, 2009).

[8] *See* CCR Request at 2.

[9] *See* Ecker's Comments at 4-7.

[10] *Id*., generally, and at 1.

Filed By: charles doss, Filed Date: 3/13/26 12:02 PM, Submission Status: Approved

## IV. Recommendation

Based on the foregoing analysis, we recommend not initiating a CCR.

☒ ☐

Agree Disagree

Erin Begnal
Director, Office III
AD/CVD Operations

# EXHIBIT H

Barcode: 4925492-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II

**PUBLIC DOCUMENT**

June 2, 2026

DOC Case No. A-570-899
Total Pages: 10
Changed Circumstances Review AD/CVD Operations, E&C Office III

Howard Lutnick, Secretary of Commerce
International Trade Administration
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
1401 Constitution Avenue, NW
Washington, DC 20230

**Re: Certain Artist Canvas From the People's Republic of China: Response to Opposition to Request for Changed Circumstances Review**

Dear Secretary Lutnick,

Lexjet, LLC, Abaqa, LLC, and Brand Management Group, LLC (together "Lexjet") hereby responds to the April 29, 2026 letter filed by Ecker Textiles, LLC ("Ecker"). Through its letter, Ecker opposes the requests that the United States Department Commerce ("Commerce") conduct a changed circumstances review ("CCR") of the antidumping ("ADD") order issued in Certain Artist Canvas From the People's Republic of China (Case No. A-570-899)[1]. Lexjet files this response pursuant to 19 C.F.R. § 351.301(b)(1) and §351.102(b)(21)(v).[2]

Ecker failed again to move the needle with its opposition letter. Simply put, there is no deficiency in Lexjet's CCR. Lexjet's assertions clearly show that Ecker has no interest and Tara

[1] *See Notice of Antidumping Duty Order: Certain Artist Canvas from the People's Republic of China*, 71 FR 31154 (June 1, 2006) ("*Order*")
[2] Filing under this section of the regulations is appropriate because the factual information herein does not satisfy the description of paragraphs §351.102(b)(21)(i)-(iv).

Barcode: 4925492-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II

Materials Inc. ("Tara") had no interest in producing 100% polyester print canvas. Ecker incorrectly points out that that an affirmative statement from domestic producers is required for a CCR. Any Commerce decision to not initiate a CCR to partially revoke the ADD order would be unlawfully predicated on misstatements, omissions, and false statements made by Tara and Ecker. Not only is the premise reasonable and logical, it is also well-supported by law. "When reviewing the final results in an antidumping changed circumstances review '[t]he court shall hold unlawful any determination, finding, or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law.' 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is ' 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' ' *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed.Cir.2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). There must be a 'rational connection between the facts found and the choice made' in an agency determination if it is to be characterized as supported by substantial evidence and otherwise in accordance with law. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). The Court 'must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion.' *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed.Cir.2006) (internal citation and quotation marks omitted)." *Sahaviriya Steel Indus. Pub. Co. v. United States*, 714 F.Supp.2d 1263, 1266 (Ct. Int'l Trade 2010). " 'Substantial evidence' means 'more than a mere scintilla' and has been characterized as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (citations omitted). … When reviewing agency determinations, findings, or conclusions for substantial evidence, this Court determines

whether the agency action is reasonable in light of the entire record. *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006)." *Marsan Gida Sanayi Ve Ticaret A.S. v. United States*, Court No. 09-00483, Slip Op. 11-20, *4 (Ct. Int'l Trade Feb 16, 2011). "To determine if substantial evidence exists, we review the record in its entirety, including all evidence that 'fairly detracts from the substantiality of the evidence.' *Atl. Sugar, Ltd v. United States*, 744 F.2d 1556, 1562 (Fed.Cir. 1984)." *Consolidated Fibers, Inc. v. U.S.*, 535 F.Supp.2d 1345, 1352 (Ct. Int'l Trade 2008).

Lexjet has produced facts as substantial evidence, from the investigation to present day, that show a lack of interest by Tara and Ecker. However, Ecker has produced no facts, no proof of production, not a scintilla of evidence, but only false statements that unnecessarily detract from the entire record. Tara and Ecker had the chance to set record straight but chose not to do so. Thus, there is no rational connection between the Tara/Ecker record and a Commerce decision not to initiate a CCR. A reasonable person would not accept the Tara/Ecker record as adequate to support a conclusion Tara/Ecker had/have an interest in producing 100% polyester print canvas.

Ecker seems to be incorrectly hyper-focused on a narrow interpretation of the "expressed a lack of interest" language of 19 CFR § 351.222(g)(1)(i). First, the statutes, regulations, agency, and courts have not defined the language. However, the history of CCRs and overriding principles demonstrate a view not so narrow. Lexjet cannot find that Congress intended for the term to be taken literally. "[T]he statute authorizing Commerce to conduct a changed circumstances review, 19 U.S.C. § 1675(b)(1), does not explicitly define what a CCR is or what a CCR entails.[] In fact, a CCR may address a broad range of matters and the only limitation in the statute is the requirement that there be "changed circumstances **sufficient** to warrant a

Barcode: 4925492-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II

review." *See Mittal Canada, Inc. v. United States*, 30 CIT 1565, 1572, 461 F. Supp. 2d 1325, 1332 n.7 (2006) (emphasis added)." *Marsan Gida Sanayi Ve Ticaret A.S. v. United States*, Court No. 09-00483, Slip Op. 11-20, *4 (Ct. Int'l Trade Feb 16, 2011). "[T]he House emphasized that Commerce "should be able to revoke antidumping or countervailing duties that are no longer of interest to domestic interested parties." H.R.Conf.Rep. [ ] No. 1156, 98th Cong., 2d Sess. 181 (1984), reprinted in 1984 U.S.C.C.A.N. 4910, 5220, 5298" *Oy v. U.S.*, 61 F.3d 866, 873 (Fed. Cir. 1995). "Congress envisioned that assessment of the interest of the domestic parties was necessary before revocation may occur." *Id*. "Congress has recognized that the Department may revoke an order ... in the absence of domestic party interest in continuing the order.... See H.R.Rep. No. 1156, 98th Cong., 2d Sess. 181 (1984). The so-called "sunset" provision is merely a means for ascertaining if interest in continuation of the order exists.... [B]ecause the "sunset" provision is a means for ascertaining whether there is interest in continuation of an order, it is appropriate that the Department take reasonable steps, including giving actual notice of the intent to revoke ..., to determine whether such interest exists. Antidumping Duties, 54 Fed.Reg. 12,742, 12,758 (1989) (final rule) (emphasis added). *See also* Countervailing Duties, 53 Fed.Reg. 52,306, 52,333 (1988) (final rule for parallel countervailing duty "sunset" provision). Commerce's goal in promulgating section 353.25(d)(4) was to provide a means for ascertaining industry interest." *Id*. at 874. "Because industry support is an essential part of the merits of an affirmative determination under section 1673, the ITA reasons that the question of continued industry support may be revisited in a section 1675(b) review of such determination, and that lack of interest by the industry is an independent basis for revocation of an outstanding order." *Oregon Steel Mills Inc. v. U.S. (Dept. of Commerce and Intern. Trade Admin.)*, 862 F.2d 1541, 1545 (Fed. Cir. 1988)." "It may be true — and plaintiff does not argue otherwise — that the lack

of interest on the part of the domestic industry constitutes 'changed circumstances' sufficient to warrant review. Nevertheless, **the Court cannot conclude that the identification of that lack of interest ends Commerce's obligation under the statute. Section 1675(b) demands, by its plain language, that the agency conduct a review of its affirmative determination**. As stated by the Court in *American Permac, Inc. v. United States*, 10 CIT ___, 656 F.Supp. 1228 (1986), appeal docketed, No. 87-1159 (Fed.Cir. Jan. 21, 1987): "the antidumping law reserves to the Commerce Department (the `administering authority') questions pertaining to whether and to what extent merchandise is being dumped, and — in 751(b) reviews — whether dumping is likely to continue or resume if a dumping order is revoked.' *American Permac*, 10 CIT at ___, 656 F.Supp. at 1234." *Gilmore Steel Corp. Or. Steel Mills Div. v. US*, 672 F. Supp. 1459, 1462 (Ct. Int'l Trade 1987). (emphasis added). It is clear that Tara and Ecker "expressed a lack of interest" with its misstatements, omissions, and false statements.

Interest of the domestic industry is not the only factor in CCRs. In addition to interest not being mentioned in 19 U.S.C. § 1675(b), the implementing regulation 19 CFR § 351.222(g)(1)(ii) provides for "[o]ther changed circumstances sufficient to warrant revocation or termination exist." This too makes sense. " 'False testimony in a formal proceeding is intolerable,' and '[w]e must neither reward nor condone such a `flagrant affront' to the truth-seeking function of adversary proceedings.' *ABF Freight Sys., Inc.*, 510 U.S. at 323, 114 S.Ct. 835; *see Elkem Metals Co.*, 26 CIT at 240 n. 6, 193 F.Supp.2d at 1321 n. 6. 'In any proceeding, whether judicial or administrative, deliberate falsehoods,' … 'well may affect the dearest concerns of the parties before a tribunal and may put the factfinder and parties to the disadvantage, hindrance, and delay of ultimately extracting the truth by cross examination, by extraneous investigation or other collateral means.' *ABF Freight Sys., Inc.*, 510 U.S. at 323, 114

Barcode: 4925492-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II

S.Ct. 835 (internal citations & quotations omitted). By providing Commerce with fraudulent information in the 1997-1998 administrative review, TKS compromised the accuracy of the proceedings and frustrated the Department's ability to best effectuate Congress' policy goals. *See id*. at 323-24, 114 S.Ct. 835. Under such circumstances, Commerce has the inherent authority to self-initiate a review of its prior determinations to purge them of fraudulent data. *Accord Alta. Gas Chems., Ltd.*, 650 F.2d at 12-13 (' `The inherent power of a federal court to investigate whether a judgment was obtained by fraud, [sic] is beyond question,' *Universal Oil Co. v. Root Ref Co.*, 328 U.S. 575, 580, 66 S.Ct. 1176, 90 L.Ed. 1447 (1946), . . . . This universally accepted rule has been applied to proceedings before federal administrative agencies.'); *see Greene County Planning Bd. v. Fed. Power Comm'n*, 559 F.2d 1227, 1233 (2d Cir. 1976); see also *Alta Gas Chems., Ltd.*, 650 F.2d at 12 ('[T]he [agency] will certainly be in a far better position than the ... court to determine whether it would have reached a different conclusion but for the [fraud].'); *cf. SEC v. Chenery Corp.*, 332 U.S. 194, 202-03, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) ('Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule .... [P]roblems may arise ... which the administrative agency could not reasonably foresee.... In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective."); *Elkem Metals Co.*, 26 CIT at 239, 193 F.Supp.2d at 1320. '[T]he presence of fraud and its compounded effects upon Commerce's administrative reviews and the Partial Revocation Determination tilt the balance toward the latter.' " *Tokyo Kikai Seisakusho, Ltd. v. U.S.*, 473 F.Supp.2d 1349, 1354 (Ct. Int'l Trade 2007). "[T]he presence of fraud and its compounded effects upon Commerce's administrative reviews and the Partial Revocation Determination tilt the balance toward the latter." *Id*. Commerce is required to protect the integrity of its proceedings pursuant to 19 CFR §

Barcode: 4925492-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II

351.222(g)(1)(ii) based on misstatements, omissions, and false statements from Tara and Ecker. Thus, a partial revocation is warranted.

As detailed above and in the CCR, Commerce should initiate a changed circumstances review and should amend the scope of the antidumping *Order* on artists' canvas from China to clearly exclude 100% polyester print canvas products that are not described by the current exclusionary language. Lacking any interest in duties on these products, this request accounts for virtually 100% of print canvas producers pursuant to 19 CFR § 351.222(g)(1)(i). Moreover, Lexjet has noted other changed circumstances sufficient to warrant a partial revocation pursuant to 19 CFR § 351.222(g)(1)(ii). Lexjet therefore respectfully requests that Commerce expeditiously render a changed circumstances determination that partially revokes the *Order*, effective as of June 1, 2006.

* * *

I, Kyl J. Kirby, certify that a copy of the attached submission was served this June 2, 2026 pursuant to 19 C.F.R. § 351.303(f), on the following party for Ecker Materials, LLC electronically at gwt@gwthompsonlaw.com:

George Thompson
Thompson & Associates, PLLC
1050 Connecticut Avenue, NW
Suite 500
Washington, DC 20036

Please do not hesitate to contact the undersigned with any questions regarding this submission.

Filed By: kyl@kirbyfedlaw.com, Filed Date: 6/2/26 7:50 PM, Submission Status: Approved

Respectfully submitted,

Kyl J. Kirby

Counsel to Lexjet, LLC, Abaqa, LLC, and Brand Management Group, LLC

Barcode: 4925492-01 A-570-899 CCR - Changed Circumstances Lexjet Polyester Print Canvas II

**REPRESENTATIVE CERTIFICATION**

I, Kyl J. Kirby, with Kyl J. Kirby, Attorney and Counselor at Law, P.C., counsel to Lexjet, LLC, Abaqa, LLC, and Brand Management Group, LLC, certify that I have read the attached submission, *Response to Opposition to Request for Changed Circumstances Review*, filed on June 2, 2026, pursuant to the Changed Circumstances Review regarding the antidumping order on *Certain Artist Canvas from the People's Republic of China* (No. A-570-899). In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Kyl J. Kirby

Date: June 2, 2026

Filed By: kyl@kirbyfedlaw.com, Filed Date: 6/2/26 7:50 PM, Submission Status: Approved

COMPANY CERTIFICATION

I, Jason Metnick, President & COO, currently employed by S-One Holdings Corporation, certify that I prepared or otherwise supervised the preparation of the attached submission, *Response to Opposition to Request for Changed Circumstances Review*, filed on June 2, 2026, pursuant to the Changed Circumstances Review regarding the Antidumping Duty order on *Certain Artist Canvas from the People's Republic of China* (Case No. A-570-899). I certify that the public information and any business proprietary information of by S-One Holdings Corporation's Lexjet, LLC, Abaqa, LLC, and Brand Management Group, LLC contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________

Date: June 2, 2026