THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| LEXJET, LLC,<br>ABAQA, LLC, and<br>BRAND MANAGEMENT GROUP, LLC,<br><br>Plaintiffs,<br><br>v.<br>UNITED STATES,<br><br>Defendant. | Court No. 26-cv-03150 |

**AMENDED PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS OR FOR JUDGMENT ON THE PLEADINGS**

Kyl J. Kirby
**KYL J. KIRBY, ATTORNEY AND COUNSELOR AT LAW, P.C.**
1400 Lipscomb Street
Fort Worth, TX 76104
Tel: (214) 632-0841
Attorney for Plaintiffs LEXJET, LLC, ABAQA, LLC, and BRAND MANAGEMENT GROUP, LLC

Date: November 13, 2026

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

BACKGROUND ..... 1

MOTION TO DISMISS LEGAL STANDARD ..... 1

PLAINTIFFS PROPERLY INVOKED THE CIT'S RESIDUAL JURISDICTION IN ORDER TO GAIN JUDICIAL REVIEW OF COMMERCE'S REFUSAL TO INITIATE THE CCR ..... 3

JUDGMENT ON THE PLEADINGS LEGAL STANDARD ..... 5

PLAINTIFFS HAVE ESTABLISHED AN ENTITLEMENT TO RELIEF PURSUANT TO 19 C.F.R. § 351.222(G)(1) ..... 7

PLAINTIFFS HAVE A COGNIZABLE DUE PROCESS CONSTITUTIONAL CLAIM ..... 11

PLAINTIFFS HAVE A COGNIZABLE EQUAL PROTECTION CONSTITUTIONAL CLAIM ..... 16

CONCLUSION ..... 19

# TABLE OF AUTHORITIES

## Cases

*Allegheny Pittsburgh Coal Co. v. Cnty. Comm'n of Webster Cnty.*, 488 U.S. 336 (1989). 17

*Almond Bros. Lumber Co. v. United States*, 651 F.3d 1343 (Fed. Cir. 2011) …………..… 2

*American Ass'n of Exporters and Importers-Textile and Apparel Group v. U.S., 751 F.2d 1239 (Fed. Cir. 1985)* ………………………………………………………………….. 14

*AOC Int'l v. United States*, 17 CIT 1412 (1993) ……………………………………….. 3

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ……………………………………………… 6

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ……………………………………………………………………………….. 6-7, 12

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) ……………………………….... 6

*Calgon Carbon Corp. v. United States*, 145 F. Supp. 3d 1312 (CIT 2016) ………………. 2

*Canadian Lumber Trade Alliance v. U.S.*, 441 F.Supp.2d 1259 (Ct. Int'l Trade 2006) …. 18

*Consolidated Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003) …………….. 2

*Curtin v. United States*, 91 Fed. Cl. 683 (2010) ……………………………………... 6

*Duferco Steel, Inc. v. United States*, 403 F.Supp.2d 1281 (2005) ………………………… 5

*Goodluck India Limited v. United States*, 605 F. Supp. 3d 1343 (CIT 2022) …………….. 1

*Goodluck India Limited v. United States*, 670 F.Supp.3d 1353 (Ct. Int'l Trade 2023) ….. 15

*Green v. Mansour*, 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985) ……………….... 17

*Greenfirst Forest Prods. Inc. v. United States*, 604 F. Supp. 3d 1368 (CIT 2022) ……….. 2

*Gulf States Tube Div. of Quanex Corp. v. United States*, 981 F. Supp. 630 (Ct. Int'l Trade 1997) ……………………………………………………………………………... 14

*Hartford Fire Ins. Co. v. United States*, 544 F.3d 1289 (Fed. Cir. 2008) ………………… 2

*Hartford Fire Ins. Co. v. United States*, 772 F.3d 1281 (Fed. Cir. 2014) ………………… 6

*Hous. Shutters LLC v. United States*, 816 F.Supp.3d 1349 (Ct. Int'l Trade 2026) ………... 4

*Inspired Venture v. United States*, 2024 WL 4616192 (Oct. 30, 2024) ………………….... 1

*Int'l Custom Prods., Inc. v. United States*, 791 F.3d 1329 (Fed. Cir. 2015) ………… 12, 14

*Jia Farn Mfg. Co., Ltd. v. United States*, 817 F.Supp. 969 (1993) ……………………… 10

*Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348 (Fed. Cir. 2013) …… 6

*LaChance v. Erickson*, 522 U.S. 262, 118 S.Ct. 753, 139 L.Ed.2d 695 (1998) ……... 12, 15

*Laguna Hermosa Corp. v. United States*, 671 F.3d 1284 (Fed. Cir. 2012) ……………… 12

*Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)) ………….. 13, 15

*Mittal Canada, Inc. v. U.S.*, 461 F.Supp.2d 1325 (Ct. Int'l Trade 2006) …………………. 9

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950) ……………………………………………………………………………… 13

*National Nail Corp. v. United States*, 335 F. Supp. 3d 1321 (CIT 2018) ………………… 2

*NEC Corp. v. United States*, 151 F.3d 1361 (Fed. Cir. 1998) …………………………… 12

*Nereida Trading Co. v. United States*, 248, 683 F. Supp. 2d 1348 (2010) ………….. 12, 14

*Norcal/Crosetti Foods, Inc. v. United States*, 963 F.2d 356 (Fed. Cir. 1992) ……………. 2

*Or. Steel Mills, Inc. v. United States*, 862 F.2d 1541 (Fed.Cir.1988) …………………… 10

*Oy v. United States*, 61 F.3d 866, 875 (Fed. Cir. 1995) …………………………………... 9

*Pat Huval Rest. & Oyster Bar, Inc. v. United States*, 547 F. Supp. 2d 1352 (2008) ……... 6

*PSC VSMPAvisma Corp. v. United States*, 688 F.3d 751 (Fed. Cir. 2012) ………… 12, 15

*Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952) ……………………………………………………………………………… 17

*Romer v. Evans*, 517 U.S. 620 (1996) …………………………………………………… 16

*Royal Brush Mfg., Inc. v. United States*, 483 F. Supp. 3d 1294 (2020) ……………... 13, 15

*Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250 (Fed. Cir. 2023) ……………….. 15

*Schick v. United States*, 533 F. Supp. 2d 1276 (2007) ……………………………………. 6

*Shinyei Corp. of America v. U.S.*, 355 F.3d 1297 (Fed. Cir. 2004) ……………………… 18

*Tokyo Kikai Seisakusho, Ltd. v. U.S.*, 473 F.Supp.2d 1349 (Ct. Int'l Trade 2007) ……… 11

*Transcom, Inc. v. United States*, 121 F. Supp. 2d 690 (2000) ………………………. 12, 13

*Transcom, Inc. v. United States*, 294 F.3d 1371 (Fed. Cir. 2002) ……………………….. 15

*Trustees in Bankr. of N.A. Rubber Thread v. U.S.*, 30 CIT 1537 (2006) …………………. 9

*Trustees in Bankr. of N.A. Rubber Thread v. U.S.*, 593 F.3d 1346 (Fed. Cir. 2010) ……... 4

*Trustees in Bankr. of N.A. Rubber Thread v. U.S.*, 464 F.Supp.2d 1350 (Ct. Int'l Trade 2006) ……………………………………………………………………………. 3, 5

*U.S. Auto Parts Network, Inc. v. United States*, 319 F. Supp. 3d 1303 (2018) ………….. 12

*Wilton v. Seven Falls Co.*, 515 U.S. 277, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995) …….. 17

**Statutes**

11 U.S.C. § 1146 ……………………………………………………………………… 17

11 U.S.C. § 505………………………………………………………………………... 17

19 C.F.R. § 351.213 …………………………………………………………………… 4

19 C.F.R. § 351.213(b)(1) ……………………………………………………………… 5

19 C.F.R. § 351.213(e)(1) ……………………………………………………………… 5

19 C.F.R. § 351.222 …………………………………………………………………... 11

19 C.F.R. § 351.222(G)(1) ………………………………………………………… 1, 7, 11

19 C.F.R. § 351.222(G)(1)(i) ………………………………………………………... 7

19 C.F.R. § 351.222(G)(1)(ii) ……………………………………………………… 7, 9, 10

19 U.S.C. § 1516a (f)(10) …………………………………………………………... 17

19 U.S.C. § 1675(b) …………………………………………………………………... 10

19 U.S.C. § 1675(b)(1) (2000) ……………………………………………………... 10

26 U.S.C. § 7428 ........................................................................ 17

28 U.S.C. § 1581 ..................................................................... 2, 18

28 U.S.C. § 1581(i) ..................................................................... 2-4

28 U.S.C. § 1582 ........................................................................ 18

28 U.S.C. § 2201(a) .................................................................... 17

28 U.S.C. § 2202 ........................................................................ 17

28 U.S.C. § 2643 ........................................................................ 18

28 U.S.C. § 2643(a)(1) ................................................................. 18

28 U.S.C. § 2643(c)(1) ................................................................. 18

516A(f)(10) of the Tariff Act of 1930 ............................................ 17

751(a)(1) of the Tariff Act of 1930 ................................................. 4

771(9)(B) of the Tariff Act of 1930 ................................................. 4

**Other Authorities**

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review and Join Annual Inquiry Service List; Note Regarding Format of Review Requests*, 91 FR 32937 (Dep't Commerce Jun. 2, 2026) ..... 5

*Automatic liquidation instruction for Artist Canvas from The People's Republic of China for the period 06/01 /2025 through 05/31/2026 (A-570-899)* (Dep't Commerce Sep. 16, 2026) ..................................................................................... 5

*Carbon and Certain Alloy Steel Wire Rod from Ukraine*, 70 Fed.Reg. 21396 (Dep't Commerce Apr. 26, 2005) ............................................................... 10

*Issues and Decision Memorandum for the Reconsideration of Sunset Review of the Antidumping Duty Order on Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Japan; Final Results, A-588-837* (Dep't Commerce Aug. 14, 2025) ............................................................ 11

Fed. R. Civ. P. 201 ..................................................................... 2

Fed. R. Civ. P. 8(a)(2) .................................................................. 6

*Notice of Antidumping Duty Order: Certain Artist Canvas from the People's Republic of China*, 71 FR 31154 (June 1, 2006) ………………………………………………………. 3

*Stainless Steel Sheet and Strip in Coils from the Republic of Korea*, 71 Fed.Reg. 37906 (Dep't Commerce July 3, 2006) ……………………………………………………….. 10

USCIT R. 12(c) ………………………………………………………………………… 1

USCIT R. 57 …………………………………………………………………………... 17

USCIT R. 8(a)(2) ……………………………………………………………...…… 6

USCIT R. 12(b)(1) ……………………………………………………………………... 1

USCIT R. 12(b)(6) ……………………………………………………………………... 5

USCIT R. 12(c) ………………………………………………………………………… 5

USCIT R. 12(c) ………………………………………………………………………… 6

USCIT R. 8(a) ………………………………………………………………………….. 2

USCIT R. 8(a)(1) ……………………………………………………………………….. 1

Plaintiffs Lexjet, LLC, Abaqa, LLC, and Brand Management Group, LLC ("Lexjet" or "Plaintiffs") hereby respond to the amended Motion to Dismiss or for Judgment on the Pleadings filed by Defendant, United States on October 13, 2026, ECF No. 23 ("Def. Br."). For the reasons set forth below, this Court has jurisdiction over Plaintiffs' challenge to the U.S. Department of Commerce's ("Commerce") refusal to initiate a changed circumstances review ("CCR") to exclude 100% polyester print canvas or all print canvas from the scope of the antidumping duty ("ADD") order on artist canvas from the People's Republic of China ("ADD Order"). Furthermore, Plaintiffs have established they are entitled to relief under 19 C.F.R. § 351.222(G)(1). Plaintiffs have also successfully stated constitutional Due Process and Equal Protection claims. For all claims, Plaintiffs have exceeded the factual standards to survive the Rule 12(b)(1) and (c) motions. Respectfully, this Court should accordingly deny Defendant's Motion to Dismiss and should not grant Defendant's Motion for Judgment on the Pleadings. Instead, this case should proceed in consideration of the merits of Plaintiff's appeal.

## BACKGROUND

Plaintiffs refer the Court to Plaintiffs' Complaint for a recitation of the facts in the Background and Statement of Facts Section. Complaint (Jun. 27, 2026), ECF No. 2 at 5.

## MOTION TO DISMISS LEGAL STANDARD

"Prevailing on a motion to dismiss based on a jurisdictional dispute presents a high bar." *Inspired Venture v. United States*, 2024 WL 4616192, *3 (Oct. 30, 2024) "If the party makes an allegation of fact that sufficiently invokes the subject matter jurisdiction of the Court of International Trade, then the party has satisfied the liberal pleading requirements of CIT Rule 8(a)(1), and a motion to dismiss is improper." *Goodluck India Limited*

*v. United States*, 605 F. Supp. 3d 1343, 1346 n.2 (CIT 2022) (citing CIT Rule 8(a)). The U.S. Court of Appeals for the Federal Circuit ("CAFC") repeatedly "has noted that in enacting 28 U.S.C. § 1581(i), Congress granted the CIT broad residual jurisdiction over matters relating to imports." *Almond Bros. Lumber Co. v. United States*, 651 F.3d 1343, 1351 (Fed. Cir. 2011) (emphasis added). The CAFC refers to 28 U.S.C. § 1581(i) as "a Congressional fail-safe device" and a "catch all provision." *Hartford Fire Ins. Co. v. United States*, 544 F.3d 1289, 1292 (Fed. Cir. 2008); *Norcal/Crosetti Foods, Inc. v. United States*, 963 F.2d 356, 359 (Fed. Cir. 1992). It "supplies jurisdiction only for instances when no other subsection of {28 U.S.C. § 1581} 'is or could have been available,' unless the other subsection provided no more than a manifestly inadequate remedy." *Consolidated Bearings Co. v. United States*, 348 F.3d 997, 1002 (Fed. Cir. 2003) (quoting *Norcal/Crosetti*, 963 F.2d at 359). This Court has previously used the 28 U.S.C. § 1581(i) statutory grant of residual jurisdiction to review Commerce's refusal to initiate a CCR. *Greenfirst Forest Prods. Inc. v. United States*, 604 F. Supp. 3d 1368, 1370 (CIT 2022). Where "the Government challenges the existence of jurisdiction, . . . the court may consider extrinsic evidence." *National Nail Corp. v. United States*, 335 F. Supp. 3d 1321, 1325 (CIT 2018). This Court can and should take judicial notice of documents posted on Commerce's ACCESS website. *See, e.g.*, *Calgon Carbon Corp. v. United States*, 145 F. Supp. 3d 1312, 1327 (CIT 2016). Such AD/CVD proceeding submissions, locatable on ACCESS using each document's barcode, [ ] are "generally known" and their filing "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FRCP Rule 201.

## PLAINTIFFS PROPERLY INVOKED THE CIT'S RESIDUAL JURISDICTION IN ORDER TO GAIN JUDICIAL REVIEW OF COMMERCE'S REFUSAL TO INITIATE THE CCR

Defendant contends this Court does not have jurisdiction pursuant to 28 U.S.C. § 1581(i) because Plaintiffs' "could request the same relief — revocation of the AD order — by either: (1) challenging the existence of a U.S. industry with the International Trade Commission (ITC); or (2) raising the issue of Ecker and Tara's domestic production of 100% polyester print canvas in the next annual review." Def. Br. at 9. Defendant misplaces reliance on *AOC Int'l v. United States*, 17 CIT 1412 (1993) in support of its claims. *Id*. at 12. Defendant fails to point out to the Court a factual distinction between the present case and that of *AOC*. Here, Plaintiffs requested retroactive relief to the date[1] of the ADD Order. "Plaintiffs have clearly met the burden of persuasion with respect to whether there are changed circumstances sufficient to warrant revocation of the ADD order back to the date of the antidumping duty ADD Order, i.e., June 1, 2006." Complaint (Jun. 27, 2026), ECF No. 2, ¶ 27. "Lexjet requests that Commerce not only amend the scope language, but clarify that the change is retroactive to the date that the antidumping duty *Order* was published, i.e., June 1, 2006." Def.' Br. Ex. D at *3. "ON AN EXPEDITED BASIS, COMMERCE SHOULD RETROACTIVELY AMEND THE ORDERS CONSISTENT WITH LEXJET'S PROPOSAL". *Id*. at *34. "Unlike *AOC*, here there is no possibility of prospective relief available for plaintiffs." *Trustees of N. Amer. Rubber Thread v. U.S.*, 464 F.Supp.2d 1350, 1356 (Ct. Int'l Trade 2006) "[O]nly Commerce is vested with the authority to determine the effective date for revocation of the Order based on changed

---

[1] *See Notice of Antidumping Duty Order: Certain Artist Canvas from the People's Republic of China*, 71 FR 31154 (June 1, 2006).

circumstances." *Id*. "Commerce's exclusive authority includes establishing the effective date of revocation." *Id*. at 1364. This interpretation was upheld by the U.S. Court of Appeals for the Federal Circuit in ("CAFC") *Trustees in Bankr. of N.A. Rubber Thread v. U.S.,* 593 F.3d 1346 (Fed. Cir. 2010). *See also Hous. Shutters LLC v. United States*, 816 F.Supp.3d 1349, 1353 (Ct. Int'l Trade 2026) (the Court held jurisdiction pursuant to 28 U.S.C. § 1581(i) was proper where the plaintiff "sought to retroactively eliminate AD"). Importantly, in issuing an order to deny intervention in the instant case, the Court made reference to both the CAFC *Trustees in Bankr. of N.A. Rubber Thread* case as well as the *Hous. Shutters LLC* case in stating that, "In similar cases challenging Commerce's decisions not to initiate CCRs, the court and the United States Court of Appeals for the Federal Circuit have found jurisdiction pursuant to 28 U.S.C. § 1581(i)." Order denying Partial Consent Motion of Proposed Defendant-Intervenor Ecker Textiles, LLC, on September 18, 2026, ECF No. 19. Thus, Defendant's presumption that Plaintiffs have an alternative changed circumstances remedy with the U.S. International Trade Commission is false.

Moreover, a future annual review with Commerce as posited by Defendant is also manifestly inadequate. With an annual review, Commerce does not have the authority under 19 C.F.R. § 351.213 to establish the effective date of revocation back to the date when the ADD order was published in 2006.

> Request for administrative review.
>
> Each year during the anniversary month of the publication of an antidumping or countervailing duty order, a domestic interested party or an interested party described in section 771(9)(B) of the Act (foreign government) may request in writing that the Secretary conduct an administrative review under section 751(a)(1) of the Act of specified individual exporters or producers covered by an order (except for a countervailing duty order in which the investigation or prior

> administrative review was conducted on an aggregate basis), if the requesting person states why the person desires the Secretary to review those particular exporters or producers.
>
> 19 C.F.R. § 351.213(b)(1)
>
> Period of review —
>
> (i) Antidumping proceedings. (i) Except as provided in paragraph (e)(1)(ii) of this section, an administrative review under this section normally will cover, as appropriate, entries, exports, or sales of the subject merchandise during the 12 months immediately preceding the most recent anniversary month.
>
> (ii) For requests received during the first anniversary month after publication of an order or suspension of investigation, an administrative review under this section will cover, as appropriate, entries, exports, or sales during the period from the date of suspension of liquidation under this part or suspension of investigation to the end of the month immediately preceding the first anniversary month.
>
> 19 C.F.R. § 351.213(e)(1).

Thus, the next period of review would be only for 6/1/26-5/31/27, as recently demonstrated by Commerce. *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review and Join Annual Inquiry Service List; Note Regarding Format of Review Requests,* 91 FR 32937 (Dep't Commerce Jun. 2, 2026). *Automatic liquidation instruction for Artist Canvas from The People's Republic of China for the period 06/01 /2025 through 05/31/2026 (A-570-899)* (Dep't Commerce Sep. 16, 2026). Exhibit 1. Indeed, Plaintiffs "are seeking safe harbor in what indeed appears to be their 'port of last resort.' " *Trustees of N. Amer. Rubber Thread v. U.S.*, 464 F.Supp.2d 1350, 1356 (Ct. Int'l Trade 2006) (quoting *Duferco Steel, Inc. v. United States*, 403 F.Supp.2d 1281, 1285 (2005)).

**JUDGMENT ON THE PLEADINGS LEGAL STANDARD**

The "same legal standard is applied to evaluate a Rule 12(c) motion for judgment on the pleadings as is applied for a Rule 12(b)(6) motion to dismiss for failure to state a

claim upon which relief can be granted." *Curtin v. United States*, 91 Fed. Cl. 683, 687 n.1 (2010). A complaint must set forth a short and plain statement of the claim showing that the complainant is entitled to relief. CIT R. 8(a)(2); *cf.* Fed. R. Civ. P. 8(a)(2). A motion to dismiss “tests the legal sufficiency of a complaint,” rather than challenge the substance of the claim as would a motion for summary judgment. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). “To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to ‘state a claim to relief that is plausible on its face.’” *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). “A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.” *Id.* (citing *Twombly*, 550 U.S. at 556). Although Defendant has not disputed the facts alleged by Plaintiffs, it is well-established that “[i]n deciding a motion to dismiss, the court must accept well pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant.” *Hartford Fire Ins. Co. v. United States*, 772 F.3d 1281, 1284 (Fed. Cir. 2014) (quoting *Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1365 (Fed. Cir. 2013)).

For Defendants to prevail on their Rule 12(c) motion, the Court must conclude that the “plaintiff’s factual allegations are not ‘enough to raise the right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).” *Pat Huval Rest. & Oyster Bar, Inc. v. United States*, 32 CIT 232, 236, 547 F. Supp. 2d 1352, 1357 (2008) (quoting *Twombly*, 550 U.S. at 555), *aff’d*, 785 F.3d 638 (Fed. Cir. 2015); AFDOCS/19875403.10 *Schick v. United States*, 31 CIT 2017, 2020, 533 F. Supp. 2d 1276, 1281 (2007). As the Supreme Court stated in *Twombly*, “[O]nce a

claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563.

**PLAINTIFFS HAVE ESTABLISHED AN ENTITLEMENT TO RELIEF PURSUANT TO 19 C.F.R. § 351.222(G)(1)**

At the outset, Commerce was required to consider the CCR under both 19 C.F.R. § 351.222(G)(1)(i) and 19 C.F.R. § 351.222(G)(1)(ii). Defendant did not discuss 19 C.F.R. § 351.222(G)(1)(ii). Defendant's primary contention is that "plaintiffs fail to provide any plausible basis to find Commerce's determination irrational" and that the CCR "contains no statements from the domestic industry expressing a lack of interest" in the AD Order and the complaint asserts none." Def. Br. at 14. To the contrary, Plaintiffs argued in both the CCR and the Complaint that numerous actions and inactions that amounted to Tara and Ecker expressing a lack of interest. In the CCR, Plaintiffs stated, "As outlined below, the petitioner Tara Materials Inc ("Tara"), and its subsequent purchaser, Ecker Textiles LLC ("Ecker"), have had and have a lack of interest in producing 100% polyester print canvas." Br. Ex. D at *2. For example, in its petition to the United States International Trade Commission ("ITC") and Commerce, Tara stated, "While there may be minor variations in size, material composition (all cotton or cotton/polyester blend fabric) and format (Such as prestretched or in panel form), these do not provide clear dividing lines among articles". There was no mention of 100% polyester print canvas. Def. Br. Ex. D at *4. When asked by the ITC to produce print canvas prices, Tara provided Polyflax, both polyester/cotton products posed as 100% polyester. Def. Br. Ex. D at *6. In subsequent actions, Tara did not inform the agencies that it did not make 100% polyester print canvas. Def. Br. Ex. D at *10. Importantly, "Tara executed a letter stating that Lexjet's 100% polyester Water Resistant Satin Cloth was out of scope of the *Order*." Administrative Record (Jun. 27,

2026), ECF No. 2, Ex. 25. Subsequently Ecker has been unable to provide proof production for any 100% polyester print canvas. Def. Br. Ex. D at *27. These are only a few examples of Tara and Ecker expressing their lack of interest in producing 100% polyester print canvas. From the Complaint, Defendant attempts to use the quote, "Ecker accounts for mostly all of print canvas domestic production". Def. Br. at 14. However, Defendant fails to recognize Plaintiffs' argument there is a distinction between 100% polyester print canvas and other print canvases, and the Plaintiffs have argued that neither Tara nor Ecker have had or have an interest in producing 100% polyester print canvas. If Ecker truly accounts for mostly all of the print canvas production and it has expressed a lack of interest from its fraudulent omissions and misstatements, when coupled with a lack of evidence from Ecker demonstrating any production, it follows that Commerce erred in not initiating the CCR. Defendant also attempts to twist the statement, "acknowledging that Ecker has stated 'it was interested in keeping {100% polyester print canvas} covered by the {AD Order}' ". *Id.* Plaintiffs did not acknowledge Ecker's statement. Instead, Plaintiffs asserted that "Ecker on April 29, 2026, filed an opposition to Plaintiffs' CCR Request, falsely claiming it was interested in keeping those products covered by the ADD Order and that Plaintiffs' request was deficient. Ecker provided no evidence that Tara or it actually made or makes 100% polyester print canvas." Complaint ¶ 28.

Defendant misses the mark in asserting that the claims to do not elevate to "the realm of possibility" and there were "changed circumstances sufficient to warrant a review exist". Def. Br. at 15. As further explained above and below, the Complaint record is replete with facts sufficient to state a claim to relief that is plausible on its face that rises above the speculative level. Commerce indeed was legally required to have initiated the

CCR in order to evaluate the substantial evidence. Plaintiffs do assert a plausible basis to overturn Commerce's determination to not initiate a CCR. Although this appears to be a case of first impression, the CCR request and Complaint clearly show that Tara and Ecker expressed a lack of interest in 100% polyester print canvas pursuant to 19 C.F.R. § 351.222(G)(1)(i). *Oy v. United States*, 61 F.3d 866, 875 (Fed. Cir. 1995), *Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States*, 30 CIT 1537, 1542 n.8 (2006). Certainly, Commerce in determining that the "misstatements, omissions, and false statements" were irrelevant, Commerce erred in its decision. Def. Br. at 16. Commerce also erred when it discounted other, numerous facts that demonstrated an expressed lack of interest. *Id*. Instead, Defendant states, "plaintiffs do not point to any authority that requires Ecker and Tara to produce 100% polyester print canvas before stating an interest in maintaining the scope of the AD Order." *Id*. Antidumping rules are to protect against material injury to domestic producers. It is illogical the rules were also meant to protect domestic production that simply does not exist. Nothing in the antidumping rules prevents Commerce from making a material injury determination. As shown by past actions, Commerce could have referred the material injury matter to the ITC. Plaintiffs' assertions do not fail to establish that they have a plausible claim for relief. *Id*.

The "misstatements, omissions, and false statements" during administrative proceedings are among the reasons also to initiate a CCR pursuant to 19 C.F.R. § 351.222(G)(1)(ii). Complaint ¶ 29. *See also* Complaint ¶ 27. "Commerce emphasizes the broad range of matters to which changed circumstances reviews may relate." *Mittal Canada, Inc. v. U.S.*, 461 F.Supp.2d 1325, 1332 (Ct. Int'l Trade 2006). Indeed, "Commerce may initiate a changed circumstances review to examine several factors wholly unrelated

to assessment rates. The scope of Commerce's authority to initiate changed circumstances reviews under 19 U.S.C. § 1675(b) is delimited only by the general requirement that there be 'changed circumstances sufficient to warrant a review' of the antidumping order. *See* 19 U.S.C. § 1675(b)(1) (2000). Commerce's discretion is broad, and the range of matters subject to changed circumstances reviews is wide. *See*, e.g., O*r. Steel Mills, Inc. v. United States*, 862 F.2d 1541, 1545 (Fed.Cir.1988) (review of amount of domestic industry support of antidumping duty order); *Jia Farn Mfg. Co., Ltd. v. United States*, 17 CIT 187, 193, 817 F.Supp. 969, 974 (1993) (review of importer's resales of other producer's merchandise); *Stainless Steel Sheet and Strip in Coils from the Republic of Korea*, 71 Fed.Reg. 37906 (Dep't Commerce July 3, 2006) (final results of changed circumstances review) (successor-in-interest review); *Carbon and Certain Alloy Steel Wire Rod from Ukraine*, 70 Fed.Reg. 21396 (Dep't Commerce Apr. 26, 2005) (notice of initiation of changed circumstances review) (reviewing nonmarket economy status)." *Id*. at 1339.

In discussing its reasoning not to initiate a CCR pursuant to 19 C.F.R. § 351.222(G)(1)(ii), Commerce summarily stated, "Commerce determines whether dumping occurs by investigating foreign companies. [ ] Lexjet does not explain how any statements or omissions on the types of products available from domestic production would affect Commerce's determination that was based on the investigation of foreign companies. Further, we find that the conduct of ITC proceedings is outside of Commerce's purview." Def. Br. Ex. A at 3. However, antidumping rules and caselaw demonstrate that Commerce's Determination Not to Initiate CCR is unsupported by substantial evidence, unreasonable, arbitrary, capricious, and otherwise not accordance with law. 5

U.S.C. § 706. There is no rational connection between the facts found and the choice made. *Tokyo Kikai Seisakusho, Ltd. v. U.S.*, 473 F.Supp.2d 1349, 1364 n. 11 (Ct. Int'l Trade 2007) ("declaring that reconsideration of sunset review will allow Commerce to analyze nature of material injury" caused by fraud). Commerce can and does refer material injury determinations to the ITC when necessary in 19 C.F.R. § 351.222 actions. *Issues and Decision Memorandum for the Reconsideration of Sunset Review of the Antidumping Duty Order on Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Japan; Final Results*, A-588-837 (Dep't Commerce Aug. 14, 2025) ("defer[al] to the ITC with respect to its authority to analyze the likelihood of continuation or recurrence of material injury on the domestic [industry]"). Exhibit 3 at 12. *Id*. at 11 (evidence of fraud warrant reconsideration of the sunset review so that the ITC may further analyze the issue of material injury). *Id*. at 10 (domestic production evidence analyzed as part of a 19 C.F.R. § 351.222 sunset reviewed action).

The record is replete with the numerous facts that warrant an initiation of a CCR. These missteps resulted in erring in its decision. Plaintiffs have clearly stated a claim to relief that is plausible on its face rising above speculation, for which Plaintiffs should be allowed to argue the merits of the 19 C.F.R. § 351.222(G)(1) claims.

## PLAINTIFFS HAVE A COGNIZABLE DUE PROCESS CONSTITUTIONAL CLAIM

Defendant contends that, "At best, however, these claims are derivative of plaintiffs' request for a CCR by Commerce and have no independent merit." Def. Br. at 17. Defendant goes on to allege, "There was no advance review and no showing that any form of due process or procedures were followed as prescribed under the statute. Plaintiffs' recharacterization of their principal claim as constitutional in nature does not create a

separate 'legally cognizable right of action' or 'elevate [their] claim for relief to the realm of plausibility.' *Twombly*, 550 U.S. at 555; *Laguna Hermosa*, 671 F.3d at 1288." *Id.*

"The Fifth Amendment prohibits the deprivation of life, liberty, or property without due process of law." *U.S. Auto Parts Network, Inc. v. United States*, 42 CIT ——, ——, 319 F. Supp. 3d 1303, 1310 (2018) (citing U.S. Const. amend. V). Thus, "[t]he first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in property or liberty." *Int'l Custom Prods., Inc. v. United States*, 791 F.3d 1329, 1337 (Fed. Cir. 2015) (citation omitted). While "engaging in foreign commerce is not a fundamental right protected by notions of substantive due process," *NEC Corp. v. United States*, 151 F.3d 1361, 1369 (Fed. Cir. 1998), an importer participating in an administrative proceeding has a procedural due process right to 'notice and a meaningful opportunity to be heard,' *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761–62 (Fed. Cir. 2012) [hereinafter Avisma ] (quoting *LaChance v. Erickson*, 522 U.S. 262, 266, 118 S.Ct. 753, 139 L.Ed.2d 695 (1998) );19 see also *Nereida Trading Co. v. United States*, 34 C.I.T. 241, 248, 683 F. Supp. 2d 1348, 1355 (2010) (assuming that the plaintiff had 'a protected interest in the proper assessment of tariffs on goods already imported' and further examining 'what process is due') (citation omitted); *Transcom, Inc. v. United States*, 24 C.I.T. 1253, 1271, 121 F. Supp. 2d 690, 707 (2000) ('It is impossible to comprehend how an importer's lack of a vested right to import merchandise in the future negates the obligation to provide the importer with notice prior to imposing an antidumping duty for the merchandise already imported.'). In general, 'notice [must be] reasonably calculated, under all the circumstances, to appri[s]e interested [ ] parties of the pendency of the action and afford them an opportunity to present their objections.'

*Transcom*, 24 C.I.T. at 1272, 121 F. Supp. 2d at 708 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). Such opportunity must occur 'at a meaningful time and in a meaningful manner.' *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976))." *Royal Brush Mfg., Inc. v. United States*, 483 F.Supp.3d 1294, 1305 (Ct. Int'l Trade 2020).

Defendant's assertion that Plaintiffs do not have an independent cause of action is simply incorrect. In *Royal Brush*, this Court found an independent Due Process cause of action where "CBP failed to ensure that confidential filings were accompanied by the requisite public summaries." *Id*. "CBP's compliance with its regulation concerning public summarization of confidential information is relevant to assessing Royal Brush's claim that CBP denied Royal Brush a meaningful opportunity to participate in the administrative proceeding." *Id*. at 1307. In *Royal Brush* the plaintiff complained that "CBP's conclusion is based on a flawed logic and is therefore irrational" and that "[a] mere possibility does not constitute substantial evidence". Reply Brief of Plaintiff at 12, *Royal Brush*. Here too, Plaintiffs are complaining that Commerce's determination is unsupported by substantial, unreasonable with no rational connection between the facts found and the choice made. Complaint ¶ 35. Like in *Royal Bush*, the Due Process allegation is not based on an agency decision but is based on procedural Due Process that should be afforded. The plaintiff in Royal Brush claimed that "CBP violated its own regulations and deprived Royal Brush of due process through a series of errors that compounded each other." Reply Brief of Plaintiff at 1, *Royal Brush*. Here, Plaintiffs have similarly stated that, "When Commerce perfunctorily took Ecker's false assertions at face value and without considering the numerous facts presented by Plaintiffs, it turned the review into meaningless, futile

exercise, in violation of due process requirements." Complaint ¶ 41. Indeed, in its decision, Commerce tellingly stated, "While Lexjet disagrees with Ecker Textiles on whether Ecker Textiles actually produces the requested merchandise,[ ] this disagreement is not material to our analysis. … We disagree that Lexjet's allegations warrant a CCR to partially revoke the *Order* with respect to requested merchandise. First, Commerce determines whether dumping occurs by investigating foreign companies.[ ] Lexjet does not explain how any statements or omissions on the types of products available from domestic production would affect Commerce's determination that was based on the investigation of foreign companies. Further, we find that the conduct of ITC proceedings is outside of Commerce's purview." Def. Br. Ex. A at *3. "When Commerce perfunctorily took Ecker's false assertions at face value and without considering the numerous facts presented by Plaintiffs, it turned the review into meaningless, futile exercise, in violation of due process requirements." Complaint ¶ 41. Clearly there are two separate, legitimate, causes of action.

Defendant is trying to lead this Court to believe that the Plaintiffs have no Due Process rights in relying on *Int'l Custom Prods., Inc. v. United States*, 791 F.3d 1329 (Fed. Cir. 2015) and *Gulf States Tube Div. of Quanex Corp. v. United States*, 981 F. Supp. 630, 652 (Ct. Int'l Trade 1997). Def. Br. at 17. However, "these holdings do 'not preclude a protected interest in the proper assessment of tariffs on goods already imported.' *Nereida Trading Co., Inc. v. United States*, 34 C.I.T. 241, 248, 683 F. Supp. 2d 1348, 1355 (2010); *cf. Am. Ass'n of Exporters*, 751 F.2d at 1250 (finding no protected interest where the agency 'has not taken from [importers] any merchandise which they have already purchased' but 'has merely limited the amounts which the importers can purchase in the future'). … "[T]he right to due process does not depend on whether statutes and

regulations provide what is required by the [C]onstitution." *Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250, 1260 [ ] (Fed. Cir. 2023). For instance, participants in antidumping duty order proceedings are entitled to the 'due process right . . . ' to notice and a meaningful opportunity to be heard,' ' *PSC VSMPAvisma Corp. v. United States*, 688 F.3d 751, 761-62 (Fed. Cir. 2012) (quoting *LaChance v. Erickson*, 522 U.S. 262, 266, 118 S.Ct. 753, 139 L.Ed.2d 695 (1998)), which may extend beyond Commerce's statutory and regulatory obligations, *cf. Transcom, Inc. v. United States*, 24 C.I.T. 1253, 1272, 121 F. Supp. 2d 690, 708 (2000), aff'd, 294 F.3d 1371 (Fed. Cir. 2002) (ultimately finding that the regulation afforded sufficient process). … And the opportunity to be heard must be afforded 'at a meaningful time and in a meaningful manner." *Royal Brush Mfg., Inc. v. United States*, 44 CIT —, —, 483 F. Supp. 3d 1294, 1306 (2020) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). *Goodluck India Ltd. v. United States*, 670 F.Supp.3d 1353, 1378 (Ct. Int'l Trade 2023). While Defendant attempts to rely on *PSC VSMPAvisma Corp.*, Defendant offered up no argument as to how Commerce's proceeding was meaningful and only focused on the notice aspect. Simply put, the proceeding was nothing but an empty formality. Commerce refused to exercise its broad discretion to review the matter. These missteps resulted in violating Plaintiffs' Due Process rights.

As recognized by Defendant, Plaintiffs have a cognizable protected interest based on action brought by the United States to recover lawful duties, taxes, fees and penalties for previously entered merchandise. Def. Br. at 4. Plaintiffs put forth numerous facts demonstrating that Commerce failed to provide a meaningful opportunity to be heard. Plaintiffs have clearly stated a claim to relief that is plausible on its face rising above

speculation, for which Plaintiffs should be allowed to argue the merits of the Due Process claim.

## PLAINTIFFS HAVE A COGNIZABLE EQUAL PROTECTION CONSTITUTIONAL CLAIM

As above, Defendant also describes Plaintiff's Equal Protection claim as, "At best, however, these claims are derivative of plaintiffs' request for a CCR by Commerce and have no independent merit." Def. Br. at 17. At the outset, the record is clear Plaintiffs are requesting two distinct reliefs. Count One concerns attacking the CCR decision by Commerce and Plaintiffs' prayed that the Court hold that Commerce's determination is not in accordance with the law. Court three concerns attacking the scope of the ADD case and Plaintiffs prayed that the Court hold the ADD case to be unconstitutional, null and void.

Defendant next argues that, "And plaintiffs premise their 'equal protection' challenge on the allegation that there is 'no material injury to domestic producers that do not exist.' Compl. ¶ 46 (count III). But these arguments only restate the basis of plaintiffs' request for a CCR and the basis for their appeal to this Court, *i.e.*, that 'Commerce improperly declined to engage with the substance of Plaintiffs' CCR.' Compl. ¶ 33 (count I)." Def. Br. at 17. If there is no material injury, there is no rational, legitimate basis to treat similarly situated persons differently. "[L]aws singling out a certain class of citizens for disfavored legal status or general hardships are rare. A law declaring that in general it shall be more difficult for one group of citizens than for all others … is itself a denial of equal protection of the laws in the most literal sense. *Romer v. Evans*, 517 U.S. 620, 633 (1996). "The equal protection clause … protects the individual from … action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the

same class." *Allegheny Pittsburgh Coal Co. v. Cnty. Comm'n of Webster Cnty.*, 488 U.S. 336, 345 (1989).

Defendant goes on to state, "But plaintiffs fail to explain how their equal protection challenge is within the scope of Commerce's determination on review — *i.e.*, Commerce's decision not to initiate a CCR." It is well-known that the Court has discretion in fashioning remedies where it has jurisdiction. "In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986 [26 U.S.C. § 7428], a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930 [19 U.S.C. § 1516a (f)(10)]),2 as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such. 28 U.S.C. § 2201(a) (emphasis added). *See also* USCIT R. 57; 28 U.S.C. § 2202. The Supreme Court has explained that '[w]hile the courts should not be reluctant' to grant relief in appropriate cases, *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 243, 73 S.Ct. 236, 97 L.Ed. 291 (1952), the declaratory judgment statute 'is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant,' *id*. at 241, 73 S.Ct. 236. *See also Green v. Mansour*, 474 U.S. 64, 72, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985); *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995) ("By the Declaratory Judgment Act, Congress

sought to place a remedial arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants.').” *Canadian Lumber Trade Alliance v. U.S.*, 441 F.Supp.2d 1259, 1262 (Ct. Int'l Trade 2006). Here, Plaintiffs asked for a declaratory judgment to declare the ADD Order as unconstitutional, null and void. Complaint at 15. Moreover, “the Court of International Trade has been granted broad remedial powers. *See* 28 U.S.C. § 2643 (2000). Specifically, the Court of International Trade's relief statute provides for entry of a money judgment ‘for or against the United States in any civil action commenced under section 1581 or 1582 of this title,’ id. § 2643(a)(1), and allows the court to ‘order any other form of relief that is appropriate in a civil action....’ Id. § 2643(c)(1)” *Shinyei Corp. of America v. U.S.*, 355 F.3d 1297, 1311 (Fed. Cir. 2004). Clearly the Court can fashion any of the remedies listed in the Complaint.

While Defendant proclaims that the government has a “ ‘legitimate governmental purpose’ of enforcing trade laws and protecting domestic industry”, there is no material injury, and therefore no rational basis for which to treat similarly situated persons differently. The ADD case is violation of the Equal Protection clause as such. Plaintiffs have clearly stated a claim to relief that is plausible on its face rising above speculation, for which Plaintiffs should be allowed to argue the merits of the Equal Protection claim.

## CONCLUSION

For the foregoing reasons, the Defendant’s Motion to Dismiss must be denied in its entirety and the Motion for Judgment on the Pleadings must not be granted. May the Court grant the case to continue to argue the merits of the claims.

Respectfully submitted,
/s/ Kyl J. Kirby
Kyl J. Kirby
**KYL J. KIRBY, ATTORNEY AND COUNSELOR AT LAW, P.C.**
1400 Lipscomb Street
Fort Worth, TX 76104
Tel: (214) 632-0841
Attorney for Plaintiffs LEXJET, LLC, ABAQA, LLC, and BRAND MANAGEMENT GROUP, LLC,

Date: November 13, 2026

**WORD COUNT CERTIFICATE OF COMPLIANCE**

Pursuant to the U.S. Court of International Trade's Standard Chambers Procedures 2(B)(l), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiffs' Response, as computed by KYL J. KIRBY, ATTORNEY AND COUNSELOR AT LAW, P.C.'s word processing system (Microsoft Word for 365), is 5,644 words.

Respectfully submitted,
/s/ Kyl J. Kirby
Kyl J. Kirby
**KYL J. KIRBY, ATTORNEY AND COUNSELOR AT LAW, P.C.**
1400 Lipscomb Street
Fort Worth, TX 76104
Tel: (214) 632-0841
Attorney for Plaintiffs LEXJET, LLC, ABAQA, LLC and BRAND MANAGEMENT GROUP, LLC,

Date: November 13, 2026

EXHIBIT 1

| | | | |
|---|---|---|---|
| **MESSAGE NO.** | 6259409 | **MESSAGE DATE** | 09/16/2026 |
| **STATUS** | Active | **INACTIVATED DATE** | |
| **TYPE** | ALI-Automatic Liquidation | **FR CITE** | 91 FR 51436 |
| **SUB-TYPE** | ADMIN RVW-Administrative Rvw | **FR DATE** | 08/10/2026 |
| **CATEGORY ACCESS** | AD | **EFFECTIVE DATE** | 08/10/2026 |
| **TYPE** | Public ✓ Non-Public ☐ | **POI/POR DATE** | 06/01/2025 - 05/31/2026 |
| **Notice of lifting of Suspension Date** | 08/10/2026 | **PERIOD COVERED** | - |

| | |
|---|---|
| **SHORT CASE NAME** | Artist Canvas |
| **COURT CASE #s** | |
| **REF MESSAGE #s** | |
| **PRINCIPAL CASE #s** | A570899 |
| **3rd Country CASE #s** | |

EXHIBIT 1

**RE:** Automatic liquidation instruction for Artist Canvas from The People's Republic of China for the period 06/01/2025 through 05/31/2026 (A-570-899)

1. Commerce does not automatically conduct administrative reviews of antidumping duty orders. Instead, reviews must be requested pursuant to section 751(a)(1) of the Tariff Act of 1930, as amended, and in accordance with 19 CFR 351.213.

2. Commerce has not received a request for an administrative review of the antidumping duty order for the period and on the merchandise identified below. Therefore, in accordance with 19 CFR 351.212(c), you are to assess antidumping duties on merchandise entered, or withdrawn from warehouse, for consumption at the cash deposit rate in effect on the date of entry. Liquidate all entries for all firms.

Product: Artist Canvas
Period: 06/01/2025 through 05/31/2026
Country: The People's Republic of China
Case number: A-570-899

3. There are no injunctions applicable to the entries covered by this instruction.

4. Notice of the lifting of suspension of liquidation of entries of subject merchandise covered by paragraph 2 occurred with the publication of the notice of initiation of administrative review for the 06/2026 anniversary month (91 FR 51436, 08/10/2026). Unless instructed otherwise, for all other shipments of Artist Canvas from The People's Republic of China you shall continue to collect cash deposits of estimated antidumping duties for the merchandise at the current rates.

5. The assessment of antidumping duties by CBP on shipments or entries of this merchandise is subject to the provisions of section 778 of the Tariff Act of 1930, as amended. Section 778 requires that CBP pay interest on overpayments or assess interest on underpayments of the required amounts deposited as estimated antidumping duties. The interest provisions are not applicable to cash posted as estimated antidumping duties before the date of publication of the antidumping duty order. Interest shall be calculated from the date payment of estimated antidumping duties is required through the date of liquidation. The rate at which such interest is payable is the rate in effect under section 6621 of the Internal Revenue Code of 1954 for such period.

6. Upon assessment of antidumping duties, CBP shall require that the importer provide a reimbursement certification in accordance with 19 CFR 351.402(f)(2) and as described under this paragraph:
a. The importer must certify with CBP prior to liquidation (except as provided below) whether the importer has or has not been reimbursed or entered into any agreement or understanding for the payment or for the refunding to the importer by the manufacturer, producer, seller, or exporter for all or any part of the antidumping and/or countervailing duties, as appropriate. Such certification should identify the commodity and country and contain the information necessary to link the certification to the relevant entry or entry line number(s).

b. The certification may be filed either electronically or in paper in accordance with CBP's requirements, as applicable.
c. If an importer does not provide its certification prior to liquidation, CBP may accept the certification in accordance with its protest procedures under 19 U.S.C. 1514, unless otherwise directed.
d. Certifications are required for entries of the relevant commodity that have been imported on or after the date of publication of the antidumping notice in the Federal Register that first suspended liquidation in that proceeding.
e. Consistent with 19 CFR 351.402(f)(3), if an importer fails to file the certification, Commerce may presume that the importer was paid or reimbursed the antidumping or countervailing duties. Therefore, if the importer does not provide the certification prior to liquidation (or as provided above), reimbursement of the duties shall be presumed. Accordingly, if there is no certification with respect to the antidumping duty, CBP shall increase the antidumping duty by the amount of the antidumping duty. In addition, if there is no certification with respect to any applicable countervailing duty, CBP shall increase the antidumping duty by the amount of the countervailing duty. Further, if the importer certifies that it has an agreement with the manufacturer, producer, seller, or exporter, to be reimbursed antidumping duties, CBP shall increase the antidumping duty by the amount of the antidumping duty. In addition, if the importer certifies that it has an agreement with the manufacturer, producer, seller, or exporter, to be reimbursed any applicable countervailing duties, CBP shall increase the antidumping duty by the amount of the countervailing duty.

7. This instruction to liquidate entries covered by this message does not limit CBP's independent authority, including its authority to suspend, continue to suspend, or extend liquidation of entries addressed by this message. Accordingly, CBP should examine all entries for which this message directs liquidation to determine whether any such entries are subject to suspension, continued suspension, or extension of liquidation pursuant to CBP's independent authority (e.g., Enforce and Protect Act under section 517 of the Tariff Act of 1930, as amended). If entries of subject merchandise covered by this message are subject to suspension, continued suspension, or extension of liquidation pursuant to CBP's own authority, CBP port officials should follow CBP's internal procedures with respect to continuing any suspension, the lifting of suspension, and/or continuing any extension of liquidation for such entries.

8. If there are any questions by the importing public regarding this message, please contact the Call Center for the Office of AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce at (202) 482-0984. CBP ports should submit their inquiries through authorized CBP channels only. (This message was generated by O#CLU:YB.)

9. There are no restrictions on the release of this information.

Alexander Amdur

EXHIBIT 25



**To:** Dean Lambert[dean.lambert@sone.com]
**Cc:** David Twite[dtwite@taramaterials.com]
**From:** Mike Ecker[mecker@taramaterials.com]
**Sent:** Fri 10/27/2017 8:15:46 PM (UTC)
**Subject:** RE: Letters for S-One re: ADT
TBAN_WRSC_ADT_Letters_10_27_17.pdf

Dean:

I apologize for the delay. Michael is still concerned about the consequences of signing these letters and we had some delay in the response of our attorneys. David and I have discussed the letters on multiple occasions and come to the conclusion that it is more important to support you and S-One. We will worry about the consequences later. The signed letters are attached.

Additionally, David and I would like to visit with you in Sarasota the week of the 13th. Please let us know what day will work best.

Thanks-
Mike

---

**From:** Dean Lambert [mailto:dean.lambert@sone.com]
**Sent:** Thursday, October 26, 2017 11:18 AM
**To:** Mike Ecker - Tara Materials, Inc. (mecker@taramaterials.com)
**Subject:** RE: Letters for S-One re: ADT

Mike, any chance of you guys helping us with these letters? I am here if you would like to discuss further.

Dean

---

**From:** Dean Lambert
**Sent:** Monday, October 16, 2017 8:58 AM
**To:** Mike Ecker - Tara Materials, Inc. (mecker@taramaterials.com) <mecker@taramaterials.com>
**Subject:** Letters for S-One re: ADT

Mike,

Here are the letters we are suggesting to assist us in eliminating these items from ADT enforcement. Could you please review and get back to me ASAP with any questions?

Thanks,

Dean

S-One HOLDINGS CORPORATION

**Dean Lambert**
S-One Holdings Corporation | www.SOne.com

1605 Main Street - Suite 503, Sarasota, FL 34236, USA

**T:** 941-256-7831 | dean.lambert@SOne.com

EXHIBIT 25

Fredrix ARTIST CANVAS Since 1868
Tara Materials Inc.
F.E.I. NO: 58-0975796
Fredrix ARCHIVAL PRINT CANVAS
322 INDUSTRIAL PARK DR. LAWRENCEVILLE, GA 30046 TELEPHONE: (770) 963-5256 FAX: (770) 963-1044 www.TaraMaterials.com

October 27, 2017

Mr. Dean Lambert
LexJet, LLC / Brand Management Group, LLC
1605 Main St.
Sarasota, FL 34236

Barcode:4869837-01 A-570-899 CCR - Changed Circumstances - Request New Segment

Re: Antidumping Duty Order Against Artist Canvas from China - LexJet Water-Resistant Satin Cloth (**WRSC**)

Dear Dean:

As you are aware, Tara Materials, Inc. was the original U.S. domestic petitioner of the investigation that led to the imposition of the antidumping duty order against artist canvas from China (Case No. A-570-899 or the "Order").

Tara Materials continues to be a U.S. domestic producer of artist canvas. Further, Tara Materials continues to support the Order and the U.S. Government's efforts to collect required antidumping duties.

However, we understand that there has been recent confusion regarding the products that are covered by the scope of the Order. In particular, at your request, we reviewed a sample of LexJet Water Resistant Satin Cloth (**WRSC**) and would agree that this product is not subject to the Order nor was **WRSC** intended to be covered by Tara Materials' petition that led to the products subject to the Order.

We authorize you to share this letter with any U.S. Government authority that may question whether **WRSC** is subject to the Order. Please let us know if we can provide any further assistance.

Thank you.

Michael A. Ecker
Executive Vice President
Tara Materials, Inc.

#53760368_v1

Filed By: kyl@kirbyfedlaw.com, Filed Date: 1/26/26 6:15 PM, Submission Status: Approved

EXHIBIT 3

71 FR 11590, March 8, 2006

A-588-837
Changed Circumstances Review
Public Document
ADCVD/2: KJ

MEMORANDUM TO: David M. Spooner
Assistant Secretary
for Import Administration

FROM: Stephen J. Claeys
Deputy Assistant Secretary
for Import Administration

SUBJECT: Issues and Decision Memorandum for the Changed Circumstances Review of Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Japan

Summary

We have analyzed the comments of the interested parties in the changed circumstances review of large newspaper printing presses and components thereof, whether assembled or unassembled (LNPPs), from Japan. As a result of our analysis of the comments received from interested parties, the Department of Commerce (the Department) will revise TKS' margin for the 1997-1998 review and rescind the revocation of the antidumping duty order for TKS. In addition, the Department will initiate a proceeding in order to reconsider the sunset review which resulted in revocation of this order. We recommend that you approve the positions we have developed in the "Discussion of the Issues" section of this memorandum. Below is the complete list of the issues in this changed circumstances review for which we received comments from parties.

General Comments

*Comment 1* *Department's Authority to Conduct this Review*
*Comment 2* *Department's Authority to Reinstate the Antidumping Duty Order*
*Comment 3* *Department's Authority to Reconsider the Sunset Review which Resulted in Revocation of the Order*
*Comment 4* *Allegations of TKS' Misconduct in the 1998-1999 and 1999-2000 Administrative Reviews*
*Comment 5* *Adverse Facts Available Rate Applied to TKS*

EXHIBIT 3



Background

On September 13, 2005, the Department published a notice of preliminary results of changed circumstances review of the antidumping duty order on LNPPs. See Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Japan: Preliminary Results of Changed Circumstances Review, 70 FR 54019 (September 13, 2005).

We invited parties to comment on our preliminary results. We received comments from the petitioner (i.e., Goss International Corporation) (Goss), Tokyo Kikai Seisakusho, Ltd. and TKS (U.S.A.), Inc. (collectively, TKS), Mitsubishi Heavy Industries, Ltd. (MHI), The Washington Post and North Jersey Media Group, Inc. (NJMG), interested parties in this review. These comments are discussed and addressed below.

On January 26, 2006, we invited comments on the decision of the U.S. Court of Appeals for the Eighth Circuit in Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft, No. 04-2604, 2006 U.S. App. LEXIS 1569 (8th Cir. Jan. 23, 2006), which affirmed the Iowa district court decision in Goss Int'l Corp. v. Tokyo Kikai Seisakusho, Ltd., 321 F.Supp.2d 1039, 1045-46 (N.D. Iowa 2004) (Goss Int'l.). In both cases, the courts described how TKS had concealed rebates, destroyed documents, and misled the Department in its antidumping proceeding. Id. Goss, TKS, and MHI filed comments on January 31, 2006. Goss argues that the Court's decision is relevant to the Department's consideration of evidence on the record of this review because it demonstrates that TKS provided the Department with false information, or withheld material information regarding sales pertinent to the three administrative reviews of this order. Both TKS and MHI contend that the Court's decision has no relevance to the changed circumstances review initiated by the Department. TKS argues that the decision addresses legal issues such as the meaning of the intent requirement under the Antidumping Act of 1916, that are not at all pertinent to the changed circumstances review. MHI adds that the Antidumping Act of 1916, unlike the Tariff Act of 1930, is silent regarding antidumping duty orders, and provides no authority to the Department or any other agency regarding the administration of U.S. trade law. While the legal standards of the Antidumping Act of 1916 are clearly distinct from those of the Tariff Act of 1930, we believe the appellate decision is relevant to this changed circumstances review because, in affirming the lower court's ruling, the appellate court lent further credence to the facts upon which we initiated the review.

Based on our analysis of the comments received, we affirm our decision to apply an adverse facts available (AFA) rate of 59.67 percent to TKS in the 1997-1998 administrative review. In addition, because the rate for the 1997-1998 administrative review is no longer zero, TKS no longer qualifies for revocation of the antidumping duty order based on three consecutive administrative reviews resulting in zero dumping margins. Therefore, we are rescinding the revocation with respect to TKS and reinstating the order with respect to TKS from September 1, 2000, through September 3, 2001, the day before the effective date of the sunset revocation. Finally, we intend to reconsider the revocation of the order pursuant to the sunset review provision of the statute, section 751(c) of the Tariff Act of 1930, as amended (the Act).

Discussion of the Issues

Comment 1: *Department's Authority to Conduct this Review*

TKS argues that the Department has no legal authority to initiate or conduct this changed circumstances review because there is no antidumping duty order or suspension agreement in effect with respect to LNPPs from Japan. Citing section 751(b)(1) of the Act, TKS argues that the statute provides for the initiation of a changed circumstances review of only three types of determinations: 1) a final affirmative determination that resulted in an antidumping duty order; 2) a suspension agreement; or 3) a final affirmative determination resulting from an investigation continued pursuant to section 704(g) or 734(g) of the Act. As further support for its argument that an existing order must be in place in order for the Department to conduct a changed circumstances review, TKS cites Article 11 of the World Trade Organization Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994 (the Antidumping Agreement) and the Statement of Administrative Action at 816-17, which all refer to "the continued imposition of dumping duties" (emphasis added) in the context of the conduct of changed circumstances reviews.

TKS rejects the Department's comparison of the instant case to Elkem Metals Co. v. United States, 193 F. Supp. 2d 1314, 1321 (CIT 2002) (Elkem Metals), in which the Court of International Trade (CIT) permitted the International Trade Commission (ITC) to reopen an affirmative injury determination "even though the ITC did not have explicit statutory authority to do so." In contrast to the actions the Department now proposes to take, TKS argues, the ITC's actions in Elkem Metals were specifically authorized by section 751(b) of the Act, because they were based upon changed circumstances reviews of affirmative determinations that resulted in the issuance of antidumping duty orders. Furthermore, TKS claims that Alberta Gas Chemicals, Ltd. v. Celanese Corp., 650 F.2d. 9, 12-13 (2d Cir. 1981) (Alberta Gas), relied upon by the Department for the proposition that "an agency may act to protect the integrity of its proceedings" (70 FR at 54021), is inapposite because it had nothing to do with either changed circumstances reviews or sunset reviews. TKS then argues that the Department's citation to Touche Ross & Co., v. SEC, 609 F.2d 570, 582 (2d Cir. 1979), is equally misplaced because the instant changed circumstances review was not initiated under the Department's rulemaking authority, nor is it consistent with the Department's own regulations and governing statute (see section 751(b) and (c) of the Act).

TKS disputes the Department's assertion in its preliminary results that it has "inherent authority" to conduct this changed circumstances review in order to protect the integrity of its proceedings. TKS contends that an agency may not reconsider a decision if to do so would exceed its congressionally delegated authority. In support of this contention, TKS cites Macktal v. Chao, 286 F.3d 822, 826 (5th Cir. 2002) and Bookman v. United States, 453 F.2d 1263, 1265 (Ct. Cl. 1972) (absent statutory or administrative guidelines, an agency's authority to reconsider a decision is determined in light of "contrary legislative intent or other affirmative evidence . . .") (Bookman). Finally, TKS warns the Department against attempting to fill perceived gaps or omissions in the statute by conducting a proceeding that Congress has not authorized. In support

EXHIBIT 3



of its position, TKS cites to FAG Italia S.p.A. v. United States, 291 F.3d 806, 815-16 (Fed. Cir. 2002) and Ad Hoc Committee of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States, 13 F.3d 398, 400-01 (Fed. Cir. 1994) (in which the Federal Circuit held that "where Congress has included specific language in one section of a statue but has omitted it from another, related section of the same Act, it is generally presumed that Congress intended the omission.")

Goss argues that the Department's conduct of the instant review is fully consistent with the governing statute and regulations and supported by the Department's inherent authority to reconsider the administrative reviews and sunset reviews, the outcomes of which were affected by TKS' misconduct. Goss notes that the courts have consistently held that this authority does not require a statutory source. See, e.g., Borlem S.A.-Empreedimentos Industriais v. United States, 913 F.2d 933, 938 (Fed. Cir. 1990). See also Belville Mining Co. v. United States, 999 F.2d 989, 997 (6th Cir. 1993) (stating that "even where there is no express reconsideration authority for an agency, however, the general rule is that an agency has inherent authority to reconsider its decision, provided that reconsideration occurs within a reasonable time after the first decision.").

Goss contends that the Department has the authority to reconsider prior determinations that resulted from fraud, citing the CIT ruling in Elkem Metals (concerning an agency's inherent power to reopen prior proceedings whose outcomes have been affected by fraud on the part of a participant) in support of its position. Goss maintains that TKS' attempt to limit this case to situations where an antidumping duty order is in place is an unacceptable limitation on the Department's authority to deal with corruption of its proceedings.

Moreover, according to Goss, it is reasonable for the Department to conduct a changed circumstances review as a mechanism for determining whether and how to exercise this inherent authority. Goss argues that TKS distorts the plain meaning of the Department's regulations relating to changed circumstances reviews by asserting that "an order" necessarily means "an existing order." Goss maintains that the only prerequisite to a changed circumstances review is that there must have been an affirmative determination that resulted in an antidumping duty order.

The Department's Position:

The Department has the legal authority to initiate and to conduct this changed circumstances review for two reasons. First, federal agencies may reconsider final decisions if the information the agency relied upon may have been false or misleading. See Elkem Metals at 320-23. Not only do federal agencies have the power to reconsider these determinations, but in some cases they may have an affirmative duty to do so. See Bookman, 453 F.2d at 1265; see also Greene County Planning Board v. Federal Power Commission, 559 F.2d 1227, 1233 (2nd Cir. 1976), cert. denied, 434 U.S. 1086, 98 S. Ct. 1280, 55 L. Ed. 2d 791 (1978). In the instant case, new evidence appeared in the form of a federal court decision: a federal jury and a federal judge determined that TKS and its former counsel falsified business records, destroyed documents, and

"agreed to a fraudulent price increase" to "make it appear to Goss that the sale was not dumped." See Goss Int'l. Thus, the information the Department relied upon in the 1997-1998 administrative review for TKS was false and misleading.

Second, the misleading behavior that the Department considered in this changed circumstances review occurred when the antidumping duty order was still in effect. The statute states that Commerce will conduct a changed circumstances review "[w]henever the administering authority . . . receives information concerning . . . a final affirmative determination that resulted in an antidumping duty order under this subtitle . . . ." See section 751(b)(1) of the Act (emphasis added). The term "whenever" does not explicitly limit the time in which the Department may initiate a changed circumstances review and the Department's interpretation of that term is reasonable in light of the purpose of the statute. TKS would seek to shield its misconduct from scrutiny based on an unreasonably restrictive reading of the statute. Indeed, because the statute requires that entries be reviewed upon a retrospective basis, reviews may occur after revocation of the order. See section 751(a)(2) of the Act. The "fraudulent price increase" was related to TKS' sale to the Dallas Morning News (DMN), the subject of the Department's 1997-1998 review. See Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Japan: Initiation of Changed Circumstances Review Initiation, 70 FR 24514 (May 10, 2005) at 24516 (citing Goss Int'l, 321 F. Supp. 2d at 1045). Thus, the original decisions, which the Department has reconsidered based on TKS' misconduct, had been made when an order on LNPPs from Japan was in existence. The Department properly reconsidered prior decisions that had been based on false information, and when TKS misled the Department. Finally, there is no obligation in Article 11 of the Antidumping Agreement that requires the Department to act otherwise. U.S. law, as implemented through the Uruguay Round Agreements Act, is consistent with the United States' obligation pursuant to the World Trade Organization Agreement.

Comment 2: *Department's Authority to Reinstate the Antidumping Duty Order*

TKS argues that the Department has no authority to rescind the revocation of the antidumping duty order with respect to TKS. According to TKS, if Congress had intended to provide such authority, it would have included revocation determinations among the determinations that are reviewable under the changed circumstances provision. Moreover, TKS claims that the proposed action is contrary to the Department's own regulations because 19 CFR 351.222(b)(2)(iii) [sic] only applies as long as any producer or exporter is subject to the order. TKS maintains that no producer or exporter is subject to the antidumping duty order on LNPPs from Japan because the order was revoked with respect to all producers or exporters of the merchandise one month after it was revoked with respect to TKS.

MHI argues that the Department does not have the authority through this review to impose an antidumping duty order where none exists today, even when an order existed previously. According to MHI, the statute is absolutely clear that an order can be imposed only through an investigation, an interpretation which MHI claims has not only been upheld by the CIT, but also recognized by the Department itself in prior rulemakings and decisions. MHI cites the

Department's Countervailing Duties, 53 FR 52306 (December 27, 1988), in which the Department stated its belief that the reinstatement provisions apply only to partial revocations of producers subject to an existing order, and not to the reinstatement of a revoked order absent a new investigation. MHI also cites Asahi Chemical Industry Co. v. United States 727 F. Supp. 625, 628 (CIT 1989) in which the CIT concluded that "once Commerce makes a revocation determination, the antidumping duty order ceases to be operative and may not be reinstated."

MHI further argues that to put in place an order without a new, contemporaneous injury determination would violate the statute as well as the United States' obligation to interpret its statutes in a manner consistent with international law. MHI also believes that since other agencies have explicit statutory authority to punish fraudulent behavior, and such agencies are taking action, there is no reason for the Department to attempt to use improper reinstatement of the order as a form of enforcement.

Goss contends that the Department has the authority to reinstate the antidumping duty order after the completion of a reopened sunset review. Goss cites Elkem Metals in support of its assertion that this authority derives from the inherent ability for an agency to reconsider and correct its proceedings where fraud occurred. It would logically follow, according to Goss, that the Department has the authority to rescind the revocation if its reconsideration determines that such action is warranted. Goss argues that MHI acknowledges that the Department has the authority to reopen and reconsider the outcome of proceedings that were affected by fraud and has provided no reason why this authority would not apply to a proceeding that resulted in the revocation of an order. Further, Goss notes that MHI's concerns regarding a new injury determination would be addressed through the reopened sunset review, which would require an ITC determination on the likelihood of a continuation or recurrence of injury to the domestic industry.

The Department's Position:

For the reasons stated in the preliminary results, because the rate from the 1997-1998 period of review should not have been zero, the order should not have been revoked with respect to TKS in the final results of the 1999-2000 administrative review, pursuant to 19 CFR 351.222(b). Therefore, in these final results of this changed circumstances review, we are rescinding the revocation of the antidumping duty order on LNPPs from Japan with respect to TKS from the date of its revocation from the antidumping duty order to the 2002 sunset determination. Accordingly, we are reinstating the order with respect to TKS from September 1, 2000, through September 3, 2001, the day before the effective date of the revocation of the antidumping duty order under the sunset review. See Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Japan: Final Results of Antidumping Duty Administrative Review and Revocation in Part, 67 FR 2190, 2192 (Jan. 16, 2002) (TKS' revocation effective September 1, 2000); Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Japan (A-588-837) and Germany (A-428-821): Notice of Final Results of Five-Year Sunset Reviews and Revocation of Antidumping Duty Orders, 67 FR 8522 (February 25, 2002) (sunset of order effective September 4, 2001).

EXHIBIT 3



The Department has the authority to rescind the partial revocation with respect to TKS during the time before the sunset revocation based upon its inherent authority to protect the integrity of its proceedings. Moreover, as discussed in Comment 1, above, the statute does not state that the Department may initiate a changed circumstance review only if the order is in effect at the time of initiation. Rather, the statute states that:

> Whenever the administering authority . . . receives information concerning . . . a final affirmative determination that resulted in an antidumping duty order under this subtitle . . . . which shows changed circumstances sufficient to warrant a review of such determination . . . , the administering authority . . . shall conduct a review of the determination. . . after publishing notice of the review in the Federal Register.

See section 751(b)(1) of the Act (emphasis added). The term "whenever" does not specify a time restriction limiting the period in which the Department may initiate a changed circumstances review. Rather, the statute authorizes the Department to conduct a changed circumstances review whenever changed circumstances, such as those encountered here, are made known, so long as that information applies to a period of time when the order was in place. The statute does not preclude the Department from acting where, as here, misrepresentations made by a party to a proceeding may have contributed to the revocation of that proceeding to the party's benefit.

The Department's application of the statute in this case is reasonable because both TKS' egregious behavior and the company-specific revocation occurred when the entire order on LNPPs from Japan remained in place. The Department routinely conducts retrospective reviews of antidumping duty orders. As a result, the Department regularly conducts reviews for a segment of time in the past when the order existed even if the order no longer exists at the time of initiation of that review. See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews and Revocation of Orders in Part, 66 FR 36551 (July 12, 2001) (orders covering cylindrical roller bearings revoked effective January 1, 2000; administrative reviews initiated six months later, on July 7, 2000, for cylindrical roller bearings); see also Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Japan (A-588-837) and Germany (A-428- 821): Notice of Final Results of Five-Year Sunset Reviews and Revocation of Antidumping Duty Orders, 67 FR 8522, 8523 (February 25, 2002) (similarly explaining that the Department would be conducting retrospective reviews of antidumping duty orders). Therefore, because both the misconduct and the affected administrative review addressed in this changed circumstances review covered a time period when an order on LNPPs from Japan was in existence, the Department is properly reconsidering that review, pursuant to section 751(b)(1) of the Act, and rescinding the partial revocation of the order with respect to TKS.

In rescinding the revocation with respect to TKS, however, the Department is not unilaterally and prospectively reinstating the order on LNPPs from Japan. In reconsidering a sunset determination, as with any sunset review, the Department could report to the ITC a likelihood of continuation of dumping; however, the Department by itself cannot order a continuation of an

EXHIBIT 3



antidumping order without an affirmative injury finding by the ITC. See section 751(c) of the Act; Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc No. 103-316, vol. 1, at 879 (1994)(the Department determines whether the revocation of the order would lead to recurring or continuing dumping, but the ITC determines the likelihood of recurring or continuing injury). As discussed in Comment 3 below, TKS' egregious behavior and the resulting erroneous partial revocation of TKS from the order warrant reconsideration of the sunset review pursuant to section 751(c)(1) of the Act.

The Department has the authority to reconsider the sunset review for the same reason it has the authority to initiate this changed circumstances review: to protect the integrity of its proceedings. As discussed in the preliminary results and in Comment 3 below, TKS' flagrant misconduct during the 1997-1998 administrative review requires the Department to reconsider the sunset review it conducted when the order was in place, but when the Department was unaware of TKS' misconduct. While we recognize that other agencies in the U.S. government are also investigating TKS' misconduct, the Department has its own responsibility to defend the integrity of its past determinations and to ensure the integrity of its future proceedings.

Comment 3: *Department's Authority to Reconsider the Sunset Review which Resulted in Revocation of the Order*

Goss claims that the Department's determination that Goss' withdrawal from the sunset review and the subsequent revocation of the order resulted from TKS' fraud is supported by substantial evidence. In addition, Goss believes that the Department's use of an adverse facts available standard to conclude that TKS caused Goss to cease domestic production was appropriate, pointing out that neither respondent disputes that TKS' conduct in these reviews merits the application of adverse facts available. Moreover, Goss states that a major premise of TKS' argument that its actions cannot have hurt Goss severely is its assumption that the only actions at issue are those with respect to the DMN sale considered in the 1997-1998 administrative review. Goss claims that this premise disappears when the totality of the evidence is considered.

Goss further argues that the record does not support a conclusion that its difficulties were solely self-inflicted or the result of competition with respondents other than TKS. Goss claims that TKS and MHI ignore much of the evidence on the record linking Goss' 2001 bankruptcy and plant closure to injuries suffered from dumping, and instead focus on a small sample of self-selected evidence. Goss cites a number of examples in support of its contention that: (1) the documents placed on the record do not establish that Goss' problems with customers were uniquely damaging; (2) TKS' problems with its customers support a finding that such complaints are a normal occurrence in this industry; and (3) the record demonstrates that TKS was Goss' principal competitor during the 1997-2000 period.

Goss maintains that the Department has the inherent authority to reopen the sunset review to remove the taint of TKS' fraud. Goss cites Elkem Metals and Alberta Gas in support of its contention that administrative agencies have the inherent power to reconsider their own decisions. Goss argues that, contrary to TKS' assertion, the Department does not propose to

EXHIBIT 3



conduct a sunset review of a revoked order, but rather it is reconsidering the decision that led to the revocation of the order. According to Goss, it clearly demonstrated that it was interested in maintaining the LNPP antidumping duty orders on LNPPs by responding to the notice of initiation of the sunset review at both the Department and the ITC. Goss claims that had it not been forced by the closure of its manufacturing facility to withdraw from the proceedings, the agencies would have completed a full sunset review proceeding, as required by the statute. Goss argues that the case for agency reconsideration here is even more compelling than in the Elkem Metals and Alberta Gas cases because TKS' fraud undermined the integrity of the sunset reviews and led to an incorrect result - revocation of the order - rather than simply calling key factual findings into question.

With respect to the contemplated sunset review, Goss maintains that the Department should use its normal procedures to conduct this review, with the date on which the proceeding is reopened relating back to the original date of initiation of the sunset review. Goss also urges the Department to take into account TKS' continued dumping through all three administrative reviews.

TKS claims that the evidence cited by the Department does not support the assertion that TKS engaged in misconduct as to any transaction other than the DMN sale, and it is entirely implausible to assert that any connection existed between that transaction and Goss' closure of its U.S. production facilities five years later. TKS maintains that overwhelming evidence on the record demonstrates that Goss' injuries were self-inflicted (i.e., due to mismanagement, the debt burden created by a leveraged buy-out, its poor customer relations, and its increasing inability to provide the level of service required by customers) or caused by competition from LNPP producers other than TKS. TKS further states that TKS is almost never mentioned in documents describing these problems. Rather, according to TKS, competing producers are repeatedly cited by Goss as its main adversaries. TKS argues that this is not surprising because it had an insignificant share of the U.S. market compared to other producers viewed by Goss as presenting serious competitive threats.

In addition, TKS objects to Goss' assertion that TKS, and its one sale to an existing customer in 1996, was the cause of Goss' failure in the marketplace in the late 1990s and into 2001, arguing that there is no basis for Goss to claim that but for the loss of one sale in 1996, Goss would have been able to continue production and participate in the sunset review. TKS refutes cases cited by the Department and also cites numerous documents in support of its assertion that Goss' difficulties were due to production problems, inefficiencies, and poor management. TKS also cites numerous documents in support of its claim that these problems impacted customer relations. In a letter dated October 28, 2005, the NJMG also questions whether but for TKS' actions, Goss would have been able to continue production in the United States. NJMG argues that Goss filed for bankruptcy twice in the years before closing its Iowa facilities, leading to a serious decrease in customer confidence. In addition, according to NJMG, Goss had highly publicized problems with presses it sold to several newspapers, and is now primarily a non-U.S. producer with only limited production facilities in the United States.

TKS further argues that, contrary to Goss' position, the Department did not initiate a changed circumstances review to give Goss an opportunity to reargue issues from the administrative review, but to determine whether TKS was somehow responsible for Goss' closure of its U.S. production facilities and its withdrawal from the sunset review. According to TKS, Goss' arguments do not address this issue. TKS claims that even if the Department would have found dumping by TKS in each administrative review, as claimed by Goss, the antidumping duty order would still have been revoked after Goss terminated its domestic production because Goss' financial problems were due to its own failures. In a letter dated October 20, 2005, The Washington Post supports TKS' argument, stating that there is no solid evidence to support Goss' claim that "but for" the actions of TKS in the 1997-1998 administrative review, it would have been able to continue its domestic production through 2002, and, therefore, would have participated in the 2002 sunset review. The Washington Post maintains that Goss was in serious decline, having suffered from a change in ownership, the burden of substantial debt, and the loss of key technical and leadership personnel.

In addition, TKS claims that nowhere in Goss' briefs or exhibits is there any evidence to support the charge that TKS and its former counsel engaged in forgery or alteration of documents that were submitted to the Department. At most, according to TKS, in some cases TKS may not have submitted all of the documents requested in the Department's questionnaires. TKS maintains that the only purpose served by Goss' false accusations and misleading interpretations of the evidence is to obfuscate the actual issue at hand, which is whether TKS was responsible for the termination of Goss' domestic production and the revocation of the antidumping order. TKS contends that these unsupported allegations merit no greater consideration in the Department's final results.

With respect to the proposed new sunset review, TKS contends that it would be impossible for the Department to conduct such a proceeding in this case, in accordance with 19 CFR 351.218, because the order was revoked three years ago.

According to MHI, the Department has no basis to reconsider the final results of the 2002 sunset review because no one has identified any fraud that occurred in the sunset review that would justify reconsideration of the final results in that proceeding. MHI also agues that Goss fails to address the impracticality of having the Department conduct a "likelihood of continuation or recurrence of dumping" analysis in 2006 as though the date was 2002 and as though Goss had not shut its U.S. production facility and the order had not been revoked. In addition, MHI argues that the ITC would be required to attempt to assess injury to a U.S. industry for a period when there was no U.S. production. MHI further maintains that reinstating the Japanese order - and not the related German order - is arbitrary toward the non-fraudulent Japanese companies.

Moreover, MHI contends that the Department's conclusion that TKS' fraud in the 1997-1998 administrative review resulted in Goss' decision to close its U.S. manufacturing facilities is entirely speculative and wholly unsupported. First, according to MHI, the Department's analysis is identical to the type of injury analysis undertaken by the ITC, and is precisely the type of analysis the Department has repeatedly held it cannot make. Second, MHI argues that the record

evidence demonstrates that Goss' difficulties were entirely of its own making. MHI maintains that in light of all the evidence on the record, the Department cannot reasonably conclude that the actions of TKS with respect to a single sale in the 1997-1998 time period led to Goss' decision to close its U.S. manufacturing operations. Furthermore, MHI protests that an adverse assumption cannot be made with respect to MHI, as it has done nothing throughout the entire course of the proceeding to permit the application of adverse inferences. MHI contends that under any of these bases, the preliminary results cannot be sustained on the issue of reinstating the entire order against LNPPs from Japan. In addition, MHI argues that the record in this proceeding suggests that Goss may not be an actual producer of the domestic like product and, if so, the imposition of an antidumping duty order would serve no remedial purpose.

Finally, MHI argues that numerous options exist outside the antidumping law to penalize fraud in trade proceedings. According to MHI, such proceedings can be brought by the Department of Justice and/or U.S. Customs and Border Protection and would likely have an even more significant cautionary effect.

<u>The Department's Position</u>:

This review reveals a uniquely egregious display of misconduct by a respondent in an antidumping proceeding. As discussed in the initiation and preliminary results <u>Federal</u> <u>Register</u> notices, the evidence supports the conclusion that TKS deliberately embarked on a campaign to withhold and misrepresent material information specifically requested by the Department in the conduct of an antidumping duty proceeding. We reached this conclusion based on our own assessment of the evidence; moreover, two courts have also described the egregious nature of TKS' conduct. For example, a federal district court stated that:

> The jury further heard evidence at trial that TKS agreed to a fraudulent price increase and secret $ 2.2 million rebate to keep the DMN [Dallas Morning News] from purchasing the two towers from Goss in 1996. To make it appear to Goss that the 1996 sale was not dumped, TKS and the DMN agreed to increase the price on paper to $ 7.4 million. In exchange, TKS and the DMN agreed that TKS would secretly rebate $ 2.2 million to the DMN through a combination of $ 1 million in cash and a promise of $ 1.2 million in free digital ink pumps [DIPs] or credit to be delivered in the future.
>
> The jury was also presented with evidence that TKS and its counsel engaged in a concerted effort to conceal the secret rebates. Mr. Saito warned that putting the rebate in writing would be "incriminating" and that it should therefore be a verbal or "handshake deal." (PX 200). Even though he recognized that the agreement for free digital ink pumps was a direct <u>quid</u> <u>pro</u> <u>quo</u> for the phantom price increase, Mr. Saito told TKS that "there should be no apparent linkage between DIPs' give-away and the towers' price," and urged TKS (USA) to falsify its business records, stating that "TKS U.S.A.'s business records should carefully reflect that the DIPs were transferred to DMN as an inducement for DMN's future purchase of presses from TKS." (PX 197). There was also evidence presented at trial that TKS and its counsel attempted to destroy documents to conceal the secret rebates. For example, in May 1996, TKS executives in Japan told Mr. Saito that they had issued a standing order to TKS (USA) employees that all documents related to

EXHIBIT 3



> the DMN matter "should be disposed of whenever possible." (PX 199). When TKS employees committed the secret rebate agreement with the DMN to a signed, written agreement, TKS executives Mr. Morimoto and Takehiro Fukuyama stated that "there should not be such a document" and ordered that copies of the document "must be collected and destroyed." (PX 84, 86). Mr. Morimoto likewise instructed the DMN to destroy a memorandum documenting the secret rebate: "destroy this fax letter after you read it." (PX 154).

See Goss Int'l, as placed on the record of this review in the May 5, 2005, Memorandum to the File entitled "Transmittal of Federal Court Decision for Record."

A federal appellate court has also described the egregious nature of TKS' behavior:

> TKS attempted to cover up its dumping practices. Specifically, Goss presented evidence to the jury that TKS (1) knew it faced dumping problems because of its conduct; (2) made secret rebate deals with newspapers to conceal dumping issues; (3) tried to destroy or conceal evidence of its dumping practices; and (4) sought to avoid written agreements when trying to skirt antidumping laws. When this conduct is viewed in light of the evidence listed above, the jury reasonably could have concluded TKS knew it was engaging in unlawful conduct, but nevertheless continued to violate the antidumping laws in its desire to injure or destroy its enemy–Goss.

See Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft, No. 04-2604 at 23-24 (8th Cir. Jan. 23, 2006), as placed on the record of this review in the January 26, 2006, Memorandum to the File entitled "Transmittal of Eighth Circuit Court of Appeals Decision for Record."

While we emphasize that the federal court decisions quoted above refer to judgements pursuant to the Antidumping Act of 1916, and not pursuant to the Act, we cite them to illustrate TKS' egregious misconduct in an antidumping administrative review before the Department. TKS' actions in the 1997-1998 administrative review, as they are now understood, corrupt the original results of that review and, for the reasons discussed in the preliminary results, merit the application of an AFA rate for that review. In turn, restating the 1997-1998 rate to 59.67 percent removes one of the three zero rates TKS received that resulted in the revocation of the order with respect to TKS. Accordingly, that revocation is rescinded.

Goss argues that, but for TKS' misconduct in the 1997-1998 and subsequent reviews, it would not have been in a position that forced it to withdraw from the sunset review proceeding.
As discussed below under Comment 4, we do not reach the allegations of TKS fraud in the 1998-1999 and 1999-2000 reviews. However, whether or not TKS' misconduct in the 1997-1998 review was either the single most significant factor or a significant factor leading to Goss' withdrawal from the sunset review proceeding and thus the revocation of the order, is not the issue. Rather, TKS' misconduct in the 1997-1998 review was so egregious, and affected a key component of the margin calculation - U.S. price - that it substantially tainted the integrity of the proceeding. Accordingly, we find that TKS' actions may have significantly undermined the

integrity of the sunset review results, including the parties' decisions whether or not to participate in the sunset review.

The Department also has the affirmative obligation to defend the integrity of its proceedings for future purposes. The courts have held that agencies have the inherent authority to protect the integrity of their proceedings. See Alberta Gas, 650 F.2d at 13-14; Elkem Metals, 193 F. Supp. 2d at 1321. The CIT has stated that to "maintain trust in the fair execution of law by this nation's government, Commerce must. . . avoid even the appearance of bias or impropriety, to say nothing of hypocrisy." See Lincoln Gen. Insurance Co. v. United States, No. 03-00546, Slip. Op. 05-162 (CIT December 22, 2005)(citing NKF Engineering, Inc. v. United States, 805 F.2d 372 (Fed. Cir. 1986) (bidder disqualified to preserve the integrity of the procurement system)). Given the seriousness of TKS' misconduct, we find it reasonable to reconsider the sunset review to examine the likelihood of continued dumping, and to allow all parties an opportunity to participate. We find that such an examination is necessary now because TKS' misconduct in the 1997-1998 administrative review was so egregious that it renders the results of the subsequent sunset review unreliable.

Although the existence of any zero or *de minimis* margins in any segment of a proceeding does not automatically lead to a determination that there is no likelihood of continuation or recurrence of dumping in a sunset review, the Department does consider the history of the order, including the existence of dumping after the imposition of an order and sales below the cost of production. See section 752(c) of the Act; see also Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc No. 103-316, vol. 1, at 889-91 (1994). The Department was unaware that TKS had made false statements in the 1997-1998 review when it initiated the sunset review, and the Department erroneously revoked the order in part with respect to TKS based on that false information before the sunset review was concluded. See Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Japan: Final Results of Antidumping Duty Administrative Review and Revocation in Part, 67 FR 2190, 2192 (January 16, 2002)(revoking the order with respect to TKS); and Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Japan (A–588–837) and Germany (A–428–821): Notice of Final Results of Five-Year Sunset Reviews and Revocation of Antidumping Duty Orders, 67 FR 8522 (February 25, 2002) (revoking entire order) (2002 Sunset Review). Furthermore, Goss made its decision to withdraw from the sunset review after the Department made its erroneous preliminary determination revoking the order with respect to TKS. See Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Japan: Preliminary Determination To Rescind the Administrative Review, in Part, To Revoke the Order, in Part, and Results of Antidumping Duty Administrative Review, 66 FR 51379 (October 9, 2001); 2002 Sunset Review, 67 FR at 8522-23 (Goss withdrew on December 21, 2001)). Thus, decisions made during the course of the sunset review may have been based on false information, and the recent revelation of TKS' misconduct impugns the results of that sunset review.

TKS and MHI argue that Goss' withdrawal from the sunset review was not the result of TKS' misconduct, but rather for a variety of economic and commercial reasons unrelated to the antidumping duty proceeding. In our view, such claims are better evaluated in the context of a new proceeding involving all interested parties that will consider the ramifications of TKS' egregious conduct in the sunset review, a review that may have proceeded differently had such misconduct not taken place. Moreover, our determination in this regard is based on the broader concern of the damage TKS has done to the entire proceeding stemming from its misconduct in the 1997-1998 review. As a result, the Department will act to repair any damage by reconsidering the sunset review. In repairing the damage, reconsideration of the sunset review is not an adverse assumption against any party because all parties will have an opportunity to participate, and the Department intends to reconsider the sunset review.

Accordingly, within approximately 30 days of publication of these final results, the Department intends to initiate a proceeding to reconsider the results of the prior sunset review of LNPPs from Japan. In this proceeding, we will conduct a sunset review following the procedures outlined in section 751(c) of the Act and 19 CFR 351.218. As in a situation when a suspension agreement is terminated and an investigation is resumed, the Department will examine and collect information from the prior sunset review period. See, e.g., Final Determination of Sales at Less Than Fair Value: Uranium from the Republic of Kazakhstan, 64 FR 31179 (June 10, 1999). See also Fresh Tomatoes from Mexico: Notice of Intent to Terminate Suspension Agreement, Intent to Terminate the Five-Year Sunset Review, Intent to Resume Antidumping Investigation, and Request for Comments on the Use of Updated Information, 67 FR 43278 (June 27, 2002).

Comment 4: *Allegations of TKS' Misconduct in the 1998-1999 and 1999-2000 Administrative Reviews*

Although the Department addressed TKS' misconduct in the 1997-1998 review, Goss asserts that the Department must also consider Goss' allegations of TKS misconduct in the subsequent 1998-1999 and 1999-2000 reviews for the final results, which the Department did not address in the preliminary results. Goss contends that the information it provided in this review demonstrates TKS' intentional withholding of relevant information and submission of false information sufficient for the Department to revise TKS' margins in these two reviews from zero to the appropriate facts available rate.

Specifically, with respect to the 1998-1999 administrative review involving a single sale to the Columbus Dispatch, Goss contends that Goss deliberately withheld key information on a side agreement for installation of the press under review, and on TKS' sales negotiations for the sale. In turn, Goss asserts that these actions obstructed the Department's consideration of key methodological and calculation issues, including the analysis of the terms of sale. Accordingly, Goss contends that these actions impeded the Department's proper analysis of the sale, warranting the application of total adverse facts available for TKS in the 1998-1999 review.

EXHIBIT 3



With respect to the 1999-2000 administrative review, involving sales of additions to Dow Jones and the Atlanta Journal, Goss also argues that TKS withheld critical information from the Department and falsified other information. Specifically, Goss contends that TKS intentionally withheld sales negotiation documents for the Dow Jones sale in order to manipulate the Department's determination of the date of sale which, in turn, established the exchange rate used in the Department's margin calculations for that sale. Goss asserts that TKS provided false information concerning its list of "spare parts", as well as corresponding costs, to the Department in connection with the Atlanta Journal sale. In addition, Goss maintains that TKS withheld information on warranty and testing expenses, as well as final payment, associated with the Dow Jones sale. Goss argues that these deliberate attempts by TKS to obstruct the Department's review of these sales also warrant the application of total adverse facts available for TKS in this review.

In response, TKS asserts that Goss fails to show that the alleged omissions were in any way material to the results of the 1998-1999 administrative review or to the decision to revoke the order. TKS states that, in fact, the information it submitted for the record of that review disclosed that installation services for the Columbus Dispatch sale were provided by a third party and were excluded from the contract price. Although TKS acknowledges it did not mention its guarantee of third-party installation prices in its response, TKS contends that it did not incur any expenses for this guarantee and its failure to mention it does not warrant the application of AFA. Further, although TKS acknowledges a probable typographical error in a date cited in the sales negotiation documents, TKS asserts that Goss has failed to demonstrate that TKS provided any materially false information affecting the sales negotiations of the Columbus Dispatch sale.

With respect to Goss' allegations in the 1999-2000 administrative review, TKS argues that they are all unsupported by the evidence on the record. Specifically, TKS claims that it provided the relevant sales contract for the Dow Jones sale as the documents cited by Goss demonstrate that the parties were still negotiating terms up until the date of that contract, and that there is no evidence to support Goss' allegation that TKS intentionally altered or forged any document to manipulate the sale date in order to establish a more favorable exchange rate. With regard to the separate spare parts contract for the Atlanta Journal, TKS asserts that it properly reported all information it was required to report, noting that the scope of the order specifically excludes spare or replacement parts established separately from the LNPP sale. Finally, TKS argues that it fully disclosed to the Department that the final payment date for the Dow Jones sale had not been definitively determined as of its last response and that it had provided estimated data for purposes of the preliminary results.

<u>The Department's Position</u>:

Based on the information on the record of this review, we find no basis to conclude that TKS intentionally provided misinformation in the 1998-1999 and 1999-2000 administrative reviews at a level which warrants the recalculation of margins based on AFA. Goss contends that TKS either withheld or altered key information that, had TKS not done so, would have resulted in the

EXHIBIT 3



Department deciding the results of each sale differently than in the original review. We do not agree with that assessment.

As discussed in the preliminary results, the Department found clear and compelling evidence on the record of this changed circumstances review that TKS intentionally provided false and incomplete information in the context of its only sale in the 1997-1998 administrative review. During that administrative review, the Department specifically asked TKS whether or not it provided any discounts or rebates on its sale to the DMN. TKS stated clearly in its response that it provided no discounts or rebates. However, as the documents obtained in Goss Int'l and provided for this record demonstrate, TKS did, in fact, provide discounts and rebates to the DMN equal to a substantial percentage of the reported selling price determined and purposely did not disclose this relevant information to the Department. That is, based on an objective analysis of the available information, the Department concluded that TKS knowingly provided false information to the Department in response to a specific question, and made no attempt to correct it during the course of the proceeding. In addition, we note that a federal court jury in Goss Int'l arrived at the same conclusion. Furthermore, TKS has not even attempted to rebut this finding in the final results.

In contrast, Goss' arguments regarding the other TKS sales rest largely on its interpretation of subjective issues which, in turn, were based on the limited information Goss obtained from the court record of the Goss Int'l case and Goss submitted for this review. For example, Goss alleges that TKS provided incomplete information for determining the date of sale in two of the three sales covered by these reviews (i.e., the Columbus Dispatch and the Dow Jones sales), and had TKS been completely forthcoming, the Department would have determined a different date of sale and thus a different exchange rate to apply to the calculations.

Unlike the objective determination of whether or not TKS reported discounts and rebates on sales, the determination of the date of sale for a large, custom-built multi-million dollar product such as LNPPs may be more subjective. As we articulated in one of the administrative reviews,

> When defining the material terms of sale, the Department usually focuses on when the price and quantity for a particular product are set. See, e.g., Final Determination of Sales at Less Than Fair Value: Polyvinyl Alcohol from Taiwan, 61 FR 14064, 14067 (March 29, 1996). However, the Department makes determinations as to what constitutes the material terms of sale on a case-by-case basis. Thus, our practice with respect to the LNPP industry has been to consider the following terms of sale "essential" (i.e., having the ability to materially affect the net pricing of the product): specifications, price, payment terms, warranty terms, and installation requirements. See Notice of Final Determination of Sales at Less Than Fair Value: Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany, 61 FR 38166, 38182 (July 23, 1996)...

See Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Japan: Final Results Antidumping Duty Administrative Review, 66 FR

11555 (February 26, 2001) (1998-1999 Final Results), Issues and Decision Memorandum at Comment 2.

As the documents submitted for this review, as well as those submitted during the original investigation (See Notice of Antidumping Duty Order and Amended Final Determination of Sales at Less Than Fair Value: Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Japan, 61 FR 46621 (September 4, 1996) (LTFV investigation)) and the subsequent administrative reviews show, sales negotiations often take several months and involve numerous sales terms. Several proposals and contracts may be drafted before the parties appear to agree on key terms of sale. Even then, certain details may be open and thus, there is room for interpretation and difference of opinion as to when the essential terms of sale have been established. Thus, even for sales where no misconduct has been alleged, the petitioner and respondent MHI have interpreted differently with respect to the date of sale determination the sales documents submitted, requiring the Department to adjudicate this issue. See, e.g., 1998-1999 Final Results, and LTFV Investigation at 38159.

We note that, in the proprietary version of its submissions and briefs in this review, Goss may have raised some reasonable questions regarding the sales negotiations and whether all relevant documents were submitted during the appropriate review. At the same time, TKS has provided reasonable explanations in response. Accordingly, and based on our analysis of the available information, we cannot conclude the TKS intentionally withheld material information concerning the date of sale for these two transactions. Therefore, we find no grounds to recalculate the margins based on these allegations.

With respect to the third-party installation services associated with the Columbus Dispatch sale, we agree with TKS that Goss has failed to demonstrate that TKS withheld material information. As TKS noted, it reported the essential information regarding these services during the review. Goss' argument appears to suggest that TKS' alleged omission would have impacted the date-of-sale determination. However, the only information that appears to have been omitted in this regard is the TKS guarantee of the third-party installation. Under the date-of-sale methodology outlined above, it does not appear likely that this particular aspect of LNPP installation would rise to the level of an essential term of sale, nor is there any evidence that TKS incurred any unreported expenses under this guarantee.

With respect to the spare parts associated with the Atlanta Journal sale, we find no indication of intentional misinformation by TKS. As TKS notes in its rebuttal brief, it disclosed the pertinent information concerning its spare parts arrangements with its customer. Goss may argue with the Department's treatment of this information under the scope of the review and in that administrative review, but the Department's failure to accept Goss' position does not result in a finding of misconduct by TKS.

Finally, we do not agree that TKS intentionally withheld information concerning outstanding payments and testing expenses associated with the Dow Jones sale. As TKS indicates, at the

time of the last response and the Department's verification in Japan, it had disclosed that these items had not been finalized, and thus reported information based on estimates. The Department accepted this information for the preliminary results. The Department normally does not accept new factual data after the preliminary results of an administrative review unless it specifically requests this information. The Department did not request TKS to submit any further factual information after the preliminary results. That is, we cannot conclude that TKS intentionally withheld relevant information in this area because the Department did not request TKS to provide this information before the final results. Accordingly, there is no basis to reconsider the Department's margin calculation for the Dow Jones sale for this alleged misconduct.

As discussed above, the information on the record of this changed circumstances review does not provide definitive evidence of TKS misconduct in the 1998-1999 and 1999-2000 administrative reviews, unlike the situation in the 1997-1998 review, which provides clear and compelling evidence of TKS' deception. Nevertheless, as discussed in Comment 3, above, TKS' behavior in the 1997-1998 review casts doubt on the integrity of all the information provided in the entire proceeding. If we were to obtain clear and compelling information concerning TKS' misconduct with respect to the 1998-1999 and 1999-2000 reviews, we may reexamine TKS' sales in those reviews at that time.

Comment 5: *Adverse Facts Available Rate Applied to TKS*

In the preliminary results, the Department determined that, because TKS provided false and incomplete information in the context of its only sale in the 1997-1998 administrative review in which the calculated rate was zero, a new antidumping duty rate for the 1997-1998 review should be applied based on AFA, in accordance with section 776(b) of the Act. As AFA, the Department applied the highest calculated rate from the case, 59.67 percent, which is the rate calculated for MHI in the LTFV investigation, as amended and recalculated pursuant to a remand redetermination. See Notice of Court Decision: Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Japan, 65 FR 31879 (May 19, 2000) (Redetermination on Remand aff'd Mitsubishi Heavy Indus., Ltd. v. United States, 275 F.3d 1056 (Fed. Cir. 2001)).

Goss argues that the AFA rate of 59.67 percent selected by the Department in the preliminary results is not sufficiently adverse to serve the deterrent purpose of AFA, given the alleged pattern of false statements and deliberate material omissions in the 1998-1999 and 1999-2000 administrative reviews as well as the 1997-1998 review. Goss contends that the AFA rate should be revised to a higher rate, the highest non-aberrational rate calculated by the Department for a single sale by TKS during the LTFV investigation[1] because, according to Goss, it is more

[1] The margin calculated for this sale in the LTFV investigation was not placed on the public record of the LTFV investigation and thus must be considered proprietary information. As this single-sale margin was calculated based on TKS' proprietary information, Goss cannot place this margin percentage on the public record and TKS has not withdrawn its underlying request for proprietary treatment of this information.

EXHIBIT 3



indicative of TKS' business practices because it is based on an actual sale by TKS, rather than a weighted average of sales by MHI. Goss asserts that this rate should be applied not only to TKS' sales in the 1997-1998 administrative review, but also to TKS' sales in the 1998-1999 and 1999-2000 administrative reviews.

Neither TKS nor MHI commented on this issue.

The Department's Position:

We find no basis to conclude that the AFA rate selected is not sufficiently adverse to apply to TKS' sale in the 1997-1998 administrative review. As we discussed in detail in the September 6, 2005, Memorandum to the File entitled "AFA Rate Selection" (AFA Rate Memo), we selected this rate because it meets the requirements of section 776(b) and (c) of the Act for obtaining a rate derived from the petition, the final determination from the LTFV investigation, a previous administrative review, or any other information placed on the record, and for applying a rate that is corroborated, to the extent practicable, from independent sources reasonably at the Department's disposal. The selection of the 59.67 percent rate, the highest rate calculated in any segment of the antidumping duty proceeding, is fully consistent with our practice of finding a rate that is sufficiently adverse and also satisfies the corroboration requirement. See, e.g., Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews, 70 FR 54711, 54712 (September 16, 2005), and Certain Preserved Mushrooms From India: Final Results of Antidumping Duty Administrative Review, 67 FR 46172 (July 12, 2002), Issues and Decision Memorandum at Comment 8.

The Department's purpose when selecting an adverse rate from among the possible sources of information is to ensure that the margin is sufficiently adverse "as to effectuate the purpose of the facts available rule to induce respondents to provide the Department with complete and accurate information in a timely manner." See Notice of Final Determination of Sales at Less than Fair Value: Static Random Access Memory Semiconductors from Taiwan, 63 FR 8909, 8932 (February 23, 1998). As we stated in the AFA Rate Memo, when compared to the range of other margins throughout the history of the LNPP proceeding, including TKS' LTFV rate of 51.97 percent and the zero rate it received in three administrative reviews, we find that a 59.67 percent rate is sufficiently adverse. Goss has offered no evidence to support its assertion that the 59.67 percent rate is not sufficiently adverse.

Finally, we continue to apply the AFA rate only to TKS' sale in the 1997-1998 administrative review. As detailed above under Comment 4, we disagree with Goss that there are grounds to recalculate TKS' margins in the 1998-1999 and 1999-2000 administrative reviews at this time. Consequently, there is no basis to apply AFA in those reviews.

RECOMMENDATION

Based on our analysis of the comments received, we recommend adopting the above positions. If this recommendation is accepted, we will publish the final results of this changed circumstances review in the Federal Register.

Agree ______ Disagree ______

_________________________
David M. Spooner
Assistant Secretary
for Import Administration

_________________________
(Date)